# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

ARNOLD WANDEL, Derivatively on Behalf of
CABLEVISION SYSTEMS CORPORATION,

        Plaintiff,

v.                  (S.I.)

CHARLES D. FERRIS, RICHARD H.
HOCHMAN, VICTOR ORISTANO, THOMAS
V. REIFENHEISER, JOHN R. RYAN,
VINCENT TESE, RAND V. ARASKOG,
FRANK J. BIONDI, CHARLES F. DOLAN,
JAMES L. DOLAN, MARIANNE DOLAN
WEBER, PATRICK F. DOLAN, BRIAN G.
SWEENEY,THOMAS C. DOLAN, WILLIAM
BELL, ROBERT LEMLE, SHEILA MAHONY,
JOHN MALONE, LEO J. HINDERY, JR.,
ANDREW ROSENGARD and LEONARD
TOW,

        Defendants,

and

CABLEVISION SYSTEMS CORPORATION,
a NEW YORK corporation,

        Nominal Defendant.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

☆   AUG 1 8 2006   ☆

LONG ISLAND OFFICE

Case No.

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS AND STATE
LAW CLAIMS FOR BREACH OF
FIDUCIARY DUTY, CORPORATE
WASTE, UNJUST ENRICHMENT,
AND GROSS MISMANAGEMENT**

TRAGER, J.

TOMLINSON, M

Plaintiff, by his attorneys, submits this Verified Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of Nominal Defendant Cablevision Systems Corporation ("Cablevision" or the "Company") against certain current and former members of its Board of Directors (the

"Board") seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment.

2.      The claims asserted herein arise under federal securities law, and state law for breach of fiduciary duty, unjust enrichment, gross mismanagement, and corporate waste.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this Complaint states a federal question.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

4.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendant's primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

5.      Plaintiff Arnold Wandel is, and was at all relevant times, a shareholder of Nominal Defendant Cablevision.

6.      Nominal Defendant Cablevision is a Delaware corporation which was organized in 1997 with its principal executive offices located at 1111 Stewart Avenue, Bethpage,   NY.      Cablevision   operates   as   a   media,   entertainment,   and

telecommunications company in the United States.  It operates in three segments: Telecommunications Services; Rainbow; and Madison Square Garden.  The Telecommunications Services segment operates cable television business, including basic video, interactive digital video, high-speed data, voice over Internet protocol (VoIP), and residential telephone services operations.  The Rainbow segment consists principally of interests in national and regional programming networks, the Madison Square Garden sports, and entertainment businesses, as well as cable television advertising sales companies.  The Madison Square Garden segment owns and operates professional sports teams and operates sports and entertainment venues.  As of April 17, 2006, the Company has 289,912,176 shares of common stock outstanding.

7.      Defendant Charles D. Ferris ("Ferris") has served as a Director since 1985.    Defendant Ferris is a partner in the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. which provides legal services to the Company, and certain of its subsidiaries.    During the relevant period, Ferris participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

8.      Defendant Richard H. Hochman ("Hochman") has served as a Director since 1986.    Hochman also serves on the Company's Audit and Executive Committees and is Chairman of the Company's Compensation Committee.  During the relevant period, Hochman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

9.     Defendant Victor Oristano ("Oristano") has served as a Director since 1985.  Oristano also serves on the Company's Audit Committee. During the relevant period, Oristano participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

10.     Defendant Thomas V. Reifenheiser ("Reifenheiser") has served as a Director since 2002.  Reifenheiser also serves as the Chairman of the Company's Audit Committee.  During the relevant period, Reifenheiser participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

11.     Defendant John R. Ryan ("Ryan") has served as a Director since 2002.  Ryan also serves on the Company's Audit and Compensation Committee.  During the relevant period, Ryan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

12.     Defendant Vincent Tese ("Tese") has served as a Director since 1996.  Tese also serves on the Company's Audit and Compensation Committee.  During the relevant period, Tese participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

13.     Defendant Rand V. Araskog ("Araskog") has served as a Director since March 2005.  During the relevant period, Araskog participated in the issuance of false

and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

14.     Defendant Charles Dolan ("C. Dolan") has served as a Director and Chairman of the Company since 1985.  C. Dolan also served as the Chief Executive Officer of the Company from 1985 to October 1995.  C. Dolan also founded and acted as the General Partner of the Company's predecessor from 1973 until 1985.  C. Dolan is the father of Defendants James L. Dolan, Patrick F. Dolan, Marianne Dolan Weber and Thomas C. Dolan.  C. Dolan is also the father-in-law of Brian G. Sweeney. During the relevant period, C. Dolan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

15.     Defendant James L. Dolan ("J. Dolan") has served as a Director since 1991, President of the Company since June 1998 and Chief Executive Officer ("CEO") since October 1995.  J. Dolan also served as Vice President of the Company from 1987 to September 1992.  J. Dolan is the son of Defendant Charles F. Dolan and the brother of Defendants Patrick F. Dolan, Marianne Dolan Weber and Thomas C. Dolan and brother-in-law of Defendant Brian G. Sweeney.     J. Dolan also serves as the Chairman of the Company's Executive Committee.  During the relevant period, J. Dolan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

16.     Defendant Marianne Dolan Weber ("Weber") has served as a Director since 2005.  Weber is the daughter of Defendant C. Dolan, the sister of Defendants J. Dolan, Patrick F. Dolan and Thomas C. Dolan and the sister-in-law of Defendant Brian

G. Sweeney. During the relevant period, Weber participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

17.   Defendant Patrick F. Dolan ("P. Dolan") has served as a Director since August 1991.   P. Dolan is the son of Defendant C. Dolan and the brother of Defendants J. Dolan, Weber, Thomas C. Dolan and the brother-in-law of Defendant Brian G. Sweeney.   During the relevant period, P. Dolan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

18.   Defendant Brian G. Sweeney ("Sweeney") has served as a Director since March 2005.   He also has served as Senior Vice President eMedia since January 2000.   Defendant Sweeney is the son-in-law of Defendant C. Dolan and brother-in-law of Defendants J. Dolan, P. Dolan, Weber and Thomas C. Dolan. During the relevant period, Sweeney participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

19.   Defendant Leonard Tow ("Tow") has served as a Director since March 2005.   During the relevant period, Tow participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

20.   Defendant Thomas C. Dolan ("T. Dolan") served as a Director from March 1998 to May 2005.  T. Dolan has also served as Executive Vice President and Chief Information Officer of the Company since October 2001 and also as Senior Vice

President and Chief Information Officer of the Company from February 1996 to October 2001. T. Dolan is the son of Defendant C. Dolan and brother of Defendants P. Dolan, J. Dolan and Weber. T. Dolan is also the brother-in-law of Defendant Sweeney. During the relevant period, T. Dolan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

21. Defendant William Bell ("Bell") served as a Director and Vice Chairman of the Company from 1985 to March 2, 2005. During the relevant period, Bell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

22. Defendant Robert Lemle ("Lemle") served as the former Vice Chairman and Secretary of the Company and general counsel from 1986. Lemle resigned his position as general counsel on December 17, 2002. During the relevant period, Lemle participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

23. Defendant Sheila Mahony ("Mahony") served as a Director from 1998 to March 2, 2005. She also served as Executive Vice President, Communications, Government and Public Affairs of the Company from April 1999 to March 2004. During the relevant period, Mahony participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

24. Defendant John Malone ("Malone") served as a Director during the relevant time period until June 2005. During the relevant period, Malone participated

in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

25.     Defendant Leo J. Hindery, Jr. ("Hindery") served as a Director from 1998 through the relevant period.  During the relevant period, Hindery participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

26.     Defendant Andrew Rosengard ("Rosengard") served during the relevant period as the Executive Vice President and Financial Planning Controller.  During the relevant period, Rosengard participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

27.     Defendant Frank J. Biondi ("Biondi") has served as a Director since March 2005.  During the relevant period, Biondi participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

28.     Defendants identified in ¶¶7-21, 23-25, 27 are referred to as the "Director Defendants."  Defendants identified in ¶¶14-15, 21-22 and 26 are referred to as the "Officer Defendants."  Defendants identified in ¶¶15, 17-18 are referred to as the "Insider Selling Defendants."  Defendants identified in ¶¶ 8-12 are referred to as the "Committee Defendants."  Collectively, the Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE **INDIVIDUAL DEFENDANTS**

29.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  These acts include: 1) agreement to and/or acquiescence in Defendants' option backdating scheme; 2) willingness to cause Cablevision to disseminate false Proxy Statements from 1997-2002, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Cablevision, each of the Defendants were aware of these wrongful acts, had access to adverse non-public

information and was required to disclose these facts promptly and accurately to Cablevision shareholders and the financial markets but failed to do so.

31.    Pursuant to Section 162(m) of the Tax Code, 26 U.S.C.§ 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: 1) the compensation is payable solely on account of the attainment of one or more performance goals; 2) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, 3) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and 4) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

32.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

  a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

  b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.   exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company; and

d.   exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

e.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

33.   The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, the Individual Defendants were required to:

(1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)   transactions are executed in accordance with management's general or specific authorization;

(b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

34.   Cablevision's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.    Review the company's Forms 10-Q, 10-K, and where appropriate, registration statements under the Securities Act of 1933 prior to filing with the SEC and discuss with management and the independent auditors; and

b.    Review the company's quarterly and annual financial statements, including any report or opinion by the independent auditors, prior to distribution to the public or filing with the SEC.

## FACTUAL ALLEGATIONS

35.    Throughout the relevant period, Defendants caused Cablevision to grant them millions of stock options permitting them to buy Cablevision stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future. Companies usually set that price at the same time their directors approve an option grant, with an exercise price -- also known as the "strike price."  The strike price is usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

36.    Company filings show that more than 1.9 million options were granted from 1997 to 2002 to Defendants J. Dolan, Lemle, Bell, and non-defendant Mark Lustgarten, who is now deceased.

37.    At all times relevant hereto, certain of the Company's egregious stock option grants are described below:

a.    On April 17, 1997, more than 60 percent of the 1.9 million options were granted during this time.  Shares were trading at a quarterly low of $7.13, adjusted for splits.  After April 17, the shares rose sharply, closing the quarter at $11.39.  On June 9, the Company announced that it would buy ten (10) cable systems.   The Company's stock rose 38 percent that day and the next.  By the end of 1997, the sock had risen to $19.52.    During this time, Defendant Bell received 350,000; Defendant Lemle received

287,600 options, and Defendant Rosengard received 70,000 options.

b.      On May 29, 1998, the Board gave J. Dolan 60,000 options at a split adjusted price of $27.69 a share.  By the end of that year, the Company's stock had risen substantially from that price.

c.      During 1999, the Company handed out the second-largest batch of options.  These option grants were made on August 2, 1999, when the stock was at $57.34 a share, its low for the quarter.  The stock closed this year at $64.13.  Defendant J. Dolan received 240,000 options, Defendant Bell received 200,000 options, Defendant Lemle received 150,000 options and Defendant Rosengard received 150,000 options.

38.      Defendants' option grants were egregious, not only due to the size of the grants but due to the failure to include the supposed grants in Form 4s filed by the Defendants in the months after the purported grant dates.  These grants were dated on the dates which were at the low of the months in which the options were granted.  That these options were backdated is shown not only by the fact that Form 4s filed by the respective officers did not mention the grants until months after the supposed grants, but also by the fact that the officers filed Form 4s subsequent to the purported grant dates without mentioning these supposed grants.

39.      Each of these grants was not reported in Form 4s by these officers until months after the supposed grant date, despite requirements under §403 of the Sarbanes-Oxley Act requiring that changes in ownership be reported within two days:

40.      The delayed reporting clearly demonstrates Defendants were backdating the options.

41.      During the relevant period, Cablevision's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting were

grossly inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated. They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

42.     Specifically, in many instances the reported dates Cablevision stock options were granted differed from the dates on which the options appear to have been actually granted. The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose. In almost every case of misdating, the price of Company's shares on the reported option-grant date was lower than the share price on the actual day the options were issued.

43.     Specifically, since 2001, Defendants have caused the Company to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings (or understated its losses). Pursuant to the terms of the Company's stock option plans, the exercise price of options must be no less than the closing price of Cablevision stock on the date of grant.

44.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

45.    In a striking pattern that could not have been the result of chance, nearly each and every one of the foregoing stock option grants was dated just before a substantial rise in Cablevision's stock price.  In addition, with the exception of a few option grants, each of the dates selected was at the lowest price level during the trading week in which the options were granted.

46.    At the behest of the Officer Defendants, the Compensation Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Cablevision stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

47.    Further, during the Relevant Period and while in possession of material undisclosed information, Defendants engaged in insider stock sales that occurred within the Relevant Period are set forth below:

| Defendant | Shares Sold | Proceeds |
|---|---|---|
| Sweeney | 6368 | $174674.24 |
| J. Dolan | 114,468 | $2,212,247.00 |
| P. Dolan | 45,310 | $ 1,212,533.00 |
| **TOTAL:** | **166146** | **$3,599,454.24** |

## DISSEMINATION OF FALSE AND MISLEADING FINANCIAL STATEMENTS

48.     As a result of the improper backdating of stock options, the Company, with

the knowledge, approval, and participation of each of the Individual Defendants,

> a.      violated the terms of the Company's shareholder-approved stock
> option plans;
>
> b.      violated GAAP by failing to recognize compensation expenses
> incurred when the improperly backdated options were granted;
>
> c.      violated Section 162(m) by taking tax deductions based on stock
> option grants that were not payable solely on account of the
> attainment of one or more performance goals and violated the
> terms of the Company's shareholder-approved stock option plans;
> and
>
> d.      produced and disseminated to Cablevision shareholders and the
> market false financial statements that improperly recorded and
> accounted for the backdated option grants.

49.     The Company, with the knowledge, approval, and participation of each of

the Individual Defendants, disseminated its false financial statements in, *inter alia*, the

following Form 10-K filings:

> a.      On or about March 31, 1998, the Company filed its Form 10-K
> with the SEC for Fiscal year ended 12/31/97.  The Fiscal 1997
> Form 10-K was simultaneously distributed to shareholders and
> the public.  The fiscal 1997 Form 10-K included Cablevision's
> Fiscal 1997 financial statements which were materially false and
> misleading and presented in violation of GAAP, due to its
> improper accounting for the backdated stock options. As a result,
> Cablevision's compensation expense was understated and its net
> earnings were overstated.
>
> b.      On or about March 31, 1999, the Company filed its Form 10-K
> with the SEC for Fiscal year ended 12/31/98.  The Fiscal 1998
> Form 10-K was simultaneously distributed to shareholders and
> the public.  The Fiscal 1998 Form 10-K included Cablevision's
> Fiscal 1998 financial statements which were materially false and
> misleading and presented in violation of GAAP, due to improper
> accounting for the backdated stock options.  As a result,
> Cablevision's compensation expense was understated and its net
> earnings were overstated.

c.   On or about March 30, 2000, the Company filed its Form 10-K with the SEC for Fiscal year ended 12/31/99.  The Fiscal 1999 Form 10-K was simultaneously distributed to shareholders and the public.  The Fiscal 1999 Form 10-K included Cablevision's Fiscal 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Cablevision's compensation expense was understated and its net earnings were overstated.

d.   On or about March 30, 2001 the Company filed its Form 10-K with the SEC for Fiscal year ended 12/31/00.  The Fiscal 2000 Form 10-K was simultaneously distributed to shareholders and the public.  The Fiscal 2000 Form 10-K included Cablevision's Fiscal 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Cablevision's compensation expense was understated and its net earnings were overstated.

e.   On or about April 1, 2002, the Company filed its Form 10-K with the SEC for Fiscal year ended 12/31/01.  The Fiscal 2001 Form 10-K was simultaneously distributed to shareholders and the public.  The Fiscal 2001 Form 10-K included Cablevision's Fiscal 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Cablevision's compensation expense was understated and its net earnings were overstated.

f.   On or about March 31, 2003, the Company files its Form 10-K with the SEC for Fiscal year ended 12/31/2002.  The Fiscal 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The Fiscal 2002 Form 10-K included Cablevision's fiscal 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Cablevision's compensation expense was understated and its net earnings were overstated.

50.   The materially false and misleading Fiscal 1998-2002 Form 10-Ks described above were reviewed, prepared and/or endorsed by the Defendants.  The Form 10-Ks were signed by the Defendants.

51.    Furthermore, from 1997 to 2002, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating:

      a.    disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants; and

      b.    filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to the Officer Defendants.

52.    The 1997-2002 Proxy Statements concealed Defendants' option backdating scheme.    Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1997 and 2002. Defendants have been unjustly enriched at the expense of Cablevision, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

53.    On August 16, 2006, the Company released the following press release:

<u>Option and SAR Matters</u>

On August 8, 2006, Cablevision Systems Corporation (the "Company") and CSC Holdings, Inc. filed a Current Report on Form 8-K disclosing that as a result of a voluntary, ongoing review they had determined that the date and exercise price assigned to a number of its stock options and SAR grants during the 1997-2002 period did not correspond to the actual grant date and the closing price of the Company's common stock on that day.

As noted in the Company's August 8, 2006 Form 8-K, the Company contacted the Securities and Exchange Commission ("SEC") and the U.S. Attorney's Office for the Eastern District of New York concerning the option and SAR review. The Company has since been informed that the SEC and the U.S. Attorney's Office are each conducting an investigation into these matters. The Company intends to fully cooperate with these investigations.

59.    On Aug 17, the New York Times published the following article regarding the Company's stock options.  The article stated in relevant part:

### Cablevision Says Stock Options Are Being Investigated

<u>Cablevision</u> Systems said yesterday that federal prosecutors and regulators were investigating its stock options grants, a week after the company disclosed some discrepancies in the dating of the grants.

Last week, the company delayed stating its second-quarter results and said it might have to restate prior financial reports because an internal review had found the dates and exercise prices assigned to a number of options grants from 1997 to 2002 did not correspond to the actual grant dates.

Cablevision, based in Bethpage, N.Y., is the first cable company to be involved in a widening government investigation into whether companies have inappropriately manipulated the timing of their stock option grants to maximize returns to executives.

Cablevision said the Securities and Exchange Commission and the United States attorney for the Eastern District of New York were conducting separate investigations into the company's stock options practices.

***

It added that there might be similar additional lawsuits filed, including class actions and additional derivative actions, in federal or state court, concerning options-related matters.

The company's shares closed up 70 cents, to $22.90.

*****

The company, based in Mountain View, Calif., said it did not anticipate any restatement of its financial statements, based on the findings of the review conducted by a special committee composed of independent members of its board.

The primary scope of that review covered the period from Aug. 1, 1997, to the present, the company said.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

54.   The Officer Defendants breached their fiduciary duties by:

  a.   colluding with the Director Defendants to backdate stock option grants;

  b.   colluding with the Director Defendants to violate GAAP;

  c.   colluding with the Director Defendants to violate GAAP and Section 162(m);

  d.   colluding with the Director Defendants to produce and disseminate to Cablevision shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

  e.   colluding with the Director Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

55.   The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

56.   The Committee Defendants breached their fiduciary duties by:

  a.   colluding with the Officer Defendants to backdate stock option grants;

  b.   colluding with the Officer Defendants to violate GAAP and Section 162(m);

  c.   colluding with the Officer Defendants to produce and disseminate to Cablevision shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

  d.   colluding with the Officer Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

57.     The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

58.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of options, costs and expenses incurred connection with the Company's restatement of historical financial statements, and costs and expenses incurred in connection with the SEC's investigation of the Company.

## DEMAND WOULD BE FUTILE

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties and unjust enrichment.

60.     Plaintiff is an owner of Cablevision common stock and was an owner of Cablevision common stock at all times relevant hereto.

61.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

62.     As a result of the facts set forth herein, plaintiff has not made any demand on the Cablevision Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

63.   The Board currently consists of fourteen (14) directors: Defendants Ferris, Hochman, Oristano, Reifenheiser, Ryan, Tese, Araskog, Biondi, C. Dolan, J. Dolan, Weber, P. Dolan, Sweeney, and Tow.   The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.   Since 1995, Defendant C. Dolan, the Company's Chairman has had a personal investment in Regent Equity Partners, a limited partnership in which Defendant Hochman is one of the general partners.  Due to Defendant C. Dolan and Defendant Hochman's interrelated business transactions, demand on them is futile. Accordingly, Defendant C. Dolan and Defendant Hochman are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against themselves and the other defendants.

b.   Since 1999, Defendant C. Dolan has had a personal preferred stock investment in Danskin Inc.  Defendant Hochman's spouse has served as the Chief Executive Officer of Danskin Inc. since May 1999.  Defendant Hochman, his spouse and Regen Equity Partners have had a substantial direct or indirect equity investment in Danskin Inc. since 1997.  As of December 31, 2005, Defendant Hochman and his wife, collectively, and Defendant C. Dolan owned, directly or indirectly, approximately 11% and 6% respectively, of the common equity of Danskin Inc. calculated on a fully diluted, as converted basis.  Based on Defendant C. Dolan and Defendant Hochman's interrelated business relationships, demand on them is futile.

c.   Since 2004, Defendant C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company, in which Alda Limited Partners, a holding company of which Defendant Oristano is the Founder and Chairman, has an investment.  Defendant Oristano's son, Matthew Oristano, serves as the President and Chief Executive Officer of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004.   Due to Defendants C. Dolan and Defendant Oristano's interrelated business relationships, demand on them is futile.

d.   Since 2005, Charles Tese, the brother of Defendant Tese, has been employed by Madison Square Garden, L.P., a subsidiary of

the Company.   Due to Defendant Tese's interrelated familial relationships demand on Defendant Tese is futile.

e.    Defendant Ferris is a partner in the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., which provides legal services to the Company, and certain of its subsidiaries.   Due to Defendant Ferris' interrelated business relationships, demand on Defendant Ferris is futile.

f.    As the Company's Senior Vice President eMedia, Defendant Sweeney is considered an employee of the company.   Defendant Sweeny earned a base salary of $555,988 and a bonus $346,000 in 2005.   Since Defendant Sweeney is beholden to the Company due to his employment, demand on Defendant Sweeney is futile.

g.    Defendant Sweeney is the son-in-law of Defendant C. Dolan and the brother-in-law of Defendants J. Dolan, P. Dolan, and Weber. Sweeney is also the brother in law of non-defendant Thomas C. Dolan, the Company's Executive Vice President and Chief Information Officer.

h.    Rosemary E. Aigner is employed by the Company as an executive secretary. Ms. Aigner is the mother-in-law of Defendant J. Dolan.   Due to Defendant J. Dolan's interrelated familial ties within the Company, demand on J. Dolan is futile.

i.    Kristin Aigner Dolan is a Senior Vice President-Business Strategy of Madison Square Garden Entertainment, a subsidiary of the Company.   Kristin Dolan is the spouse of Defendant J. Dolan, the daughter-in-law of Defendant C. Dolan and the sister-in-law of Defendant P. Dolan, and Defendant Weber.   Due to Defendant J. Dolan, C. Dolan, P. Dolan and Weber's interrelated familial ties within the Company, demand on them is futile.

j.    Edward Atwood is a Vice President Multimedia of the Company. Mr. Atwood is the brother-in-law of Defendant Charles F. Dolan. Due to Defendant C. Dolan's interrelated familial ties within the Company, demand on Defendant C. Dolan is futile.

k.    Defendant J. Dolan has an outstanding $3 million interest free loan from the Company that were made in 2000 under the terms of seven-year awards they received under the Long Term Incentive Plan. Due to Defendant J. Dolan's interrelated business loan with the Company, demand on Defendant J. Dolan is futile.

l.      The Company holds a 49.9% voting interest and certain preferential distribution rights in Northcoast Communications, a wireless personal communications services ("PCS") provided that held licenses to provide service in certain markets. Northcoast Communications is controlled by John Dolan, the nephew of Defendant C. Dolan and the cousin of Defendant J. Dolan. Due to Defendants C. Dolan and J. Dolan interrelated business transactions and interrelated familial ties with the Company, demand on them is futile.

m.      The Company previously subleased an aircraft to an entity owned by Defendant C. Dolan ("Dolan entity"). That sublease terminated on December 14, 2004; however, during the term of the sublease the Company had the right, through an "interchange agreement," to use the aircraft subleased by the Dolan entity and the Dolan entity had the right to use a similar aircraft leased by the Company from an unrelated third party. The Dolan entity reimbursed the Company $11,883.00 for aircraft expense with differentials with respect to hours used during 2005 under the extended interchange agreement. As of December 31, 2005, the extended interchange agreement was still in effect. Due to Defendant C. Dolan's interrelated business transactions with the Company, demand on him is futile.

n.      The Company has time sharing agreements with an entity owned by Charles F. Dolan pursuant to which that entity may use helicopters owned by the Company and reimburse the Company for the usage. That entity paid the Company approximately $5,600.00 for usage of the helicopters in 2005. The Company has an aircraft lease agreement with an entity owned by Defendant P. Dolan pursuant to which the Company may lease a helicopter owned by that entity and an aircraft lease agreement with an entity owned by Defendants C. Dolan and P. Dolan. The Company also leases excess hangar space to an entity owned by Defendant C. Dolan for a monthly fee. Due to Defendants C. Dolan and P. Dolan's interrelated business transactions, demand on them is futile.

o.      The Company produces certain cable television programming content for a subsidiary of the Company by a production company, which is owned by members of the Dolan family, including Defendants C. Dolan and J. Dolan. Due to Defendant C. Dolan and J. Dolan's interrelated business transactions, demand on them is futile

p.  Fox Sports Net Ohio ("Fox Sports"), a regional sports network and News Corporation restructured their ownership interests in Regional Programming Partners (a subsidiary of Rainbow Media Holdings LLC), and Cleveland Indians Baseball Club Limited Partnership (the "Indians") are parties to a multi-year rights agreement under which Fox Sports pays license fees to the Indians in exchange for telecast rights to substantially all Indians' games. The Indians are owned by Lawrence Dolan, a brother of Defendant C. Dolan; a trust, the beneficiaries of which are Lawrence Dolan and certain descendants of Lawrence Dolan; and certain other trusts, the beneficiaries of which are certain descendants of Defendant C. Dolan, including Defendants J. Dolan, Thomas, Weber and P. Dolan; and a trust whose discretionary beneficiaries include Defendant Sweeney, the son-in-law of Defendant C. Dolan and brother-in-law of Defendant J. Dolan. Due to the interrelated business transactions, demand on the foregoing Defendants is futile.

q.  In July 2005, PVI Virtual Media Services, LLC ("PVI"), a subsidiary of the Company, entered into an agreement with Game Craft LLC ("Game Craft"), an entity owned by Mark Sweeney, brother of Defendant Sweeney and the son-in-law of Defendant C. Dolan and brother-in-law of J. Dolan. The agreement provides that PVI license certain data collection and surface mapping technology from Game Craft for use by PVI in the creation, marketing and performance of certain virtual enhancements for televised golf events and pay Game Craft a 50% share of the net revenue generated by PVI from the sale of such enhancements to advertisers and broadcasters. Due to Defendant Sweeney's interrelated familial ties and business transactions, demand on him is futile.

r.  Certain services, including employee services, of the Company are made available to members of the Dolan family and to entities owned by members of the Dolan family. Due to the interrelated familial ties, demand on the Board is futile.

s.  Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders.

t.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

u.   The acts complained of constitute violations of the fiduciary duties owned by Cablevision's officer and directors and these acts are incapable of ratification.

64.   Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

## COUNT I

## ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

65.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

66.   Each of the Individual Defendants intentionally or recklessly employed devices, schemes, and artifices and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company.

67.   The Company relied upon the Individual Defendants' fraud in granting the Officer Defendants options to purchase shares of Cablevision common stock.

68.   As a direct and proximate result of the Individual Defendants' fraud the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## COUNT II

## ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT

69.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though set forth herein.

70.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

71.     The 1997-2002 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing Cablevision to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1999.

72.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

73.     The misrepresentations and omission in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

74.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT

75.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though set forth herein.

76.     The Defendants, by virtue of their positions with Cablevision and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Cablevision within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercise the same to cause Cablevision to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

77.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

78.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

79.     As alleged in detail herein, the Officer Defendants breached their fiduciary duties by:

a.     colluding with the Committee Defendants to backdate stock option grants;

b.     colluding with the Committee Defendants to violate GAAP and Section 162(m);

c.     colluding with the Committee Defendants to produce and disseminate to Cablevision shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.     colluding with the Committee Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

80.   The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit themselves at the expense of the Company.

81.   The Committee Defendants breached their fiduciary duties by:

a.    colluding with the Officer Defendants to backdate stock option grants;

b.    colluding with the Officer Defendants to violate GAAP and Section 162(m);

c.    colluding with the Officer Defendants to produce and disseminate to Cablevision shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.    colluding with the Officer Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

82.   The Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

83.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur, loss of funds paid to the Company upon exercise of options, costs and expenses incurred in connection with the Company's restatement of historical financial statements, and costs and expenses incurred in connection with the SEC investigation of the Company.

## COUNT V

### AGAINST THE OFFICER DEFENDANTS FOR UNJUST ENRICHMENT

84.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

85.     The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

86.     To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VI

### GROSS MISMANAGEMENT AGAINST ALL DEFENDANTS

87.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

88.     Defendants had a duty to Cablevision and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Cablevision.

89.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Cablevision in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management

and administration of Cablevision's affairs and in the use and preservation of Cablevision's assets.

90.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Cablevision to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Cablevision, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Cablevision.

91.    By reason of the foregoing, Cablevision has been damaged.

## COUNT VII

## CORPORATE WASTE AGAINST ALL DEFENDANTS

92.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused Cablevision to waste valuable corporate assets.

94.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

## AGAINST THE INSIDER SELLING DEFENDANTS FOR INSIDER SELLING AND MISAPPROPRIAATION OF INFORMATION

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

96.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Cablevision common stock on the basis of such information.

97.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Cablevision common stock.

98.   At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Cablevision shares at that time.

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.   Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED: August 17, 2006             Respectfully submitted,

By: _____

William B. Federman, NY ID # WF9124
**FEDERMAN & SHERWOOD**
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone: (405) 235-1560
Facsimile:  (405) 239-2112
wfederman@aol.com

Marc Henzel, NY ID # MSH9273
**LAW OFFICES of MARC HENZEL**
335 Central Avenue
Lawrence, NY 11559
Telephone:   (610) 660-8000
Facsimile:    (610) 660-8080
Mhenzel182@aol.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Arnold Wandel, declare that I have reviewed the Complaint ("Complaint") prepared on behalf of **Cablevision Systems Corp. (CVC)**, and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

8/9/06
_____
Date

_____
Signature

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>

ARNOLD WANDEL, Derivatively on Behalf of
CABLEVISION SYSTEMS CORPORATION,

                Plaintiff,

v.

CHARLES D. FERRIS, RICHARD H.
HOCHMAN, VICTOR ORISTANO, THOMAS
V. REIFENHEISER, JOHN R. RYAN,
VINCENT TESE, RAND V. ARASKOG,
FRANK J. BIONDI, CHARLES F. DOLAN,
JAMES L. DOLAN, MARIANNE DOLAN
WEBER, PATRICK F. DOLAN, BRIAN G.
SWEENEY,THOMAS C. DOLAN, WILLIAM
BELL, ROBERT LEMLE, SHEILA MAHONY,
JOHN MALONE, LEO J. HINDERY, JR.,
ANDREW ROSENGARD and LEONARD
TOW,

                Defendants,

and

CABLEVISION SYSTEMS CORPORATION,
a NEW YORK corporation,

                Nominal Defendant.

</td>
<td>

Case No.

</td>
</tr>
</table>

RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  AUG 18 2006  ★

LONG ISLAND OFFICE

**TRAGER, J.**

**TOMLINSON, M**

## CERTIFICATE OF FINANCIALLY INTERESTED PARTIES

Pursuant to the Order for Conference and Disclosure of Interested Persons entered by the Court, Plaintiff Arnold Wandel files his Certificate of Financially Interested Persons:

1.    Arnold Wandel;

2.    Cablevision Systems Corporation -- a publicly held and traded company

(NYSE Symbol:  CVC);

3.      Charles D. Ferris;

4.      Richard H. Hochman;

5.      Victor Oristano;

6.      Thomas V. Reifenheiser;

7.      John R. Ryanl

8.      Vincent Tese;

9.      Rand V. Araskog;

10.     Frank J. Biondi;

11.     Charles F. Dolan;

3.      James L. Dolan;

4.      Marianne Dolan Weber;

5.      Patrick F. Dolan;

6.      Brian G. Sweeney;

7.      Thomas C. Dolan;

8.      William Bell;

9.      Robert Lemle;

10.     Sheila Mahony;

11.     John Malone;

12.     Leo R. Hindery, Jr.;

13.     Andrew Rosengard;

14.     Leonard Tow;

15.     All Counsel of Record; and

16.    There could be one or more insurance carriers interested; however such information would presently be in the possession of the Defendants.


DATED: August 17, 2006              Respectfully submitted,


                                    By: _____

                                    William B. Federman, NY ID # WF9124
                                    **FEDERMAN & SHERWOOD**
                                    120 North Robinson, Suite 2720
                                    Oklahoma City, OK 73102
                                    Telephone: (405) 235-1560
                                    Facsimile:  (405) 239-2112
                                    wfederman@aol.com

                                    Marc Henzel, NY ID # MSH9273
                                    **LAW OFFICES of MARC HENZEL**
                                    335 Central Avenue
                                    Lawrence, NY 11559
                                    Telephone:   (610) 660-8000
                                    Facsimile:   (610) 660-8080
                                    Mhenzel182@aol.com


                                    *Attorneys for Plaintiff*