# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARNOLD WANDEL, Derivatively and on Behalf of CABLEVISION SYSTEMS CORP., )<br><br>          Plaintiffs, )<br><br>     v. )<br><br>CHARLES D. FERRIS, et al, )<br><br>          Defendants, )<br><br>     and )<br><br>CABLEVISION SYSTEMS CORPORATION, )<br><br>          Nominal Defendant. ) | Civil Action Nos. 06-cv-4130-DGT-AKT<br><br><br>**DEMAND FOR JURY TRIAL**<br><br><br>**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT, BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, WASTE OF CORPORATE ASSETS, RESCISSION, UNJUST ENRICHMENT, GROSS MISMANAGEMENT AND CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |

PATRICIA L. FULCO, Derivatively and on )
Behalf of CABLEVISION SYSTEMS CORP., )
                              )     Civil Action Nos. 06-cv-4180-DGT-AKT
          Plaintiffs, )
                       )
       v. )
                       )
CHARLES F. DOLAN, et al, )
                       )
           Defendants, )
                       )    **DEMAND FOR JURY TRIAL**
      and )
                       )
CABLEVISION SYSTEMS CORPORATION, )
                       )
      Nominal Defendant. )
                       )
                       )
                       )

ALVIN J. HEFFNER, Derivatively and on )
Behalf of CABLEVISION SYSTEMS CORP., )
                       )     Civil Action Nos. 06-cv-5409-DGT-AKT
          Plaintiffs, )
                       )
       v. )
                       )
RICHARD H. HOCHMAN, et al, )    **DEMAND FOR JURY TRIAL**
                       )
           Defendants, )
                       )
      and )
                       )
CABLEVISION SYSTEMS CORPORATION, )
                       )
      Nominal Defendant. )
                       )
                       )

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT, BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, WASTE OF CORPORATE ASSETS, RESCISSION, UNJUST ENRICHMENT, GROSS MISMANAGEMENT AND CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY**

## NATURE OF THE ACTION

1.      This is a verified amended shareholder derivative complaint brought by Plaintiffs,
shareholders of Cablevision Systems Corporation ("Cablevision" or the "Company"), on behalf
of nominal Defendant Cablevision against certain current and former Cablevision officers and
directors.  Plaintiffs bring claims for violation of the Securities Exchange Act of 1934 (the
"Exchange Act") and Rules promulgated thereunder, breach of fiduciary duty, aiding and
abetting, unjust enrichment, rescission, gross mismanagement, disgorgement, abuse of control
and corporate waste arising from the actions of the Individual Defendants (defined below) in
engaging in, or permitting others to engage in, the deceptive practice of backdating stock options
granted to certain executives—for the purpose of increasing the value of the stock options issued
to those executives—without disclosing or reporting the additional compensation or resulting
costs to the Corporation.  In addition, Plaintiffs bring claims against the Dolan Defendants
(defined below) arising from their failure to comply with their fiduciary obligations in ignoring
the Company's interests and arranging to extinguish Cablevision as a public company.

2.      In addition, Plaintiffs bring claims against the Dolan Defendants (defined below)
arising from their failure to comply with their fiduciary obligations in ignoring the Company's
and stockholders' interests by offering to take the Company private at an inadequate price,
detailed below.

3.      With respect to the options backdating, between at least fiscal years 1997 and
2002, the Officer Defendants (defined below) received grants of stock options from the
Company on unusually favorable dates when Cablevision stock was trading at virtually the
lowest price for the given period. Analysis of the fortuitous timing of these option grants reveals
that the pattern is not a coincidence, and that the grants must have been backdated, in violation of

applicable stock option plans, in order to provide the Individual Defendants with the largest possible return on their stock, at the expense of Cablevision and its public shareholders.

4. In this case, in breach of their fiduciary duties of good faith, due care and loyalty as officers and/or directors of Cablevision, between at least fiscal years 1997 and 2002, the Individual Defendants (as defined below) engaged in a concerted effort to improperly backdate stock option grants, which represented thousands of shares of Cablevision stock, to Cablevision executive officers.

5. In furtherance of the backdating scheme, Defendants improperly reported and accounted for the stock option grants, in violation of Generally Accepted Accounting Principles ("GAAP").

6. As a result, Cablevision's financial results, as reported and filed with the Securities and Exchange Commission ("SEC") between at least fiscal years 1997 and 2002, including quarterly and annual reports, among others, were in violation of GAAP and contained materially false and misleading statements and information concerning the backdated option grants.

7. In addition, Cablevision's proxy statements, which contained materially false and misleading information, were not only filed with the SEC, but also disseminated to Cablevision's shareholders as proxy solicitations within the meaning of Exchange Act Section 14, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

8. As described herein, the backdating scheme violated not only the Company's shareholder-approved stock option plans, but also the Exchange Act, and other applicable federal and state laws.

9.     As a result of the Individual Defendants' stock option backdating scheme and related misconduct, the Individual Defendants diverted millions of dollars of corporate assets to senior Cablevision executives, caused Cablevision to incur additional compensation expenses and tax liabilities, as well as loss of funds paid to Cablevision upon the exercise of the options, and subjected Cablevision to potential liability from regulators, including the SEC and Internal Revenue Service.

10.     Moreover, according to Cablevision Proxy Statements issued for fiscal years 1997 to 2002, which are discussed in more detail below, none of the options granted to the Officer Defendants have yet to expire. Thus, the Individual Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Officer Defendants exists to this day.

11.     The practice of backdating stock, though widespread, remained virtually undetected until academic research revealed patterns of stock option grants that could not be explained by chance. Professor Eric Lie of the Tippie College of Business at the University of Iowa, hypothesized that at least some grant dates must have been determined retroactively, prompting the SEC to begin investigating the anomaly. In March 2006, *The Wall Street Journal* published a study it performed with the help of Professor Lie and Professor John Emerson, a statistician at Yale University that tested Professor Lie's theory. *See* Charles Forelle and James Bandler, *The Perfect Payday*, *The Wall Street Journal* (March 18, 2006). That article identified a number of companies at which executives had achieved stock paydays the likelihood of which far exceeded that of winning the lottery. Since that date, more than 100 corporations have been the target of investigations by the SEC, the Department of Justice, or one or more United States Attorneys, or have conducted internal investigations that resulted in a restatement of earnings.

12.     On August 8, 2006, Cablevision first disclosed that it had initiated an internal investigation of all grants made during the period 1997-2002 in response to reports concerning the pricing of stock options and the timing of option grants at various companies. The Company also announced that as a result of its review it determined that the date and exercise price assigned to a number of its stock option and stock appreciation rights ("SAR") grants during the period 1997-2002 did not correspond to the actual grant data and the closing price of Cablevision Systems Corporation's common stock on that day. *See* Press Release, Cablevision Systems Corporation (August 8, 2006) (available at company website, www.cablevision.com). The Company further announced on August 8, 2006, that it would delay its quarterly filing for the quarter ending June 30, 2006, pending completion of its review; would restate previously issued annual and interim financial statements to record adjustments relating to stock option and SAR matters; and that management had concluded financial statements for all the periods beginning January 1, 1997 should not be relied upon.

13.     Indeed, the Company had disclosed that it granted options to an executive after his death, but improperly recorded the date of the grant to an earlier time when the executive was still alive. Moreover, the Company filed with the SEC an Amended Annual Report on Form 10-K for fiscal year 2005, which admitted "[t]he Company's Board of Directors and senior management believe that the practices related to the granting of options during 1997-2002 discussed above are contrary to the high ethical standards as they believe should apply to all of the Company's business practices."

14.     In response to the derivative litigation that ensued and that their ultimate liability is irrefutable, on October 9, 2006, the Dolan Defendants announced their attempt – the second in sixteen months – to take the Company private. Specifically, the Dolan Defendants are

attempting to acquire all publicly-held shares of Cablevision in a management lead leveraged buyout for the rock-bottom price of $27.00 per share. Through this acquisition, the Dolan Defendants will ensure that they and the other Defendants will avoid liability for their breaches of fiduciary duty as alleged herein.

**PARTIES**

**Plaintiffs**

15.     Plaintiff Patricia L. Fulco is a resident of New York and has owned at all times relevant to this action, and continues to own, Cablevision common stock. During the relevant time period, at the time of the injurious acts complained of herein, Ms. Fulco held, and continues to hold, shares of Cablevision stock.

16.     Plaintiff Alvin J. Heffner is a resident of Mesa, Arizona and has owned at all times relevant to this action, and continues to own, Cablevision common stock. During the relevant time period, at the time of the injurious acts complained of herein, Mr. Heffner held, and continues to hold, shares of Cablevision stock.

17.     Plaintiff Arnold Wandel is a resident of New York and has owned at all times relevant to this action, and continues to own, Cablevision common stock. During the relevant time period, at the time of the injurious acts complained of herein, Mr. Wandel held, and continues to hold, shares of Cablevision stock.

**Nominal Defendant**

18.     Nominal Defendant Cablevision is a Delaware corporation which was organized in 1997 and is headquartered in Bethpage, New York. The Company's publicly traded stock, Cablevision NY Group Class A Common Stock ("Company stock" or "Cablevision stock") is traded on NYSE under the ticker symbol "CVC." According to its recent press releases and SEC filings, Cablevision is one of the nation's largest entertainment and telecommunications

companies. The Company operates three business segments: telecommunications, entertainment and programming, including Telecommunications Services, Rainbow Media Holdings L.L.C., and Madison Square Garden. The Company's cable television operations serve more than 3 million households in the New York metropolitan area. The Company also operates New York's famed Radio City Music Hall, owns and operates Clearview Cinemas, and owns the New York Knicks, Rangers and Liberty. *See, e.g.* Press Release, Cablevision Systems Corporation, Cablevision Systems Corporation Second Quarter 2006 Selected Operating and Financial Measures; also Reports on an Ongoing Stock Options Review and Expected Restatement (August 8, 2006) (available at Company website, www.cablevision.com).

**Director Defendants**

19.     **Defendant Charles F. Dolan** ("C. Dolan") has served as the Chairman of the Cablevision Board of Directors, and a Director of the Company since 1985. Defendant C. Dolan was also CEO of the Company from 1985 through October 1995. He founded and acted as the General Partner of the Company's predecessor from 1973 until 1985 and established Manhattan Cable Television in 1961 and Home Box Office in 1971. For serving in his Cablevision capacities, upon information and belief, Defendant C. Dolan was paid a salary, not including his stock options, of approximately $8.692 million for fiscal year 2005.

20.     Defendant C. Dolan is not an independent director. First and foremost, Defendant C. Dolan is the father of Defendants James L. Dolan, Patrick F. Dolan, Thomas C. Dolan, and Marianne Dolan Weber, as well as father-in-law of Defendant Brian G. Sweeney. Moreover, according to the Company's April 28, 2006 Proxy Statement, since 1995, Defendant C. Dolan "has had a personal investment in Regent Equity Partners, a limited partnership in which Defendant Richard H. Hochman is one of the general partners." In addition, with respect to Mr.

Hochman, since 1999, Defendant C. Dolan has had a personal preferred stock investment in Danskin Inc., a company in which Defendant Hochman's spouse is the CEO. As of December 31, 2005, Mr. and Mrs. Hochman, collectively, and Defendant C. Dolan owned, directly or indirectly, approximately 11% and 6%, respectively, of the common equity of Danskin Inc. calculated on a fully diluted, as converted basis. Since 2004, Defendant C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company, in which Alda Limited Partners, a holding company of which Defendant Oristano is the Founder and Chairman, has an investment. Matthew Oristano is the son of Defendant Oristano and serves as the President and CEO of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004. Defendant C. Dolan's longstanding personal and professional entanglements and relationships with Board Members have prevented him from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

21.     As Chairman of the Board of Directors, Defendant C. Dolan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant C. Dolan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant C. Dolan's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as it finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at management and Board meetings, and via reports and other information provided to him in connection

therewith. During the Relevant Period, Defendant C. Dolan participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

22.     **Defendant James L. Dolan** has served as a Director since 1991, as President of the Company since June 1998 and Chief Executive Officer ("CEO") since October 1995. Mr. Dolan also served as Vice President from 1987 to September 1992. He currently serves as Chairman of the Company's Executive Committee. Defendant J. Dolan has also been Chairman of MSG, a subsidiary of the Company, since October 1999, and was CEO of Rainbow Media Holdings LLC, a subsidiary of the Company, from September 1992 to October 1995. For serving in his Cablevision capacities, upon information and belief, Defendant J. Dolan was paid a salary, not including his stock options, of approximately $5.092 million for fiscal year 2005.

23.     According to Cablevision's Proxy Statements for 1987 through 2002, Defendant J. Dolan received option grants to purchase: 160,000 shares at $27.69 per share on May 29, 1998; 240,000 shares at $67.50 per share on August 2, 1999; and 241,000 shares at $36.00 per share and 189,356 shares at $20.87, both on February 14, 2002.[1] During his tenure, Mr. Dolan sold at least 164,105 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for a profit of more than $1.7 million.

24.     Defendant J. Dolan is not an independent director. Defendant J. Dolan is the son of Defendant C. Dolan and the brother of Defendants P. Dolan, T. Dolan, and Dolan Weber, as well as brother-in-law to Defendant Sweeney. Defendant J. Dolan's longstanding personal and professional entanglements and relationships with Board Members have prevented Defendant J.

---

[1] Quoted shares and per share prices of Cablevision stock in 1997 have been adjusted to reflect 2-for-1 stock splits on March 30, 1998, and again on August 21, 1998.

Dolan from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

25.     As a director, Defendant J. Dolan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Moreover, as a high-level officer during the Relevant Period, Defendant J. Dolan also assumed important managerial responsibilities at Cablevision which required him to be reasonably informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Defendant J. Dolan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant J. Dolan's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at management and Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant J. Dolan participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

26.     **Defendant Patrick F. Dolan** ("P. Dolan") has served as a Director of the Company since August 1991. Defendant P. Dolan has been President of the Company's News 12 Networks since February 2002, Vice President of News from September 1995 to February 2002, and News Director of News 12 Long Island, a subsidiary of the Company, from December 1991 to September 1995. For serving in his Cablevision capacities, upon information and belief,

Defendant P. Dolan was paid a salary, not including his stock options, of approximately $327,700 for fiscal year 2005.

27.     Defendant P. Dolan is not an independent director. Defendant P. Dolan is the son of Defendant C. Dolan and the brother of Defendants J. Dolan and T. Dolan, and Dolan Weber, as well as brother-in-law to Defendant Sweeney. Defendant P. Dolan's longstanding personal and professional entanglements and relationships with Board Members have prevented Defendant P. Dolan from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

28.     As a director, Defendant P. Dolan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant P. Dolan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant P. Dolan's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as it finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant P. Dolan participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

29.     **Defendant Marianne Dolan Weber** has served as a Director of the Company since 2005. Defendant Dolan Weber Director has been President of Dolan Family Foundation

from 1986 to September 1999, and its Chairman since September 1999, as well as President of Dolan Children's Foundation from 1997 to September 1999, and its Chairman since September 1999. Since 1997, Defendant Dolan Weber has been Manager of Dolan Family Office, LLC.

30.     Defendant Dolan Weber is not an independent director. Defendant Dolan Weber is the daughter of Defendant C. Dolan and the sister of Defendants J. Dolan, P. Dolan and T. Dolan, as well as sister-in-law to Defendant Sweeney. Defendant Dolan Weber's longstanding personal and professional entanglements and relationships with Board Members have prevented her from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

31.     As a director, Defendant Dolan Weber owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Dolan Weber owed to Cablevision, she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached her fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Dolan Weber's positions within the Company, she knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to her in connection therewith. During the Relevant Period, Defendant Dolan Weber participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

32.     **Defendant Brian G. Sweeney** has served as a Director of the Company since March 2005.  Defendant Sweeney has been the Company's Senior Vice President of eMedia since January 2000.  For serving in his Cablevision capacities, upon information and belief, Defendant Sweeney was paid a salary, not including his stock options, of approximately $901,988 for fiscal year 2005.

33.     Defendant Sweeney is not an independent director.  Defendant Sweeney is the son-in-law of Defendant C. Dolan and the brother-in-law of Defendants J. Dolan, P. Dolan, T. Dolan, and Dolan Weber.  Defendant Sweeney's longstanding personal and professional entanglements and relationships with Board Members have prevented him from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

34.     As a director, Defendant Sweeney owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Defendant Sweeney owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Sweeney's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Defendant Sweeney participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

35.    **Defendant Leonard Tow** has served as a Director since March 2005.  As a director, Defendant Tow owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Defendant Tow owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Tow's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.   During the Relevant Period, Defendant Tow participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

36.    **Defendant John Malone** served as a Director during the relevant time period until June 2005.  As a director, Defendant Malone owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Defendant Malone owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Malone's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via

access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Malone participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

37.     **Defendant Leo J. Hindrey, Jr.** served as a Director from 1998 through the relevant period. As a director, Defendant Hindrey owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Hindrey owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or. omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Hindrey's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Hochman participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

38.     **Defendant Frank J. Biondi** has served as a Director since March 2005. As a director, Defendant Biondi owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Biondi owed to Cablevision, he actively participated in or knowingly

encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Biondi's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Defendant Biondi participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

39.    **Defendant Rand V. Araskog** has served as a Director since March 2005. As a director, Defendant Araskog owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Defendant Araskog owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Araskog's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Defendant Araskog participated in the

issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

40. **Defendant Charles D. Ferris** has served as a Director since 1985. Defendant Farris is a partner in the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. which provides legal services to the Company, and certain of its subsidiaries. As a director, Defendant Ferris owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Ferris owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Ferris' positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Ferris participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

41. **Defendant Richard H. Hochman** has served as a Director of the Company since 1986. Mr. Hochman served as a member of the Audit Committee of the Board of Directors ("Audit Committee") and Compensation Committee of the Board of Directors ("Compensation Committee") during all of the relevant time period, 1997-2002. Defendant Hochman is also Chairman of Regent Capital Management Corp. since April 1995, and a director of R.A.B. Enterprises, Inc.

42.     Defendant Hochman is not an independent director.  According to the Company's April 28, 2006 Proxy Statement, since 1995, Defendant C. Dolan "has had a personal investment in Regent Equity Partners, a limited partnership in which Defendant Hochman is one of the general partners."  In addition, with respect to Defendant Hochman, since 1999, Defendant C. Dolan has had a personal preferred stock investment in Danskin Inc., a company in which Defendant Hochman's spouse is the CEO.  As of December 31, 2005, Mr. and Mrs. Hochman, collectively, and Defendant C. Dolan owned, directly or indirectly, approximately 11% and 6%, respectively, of the common equity of Danskin Inc. calculated on a fully diluted, as converted basis.  Defendant Hochman's longstanding personal and professional entanglements and relationships with Board Members have prevented Defendant Hochman from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

43.     As a director, Defendant Hochman owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Defendant Hochman owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Hochman's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Defendant

Hochman participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

44.    **Defendant Victor Oristano** presently serves as a member of Cablevision's Board of Directors, a position he has held since 1985.  He was a member of the Board's Audit and Compensation Committees during all of the relevant time period, 1997-2002.  Mr. Oristano is the founder and Chairman of Alda Limited Partners, a holding company which has built and operated cable television systems in Connecticut, Florida, New Jersey, Pennsylvania and England since 1966.  Defendant Oristano was also the founder of the nation's largest holder of wireless TV frequencies, a company controlled by Alda.

45.    Defendant Oristano is not an independent director.  According to the Company's April 28, 2006 Proxy Statement, since 2004, Defendant C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company, in which Alda Limited Partners, a holding company of which Defendant Oristano is the Founder and Chairman, has an investment. Matthew Oristano is the son of Defendant Oristano and serves as the President and CEO of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004.  Defendant Oristano's longstanding personal and professional entanglements and relationships with Board Members have prevented him from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

46.    As a director, Defendant Oristano owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Oristano owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully,

recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Oristano's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Oristano participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

47.     **Defendant Thomas V. Reifenheiser** presently serves as a member of Cablevision's Board of Directors, a position he has held since 2002. He has been a member of the Company's Audit Committee since 2002 and currently serves as Chairman of the Audit Committee. Mr. Reifenheiser retired as a Managing Director of JP Morgan Chase in September 2000, after 38 years with the company and its predecessors. Defendant Reifenheiser is also a director of Lamar Advertising Company, Mediacom Communications Corporation and F&W Publications Inc. According to the Company's April 28, 2006 Proxy Statement, Defendant Reifenheiser was considered an "audit committee financial expert" within the meaning of the rules of the SEC.

48.     As a director, Defendant Reifenheiser owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Reifenheiser owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.

Because of Defendant Reifenheiser's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Reifenheiser participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

49.     **Defendant Vice Admiral John R. Ryan USN (Ret.)** presently serves on Cablevision's Board of Directors, a position he has held since 2002. He has served on the Company's Audit Committee and Compensation Committee since 2002. Vice Admiral Ryan has been President of the State University of New York Maritime College since June 2002, and the Acting Chancellor of the State University of New York since June 2005. He was the President of State University of Albany from February 2004 to February 2005, Superintendent of the United States Naval Academy from June 1998 to June 2002. Defendant Ryan's military career included positions as Commander of the Maritime Surveillance and Reconnaissance Force, US Sixth Fleet/Commander and Fleet Air Mediterranean/Commander, Maritime Air Forces, Mediterranean until his retirement from the U.S. Navy in July 2002. Vice Admiral Ryan is also a director of CIT Group Inc.

50.     As a director, Defendant Ryan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Ryan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully,

recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Ryan's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Ryan participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

51.     **Defendant Vincent Tese** presently serves on Cablevision's Board of Directors, a position he has held since 1996. During the relevant time period, Mr. Tese served on the Audit Committee from 2000-2003. Defendant Tese currently serves on both the Company's Audit Committee and Compensation Committee. Mr. Tese has been the Director of The Bear Stearns & Co., Inc. since 1994. He served as Chairman and CEO of the New York State Urban Development Corporation from 1985 to 1987, and as Director of Economic Development for New York State from 1987 to December 1994. Defendant Tese is also a director of Bowne and Company, Inc., Cabrini Mission Society, Catholic Guardian Society, Custodial Trust Co., Gabelli Asset Management, Mack-Cali Realty Corp., Magfusion, Inc., National Wireless Holdings, Inc., Municipal Art Society, Xanboo Inc., Intercontinental Exchange, Wireless Cable International, Inc. and a trustee of New York Presbyterian Hospital and New York University School of Law.

52.     Defendant Tese is not an independent director. According to the Company's April 28, 2006 Proxy Statement, since 2005, Charles Tese, the brother of Defendant Tese, has been employed by MSG, L.P., a subsidiary of the Company, in a non-executive officer position.

Defendant Tese's longstanding personal and professional entanglements and relationships with other Board Members have prevented Defendant Tese from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

53.     As a director, Defendant Tese owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill these important fiduciary duties Defendant Tese owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Tese's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Tese participated in the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases and SEC filings.

48.     Defendants identified in ¶¶ 19 - 51 are referred to collectively as the "Director Defendants."

49.     Defendants Hochman, Oristano, Ryan and Tese are referred to collectively as the "Compensation Committee Defendants."

50.     Defendants Hochman, Reifenheiser, Oristano, Ryan and Tese are referred to collectively as the "Audit Committee Defendants."

**Officer Defendants**

51.    **Defendant Robert S. Lemle** served as Vice Chairman and Secretary of the Company from December 2002 to 2004 and as Vice Chairman, General Counsel and Vice President of the Company from February 2001 to December 2002. He also served as Vice Chairman, General Counsel and Secretary of the Company from February 1994 to February 2001 and as a Director of the Company from 1988 to 2004. According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Lemle received option grants to purchase: 575,200 shares at $7.13 per share on April 17, 1997; 150,000 shares at $67.50 per share on August 2, 1999; 130,000 shares at $76.69 per share on December 4, 2000; and 241,000 shares at $36.00 per share and 189,356 shares at $20.87, both on February 14, 2002. During his tenure, Mr. Lemle sold at least 811,700 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $47 million.

52.    **Defendant William J. Bell** served as a Director, Vice Chairman of the Company and principal Financial Officer of Cablevision since 1985, until his retirement in 2005. According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Bell received option grants to purchase: 700,000 shares at $7.13 per share on April 17, 1997; 200,000 shares at $67.50 per share on August 2, 1999; and 241,000 shares at $36.00 per share and 189,356 shares at $20.87, both on February 14, 2002. During his tenure, Mr. Bell sold at least 715,400 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $59 million.

53.    **Defendant Andrew B. Rosengard** served as Cablevision's Executive Vice President of Finance from June 2001 until 2005, as Controller of the Company from April 1999 to June 2001, Executive Vice President of Financial Planning and Controller of the Company from November 1997 to April 1999, Senior Vice President and Controller of the Company from

February 1996 to November 1997, and Senior Vice President of Finance for Rainbow Media Holdings, Inc., a subsidiary of the Company, from 1990 to February 1996. According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Rosengard received option grants to purchase: 140,000 shares at $7.13 per share on April 17, 1997; 150,000 shares at $67.50 per share on August 2, 1999; and 196,000 shares at $36.00 per share and 153,628 shares at $20.87, both on February 14, 2002. During his tenure, Mr. Rosengard sold at least 170,868 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $9.9 million.

54.     **Defendant Hank J. Ratner** has served as Cablevision's Vice Chairman since December 2002 and as Director of Rainbow Media Holdings, Inc. since April 1997. Mr. Ratner also served as Chief Operating Officer of Rainbow Media Holdings, Inc. from October 1999 to June 2002 and as Chief Operating Officer and Secretary of Rainbow Media Holdings, Inc. from October 1998 to October 1999. According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Ratner received option grants to purchase: 90,000 shares at $67.50 per share on August 2, 1999; and 50,000 shares at $36.00 per share and 214,366 shares at $20.87, both on February 14, 2002.

55.     **Defendant Shelia A. Mahony** served as a Director from 1988 until March 2, 2005 and as Cablevision's Executive Vice President of Communications and Government and Public Affairs of the Company from April 1999 until her retirement in March 2004. Upon her March 15, 2004 retirement date, the Company entered into a three-year consulting agreement with Ms. Mahony. Ms. Mahony also served as Senior Vice President of Communications and Public Affairs of the Company from June 1995 to April 1999 and as Vice President of Government Relations and Public Affairs of the Company and the Company's predecessor from

1980 to June 1995.  According to Cablevision's Proxy Statements for 1987 through 2002, Ms. Mahony received option grants to purchase: 90,000 shares at $67.50 per share on August 2, 1999; and 82,000 shares at $36.00 per share and 64,310 shares at $20.87, both on February 14, 2002.

56.    **Defendant Thomas C. Dolan** served as a Director from 1998 to May 2005 and has served as Cablevision's Executive Vice President and Chief Information Officer since October 2001.  Mr. T. Dolan also served as Senior Vice President and Chief Information Officer from February 1996 to October 2001 and as Vice President and Chief Information Officer from July 1994 to February 1996.  Mr. Dolan is the son of Defendant C. Dolan, the brother of Defendants J. Dolan, P. Dolan and Dolan Weber and the brother-in-law of Defendant Sweeney.  According to Cablevision's Proxy Statements for 1987 through 2002, Mr. Dolan received option grants to purchase: 50,000 shares at $67.50 per share on August 2, 1999; and 83,600 shares at $36.00 per share and 66,212 shares at $20.87, both on February 14, 2002.

57.    The Defendants identified in Paragraphs 51 to 56 are collectively referred to as the "Officer Defendants."

58.    Defendants C. Dolan, J. Dolan, P. Dolan, T. Dolan, Dolan Weber and Sweeney are collectively referred to as the "Dolan Defendants."

59.    The Director Defendants and Officer Defendants are referred to collectively as the "Individual Defendants."

## JURISDICTION AND VENUE

60.    This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because Plaintiffs assert claims under that Act and the Rules promulgated thereunder.  Alternatively, this Court has jurisdiction over the non-federal claims asserted herein under 28

U.S.C. § 1332 as the Parties are citizens of different states and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1376(a).

61.     Venue is proper in this District because one or more Defendants either resides or maintains offices in this District, and a substantial portion of the alleged wrongdoing occurred in this District. Moreover, Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District.

## SUBSTANTIVE ALLEGATIONS

### Background

62.     Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense as long as the options' strike price was at or above the market's closing price for the stock on the day the options were granted. If the option granted was priced below the market price on the date granted (known as an "in the money" options grant) SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in their financial statements thereby lowering the Company's reported net income. *See, e.g.*, APB 25, superseded in 2004 by FAS 123(R). Accounting rules also required that companies recognize the same compensation expense if "in the money" options were granted to non-employees. Thus, while "in the money" stock options are more valuable to those to whom they are granted, the additional expenses, if reported, reduces the total amount of net income reported to shareholders of a publicly traded company.

63.     In order to maximize remuneration to its officers and employees and to attract non-employee executives to its ranks without impacting its reported income, one or more of the Individual Defendants engaged in a practice of falsifying the issuance date of stock options to

certain key personnel by engaging in a process known as "backdating." Through this practice, the Individual Defendants would review historical stock prices prior to issuing stock options, to determine the date upon which stock prices were significantly below the current market price, and falsify the relevant documents to make it appear as if the stock options were granted on the earlier date. As a result, the executive to whom the options were granted could realize the gain observed between the historical and actual grant date while the Company's records would appear to show no difference between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

64.     Stock options granted to company insiders must be approved in advance by the Company's Board of Directors, and usually the Board's compensation committee, and disclosed in order to comply with SEC regulations and reporting requirements. *See, e.g.,* Regulation S-K. Such approval can be extended through pre-approval of a prescribed option grant plan or through discretionary grants that are individually reviewed and approved.

**Cablevision's Stock Option Plans**

65.     The Cablevision Systems Corporation 1996 Employee Stock Plan (the "Employee Stock Plan" or the "Plan") purportedly was created "to compensate key employees of the Company and its Affiliates who have been largely responsible for the management and growth of the business of the Company and its Affiliates and to advance the interests of the Company by encouraging and enabling the acquisition of a larger personal proprietary interest in the Company by key employees upon whose judgment and keen interest the Company and its Affiliates are

largely dependent for the successful conduct of their operations." Employee Stock Plan, Section 1.[2]

66.     The Employee Stock Plan currently in effect was originally adopted by the Board on February 13, 1996 and approved by the Company's stockholders at the 1996 annual meeting. During the relevant time period, the Employee Stock Plan was amended several times and was referred to under various names. The Employee Stock Plan includes the First, Second and Third Amendments and Restatements of the 1996 Employee Stock Plan. The Second Amended and Restated 1996 Employee Stock Plan previously was called the 1998 Employee Stock Plan. *See* Form S-8 (filed March 30, 2001). The Company also has a 1985 Stock Plan; however, pursuant to its terms, no award could be granted under the 1985 Stock Plan after December 5, 1995. Thus, for the purposes of this action, the effective stock option plan is the Systems Corporation 1996 Employee Stock Plan.

67.     The Employee Stock Plan permitted grants of stock options, up to a specified maximum, at the discretion of the administrator, each fiscal year to officers or key employees of the Company or an Affiliate.

68.     The Employee Stock Plan was to be administered by a committee consisting of at least three non-employee members of the Cablevision Board of Directors to be appointed by the Cablevision Board of Directors. According to Cablevision's Proxy Statements for the relevant period, the Employee Stock Plan and, more specifically the grant of stock options under the Employee Stock Plan, were administered by a subcommittee of the Compensation Committee of

---

[2] Unless otherwise specified, references are to the Cablevision Systems Corporation 1996 Stock Option Plan. Plaintiff believes that, except where indicated, the relevant provisions of the Plan remained the same during the entirety of the relevant period. During the relevant time period, the Company also maintained the Cablevision Systems Corporation Amended and Restated Stock Plan for Non-Employee Directors, which provided for each Non-Employee Director to receive an automatic grant of 4,000 shares on the date of each annual meeting of the Company's shareholders.

the Cablevision Board of Directors (the "Compensation Subcommittee"). The Employee Stock Plan gave broad powers to the Compensation Subcommittee, as set forth in Section 4(c), below.

69. The Employee Stock Plan provided that the option price was to be determined by the Compensation Subcommittee, but could not be less than "the Fair Market Value of a Rainbow Media Group Share or a Cablevision NY Group Share, as applicable, on the day on which the Option is granted." Employee Stock Plan, Section 6(b). The Employee Stock Plan also states that Fair Market Value "shall mean the average of the bid and asked closing prices at which one Share is traded on the over-the-counter market, as reported on the National Association of Securities Dealers Automated Quotation System, or the closing price for a Share on the stock exchange, if any, on which such Shares are primarily traded, but if no Shares were traded on such date, then on the last previous date on which a Share was so traded, or if none of the above is applicable, the value of a Share as established by the Committee for such date using any reasonable method of evaluation." *Id.* at Section (2)(i).

70. Under the Employee Stock Plan, the Compensation Subcommittee has full authority, subject to the terms of the Plan, to set the date of any option award and any terms or conditions associated with any such award. *Id.* at Section (3).

## The Cablevision Compensation Committee and Subcommittee

71. From the beginning of the backdating period, the Compensation Committee of the Cablevision Board of Directors was to consist of not less than two independent members of the Board and was responsible for overseeing the development and implementation of compensation programs, including the Employee Stock Plan. Moreover, the Compensation Committee was directed to:

> make recommendations to the Board with respect to non-CEO compensation, incentive-compensation plans and equity-based plans, including the Executive Performance Incentive Plan, the

> Management Performance Incentive Plan, the Employee Stock
> Plan and the Long Term Incentive Plan, oversee the activities of
> individuals and committees responsible for administering these
> plans and discharge any responsibilities imposed on the Committee
> by any of these plans.

Cablevision Systems Corporation Compensation Committee Charter ("Compensation Committee Charter") at 1-2 (available at the Company's website, www.cablevision.com). The Compensation Committee also has direct responsibility to "oversee regulatory compliance with respect to compensation matters" and to "prepare an annual report of the Compensation Committee on Executive Compensation for inclusion in the Company's annual proxy statement in accordance with applicable SEC rules and regulations. *Id.* at 2.

72.     Moreover, according to Cablevision's Proxy Statements for 1998-2002, the Compensation Committee was responsible for (i) representing the Board in discharging its responsibilities with respect to the Company's employee stock plans and, in doing so, to administer such plans with regard to, among other things, the determination of eligibility of employees, the granting of Company stock, SARs and/or options, and the termination of such plans; and (ii) to determine the appropriate level of compensation, including salaries, bonuses, Company stock and option rights and retirement benefits for members of the Company's senior management, subject to the approval of the Board of Directors. *See, e.g.,* 2002 Proxy Statement, Form DEF 14A (filed May 8, 2003).

73.     According to Cablevision's Proxy Statements for 1998-2002, during the relevant period, a subcommittee of the Compensation Committee had "exclusive authority and responsibility for, and with respect to, any grants or awards under the Company's employee stock plans to any executive officer of the Company, and to the Company's most senior employees. *See, e.g.,* 1997 Proxy Statement, Form Def 14A (filed May 18, 1998).

74.     During the relevant period, Defendants Hochman, Oristano, Ryan and Tese served on the Compensation Committee and Defendants Hochman and Oristano comprised the Compensation Subcommittee.  As of September 20, 2006, Defendant Hochman resigned from the Compensation Committee but remains on the Board of Directors.  Geraldine Fabrikant, *Cablevision Restates Results Because of Stock Options*, The New York Times (September 22, 2006); *see also* Cablevision Amended Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006).

75.     Pursuant to Cablevision's Proxy Statements during the relevant time period, the Compensation Subcommittee was directly responsible for determining the stock option awards that are the subject of this litigation, in the amounts set forth below, however, pursuant to the Employee Stock Plan and the Compensation Committee Charter, the Compensation Committee as a whole also had responsibility to oversee and ensure proper administration of the stock option awards at issue in this litigation.

**The Cablevision Audit Committee**

76.     During the relevant period, Defendants Hochman, Oristano and Tese served on the Audit Committee, which was to be comprised of at least three directors who satisfied the independence and experience requirements of the Company and applicable NASDAQ rules.

77.     The Board's Audit Committee was responsible for monitoring the Company's financial reporting, including compensation reporting.  Indeed, the stated purpose of the Audit Committee is as follows:

> The purposes of the Audit Committee are to: (1) assist Board oversight (i) of the integrity of the Company's financial statements, (ii) of the Company's compliance with legal and regulatory requirements, (iii) in assessing the independent auditors' qualifications and independence, and (iv) in assessing the performance of the independent auditor and the Company's internal audit function; and (2) prepare an audit committee report

as required by the SEC for inclusion in the Company's annual
proxy statement.

Cablevision Systems Corporation Audit Committee Charter ("Audit Committee Charter"), § II

(available at the Company's website, www.cablevision.com).

78.    The Audit Committee Charter provides the Audit Committee with broad authority

and responsibility for the Company's financial reporting, including the following:

1.    with respect to the independent auditors,

(i) to be directly responsible for the appointment, compensation,
retention and oversight of the work of the independent auditors
(including the resolution of disagreements between management
and the independent auditors regarding financial reporting), who
shall report directly to the Audit Committee;

(ii) to be directly responsible for the appointment, compensation,
retention and oversight of the work of any other registered public
accounting firm engaged for the purpose of preparing or issuing an
audit report or to perform audit, review or attestation services,
which firm shall also report directly to the Audit Committee;

(iii) to pre-approve, or to adopt appropriate procedures to pre-
approve, all audit and non-audit services to be provided by the
independent auditors;

(iv) to ensure that the independent auditors prepare and deliver
annually an Auditors' Statement (as defined below) (it being
understood that the independent auditors are responsible for the
accuracy and completeness of this Statement), and to discuss with
the independent auditors any relationships or services disclosed in
this Statement that may impact the quality of audit services or the
objectivity and independence of the Company's independent
auditors;

(v) to obtain from the independent auditors in connection with any
audit a timely report relating to the Company's annual audited
financial statements describing all critical accounting policies and
practices used, all alternative treatments within generally accepted
accounting principles for policies and practices related to material
items that have been discussed with management, ramifications of
the use of such alternative disclosures and treatments, and the
treatment preferred by the independent auditors, and any material
written communications between the independent auditors and

management, such as any "management" letter or schedule of unadjusted differences;

(vi) to review and evaluate the qualifications, performance and independence of the engagement partner of the independent auditors;

(vii) to discuss with management the timing and process for implementing the rotation of the engagement partner, the concurring partner and any other active audit engagement team partner and consider whether there should be a regular rotation of the audit firm itself; and

(viii) to take into account the opinions of management and the Company's internal auditors in assessing the independent auditor's qualifications, performance and independence;

\*      \*      \*

3.      with respect to accounting principles and policies, financial reporting and internal control over financial reporting,

(i) to advise management, the internal auditing department and the independent auditors that they are expected to provide to the Audit Committee a timely analysis of significant issues and practices relating to accounting principles and policies, financial reporting and internal control over financial issues and practices;

(ii) to consider any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Audit Committee by the independent auditors required by or referred to in SAS 61 (as codified by AU Section 380), as it maybe modified or supplemented, including reports and communications related to:

• deficiencies, including significant deficiencies or material weaknesses, in internal control identified during the audit or other matters relating to internal control over financial reporting;

• consideration of fraud in a financial statement audit;

• detection of illegal acts;

• the independent auditor's responsibility under generally accepted auditing standards;

• any restriction on audit scope;

• significant accounting policies;

• issues discussed with the national office respecting auditing or accounting issues presented by the engagement;

• management judgments and accounting estimates;

• any accounting adjustments arising from the audit that were noted or proposed by the auditors but were passed (as immaterial or otherwise);

• the responsibility of the independent auditor for other information in documents containing audited financial statements;

• disagreements with management;

• consultation by management with other accountants;

• major issues discussed with management prior to retention of the independent auditor;

• difficulties encountered with management in performing the audit;

• the independent auditor's judgments about the quality of the entity's accounting principles;

• review of interim financial information conducted by the independent auditor; and

• the responsibilities, budget and staffing of the Company's internal audit function;

(iii) to discuss with the Company's General Counsel or Deputy General Counsel any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;

(iv) to discuss and review the type and presentation of information to be included in earnings press releases;

(v) to discuss the Company's earnings and press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies, which discussion may be done generally (i.e., a discussion of the types of information to be disclosed and the type of presentation to be made) and which discussion need not be conducted in

advance of earnings release or instance in which the Company may
provide earnings guidance;

(vi) to meet with management and/or the independent auditors and if
appropriate, the head of the internal audit department:

• to discuss the scope of the annual audit;

• to discuss the audited financial statements and quarterly financial
statements, including the Company's disclosures under
"Management's Discussion and Analysis of Financial Condition
and Results of Operations";

• to discuss any significant matters arising from any audit,
including any audit problems or difficulties, whether raised by
management, the internal auditing department or the independent
auditors, relating to the Company's financial statements;

• to discuss any difficulties the independent auditors encountered
in the course of the audit, including any restrictions on their
activities or access to requested information and any significant
disagreements with management;

• to discuss any "management" or "internal control" letter issued,
or proposed to be issued, by the independent auditors to the
Company;

• to review the form of opinion the independent auditors propose to
render to the Board of Directors and shareholders; and

• to discuss, as appropriate: (a) any major issues regarding
accounting principles and financial statement presentations,
including any significant changes in the Company's selection or
application of accounting principles, and major issues as to the
adequacy of the Company's internal controls and any special audit
steps adopted in light of material control deficiencies; (b) analyses
prepared by management and/or the independent auditors setting
forth significant financial reporting issues and judgments made in
connection with the preparation of the financial statements,
including analyses of the effects of alternative GAAP methods on
the financial statements; and (c) the effect of regulatory and
accounting initiatives, as well as off-balance sheet structures, on
the financial statements of the Company;

(vii) to inquire of the Company's chief executive officer and chief
financial officer as to the existence of any significant deficiencies
or material weaknesses in the design or operation of internal
control over financial reporting which are reasonably likely to

adversely affect the Company's ability to record, process, summarize and report financial information and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting;

(viii) to discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company assess and manage the Company's exposure to risk, and to discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

(ix) to obtain from the independent auditors assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934;

(x) to establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters and review submissions and the treatment of any such complaints;

(xi) to review and discuss any reports concerning material violations submitted to it by Company attorneys or outside counsel pursuant to the SEC attorney professional responsibility rules (17 C.F.R. Part 205), the Company's attorney reporting policies or otherwise; and

(xii) to establish hiring policies for employees or former employees of the independent auditors.

4.   with respect to reporting and recommendations,

(i) to prepare any report or other disclosures, including any recommendation of the Audit Committee, required by the rules of the SEC to be included in the Company's annual proxy statement;

(ii) to conduct the evaluation required by "Performance Evaluation" below; and

(iii) to report its activities to the full Board of Directors on a regular basis and to make such recommendations with respect to the above and other matters as the Audit Committee may deem necessary or appropriate.

Audit Committee Charter, §§ 1, 3-4.

79.    As members of the Audit Committee, Defendants Reifenheiser, Hochman, Ryan and Tese had a duty to know and understand the material information regarding stock option grants as set out in the Audit Committee's charter including oversight of the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, and assisting the Board of Directors in its oversight of the Company's financial reporting, among other duties.  As of September 20, 2006, Defendants Hochman and Oristano resigned from the Compensation Committee but remain on the Board of Directors.  Geraldine Fabrikant, *Cablevision Restates Results Because of Stock Options*, The New York Times, (September 22, 2006); *see also* Cablevision Amended Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006).

80.    The members of the Audit Committee knew or should have known that Cablevision's financial statements contained materially false or misleading statements and made and/or omitted material facts regarding Defendants' options backdating practices.

## Stock Option Grants to the Officer Defendants

81.    From 1997 to 2002, the Compensation Committee granted more than 5.5 million Cablevision stock options to the Officer Defendants J. Dolan, T. Dolan, Lemle, Bell, Mahony, Ratner and Rosengard and non-defendant Marc A. Lustgarten as follows[34]:

---

[3] In 1997, 360,000 options were granted to Marc A. Lustgarten, the Company's former Vice Chairman. However, Mr. Lustgarten has not been named as a defendant in this action as he is deceased.  According to the Company and recent published reports, Cablevision awarded options to Mr. Lustgarten after his 1999 death but backdated them to make it appear as if the grant was awarded while he was still alive.  *See* Cablevision Amendment to Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006); Peter Grant, James Bandler and Charles Forelle, *Cablevision Gave Backdated Grant to Dead Official – Two Directors Quit key Posts Amid Earnings Restatement; An Award for a Consultant*, The *Wall Street Journal* (September 22, 2006).

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|---|
| Dolan, James J. | 5/29/1998 | $27.69 | 160,000 |
| | 8/2/1999 | $67.50 | 240,000 |
| | 2/14/2002 | $36.00 | 241,000 |
| | | $20.87[5] | 189,356 |
| Lemle, Robert S. | 4/17/1997 | $7.13 | 575,200 |
| | 8/2/1999 | $67.50 | 150,000 |
| | 12/4/2000 | $76.69 | 130,000 |
| | 2/14/2002 | $36.00 | 241,000 |
| | | $20.87 | 189,356 |
| Bell, William J. | 4/17/1997 | $7.13 | 700,000 |
| | 8/2/1999 | $67.50 | 200,000 |
| | 2/14/2002 | $36.00 | 241,000 |
| | | $20.87 | 189,356 |
| Mahony, Shelia A. | 8/2/1999 | $67.50 | 90,000 |
| | 2/14/2002 | $36.00 | 82,000 |
| | | $20.87 | 64,310 |
| Ratner, Hank J. | 8/2/1999 | $67.50 | 90,000 |
| | 2/14/2002 | $36.00 | 50,000 |
| | | $20.87 | 214,366 |

---

(...continued)

[4] Allegations regarding the specific options listed are based on Plaintiff's investigations to date. Plaintiff is investigating additional time periods during which Plaintiff believes backdating may have occurred. Plaintiff reserves his right to amend his complaint and expand his allegations should additional information come to light as a result of discovery which suggests the Company engaged in additional improper backdating.

[5] Options granted with an exercise price of $20.87 on February 14, 2002, represent the exchange of options to purchase shares of Rainbow Media Group Class A tracking stock at the conversion ratio of 1.19093 for options to purchase shares of Cablevision NY Group Class A common stock. *See* Cablevision Amended Annual Report, Form 10-K/A for Fiscal Year 2002 (filed April 30, 2003). On March 29, 2001, the Company had distributed a new series of common stock called Rainbow Media Group tracking stock. The tracking stock was distributed to holders of the Company's common stock at a ratio of one share of Rainbow Media Group for every two shares of the Company's common stock held. The Company's then existing common stock was redesignated as Cablevision NY Group common stock. As of August 2002, Cablevision's Board of Directors approved the exchange of Rainbow Media Group common stock for shares of Cablevision NY Group common stock and all rights of holders of shares of Rainbow Media Group common stock ceased except for the right, upon surrender of the certificates representing their shares of Rainbow Media Group common stock, to receive the shares of Cablevision NY Group common stock. *See* Cablevision Annual Report, Form 10-K for Fiscal Year 2004 (filed March 16, 2005). For those options granted prior to 2002, the number of options listed reflects information contained in the Company's proxy statements for the fiscal year in which the option was granted and does not reflect subsequent conversions due to the distribution of Rainbow Media Group stock on March 29, 2001, or the exchange on August 2002.

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|---|
| Rosengard, Andrew B. | 4/17/1997 | $7.13 | 140,000 |
| | 8/2/1999 | $67.50 | 150,000 |
| | 2/14/2002 | $36.00 | 196,000 |
| | | $20.87 | 153,628 |
| Dolan, Thomas C. | 8/2/1999 | $67.50 | 50,000 |
| | 2/14/2002 | $36.00 | 83,600 |
| | | $20.87 | 66,212 |

82.    As noted above, the Plan required that, absent specific approval by the Administrator, or a merger or acquisition, the exercise price for any stock option issued under the Plan must be at least 100% of the Fair Market Value on the date of the grant.

83.    Pursuant to APB 25, which predated FAS 123(R) and was the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeded the exercise price of the options, the Company was required to recognize the difference as an expense. Cablevision failed to do this.

84.    Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

85.     As recognized by Professor Lie, "in the absence of opportunistic grant timing or opportunistic timing of information flows around grants, the returns before and after grant dates should be similar.   Consequently, if opportunistic timing is absent, the distribution of the difference between the returns for a given number of days after the grants and the returns for the same number of days should be centered roughly at zero." Randall A. Heron and Erik Lie, *What Fraction of Stock Option Grants to Top Executives Have Been Backdated or Manipulated* (July 14, 2006).

86.     With respect to Cablevision, the stock option grant dates follow a striking pattern that could not have been the result of chance.   Each of the Officer Defendants received a substantial number of option shares that increased in value immediately after they were granted, by significant amounts.

87.     As has been reported by *The New York Times* regarding options granted for years 1997-1999:

> On April 17, 1997, when more than 60 percent of the more than 1.9 million options were granted to top executives, shares were trading at a quarterly low of $7.13, adjusted for splits.
>
> Though Mr. Dolan did not receive any of those options, four other executives got sizable grants representing 48 percent of the total.
>
> After April 17, the shares rose sharply, closing the quarter at $11.39.  On June 9, the Company announced that it would buy 10 cable systems.  Cablevision's stock rose 38 percent that day and the next.  By the end of 1997, the stock had risen to $19.52 [unadjusted close, $23.94].
>
> *  *  *
>
> On May 29, 1998, the board gave Mr. Dolan 160,000 [sic] options at a split-adjusted $27.69 a share.  By the end of that year, Cablevision's stock had risen substantially from that price.
>
> In 1999, the year Cablevision's board handed out the second-largest batch of options to its executives, the grants were made on

Aug. 2, when the stock was at $57.34 a share [unadjusted close, $67.50], its low for the quarter. It closed the year at $64.13 [unadjusted close, $75.50].

Geraldine Fabrikant, *Cablevision To Restate Its Earnings*, The New York Times (August 9, 2006).

88.     In fact, Cablevision's stock grants issued between fiscal year 1997 and 2002 display an extraordinary pattern:

- 1997: the closing price of Cablevision stock on April 17, 1997 was $7.13, the second lowest closing price of Cablevision stock during the entire year – by year-end, the price had increased 235% to $23.94;

- 1998: after the Company granted shares to Defendant James Dolan on May 29, 1998, Cablevision stock saw an 81% per share increase by year-end

- 1999: the closing price of Cablevision's stock on August 2, 1999 was $67.50, the lowest closing price for the entire quarter; and

- 2000: after the Company's December 4, 2000 grant of 130,000 stock options to Defendant Lemle, Cablevision stock rose to $84.94 by year-end.

89.     The following charts demonstrate this extraordinary pattern of Cablevision's stock grants issued between fiscal year 1997 and 2002:





July 2, 1999 – August 30, 1999



November 3, 2000 – January 3, 2001



G

January 16, 2002 - March 15, 2002



90.     As the research by Professor Lie and others demonstrates, while positive returns for a single grant might be innocently explained, a consistent pattern of frequent and well-timed grants makes backdating the most plausible -- if not the only plausible -- explanation. *See, e.g.,* Charles Forelle, *How the Journal Analyzed Stock-Option Grants*, The Wall Street Journal (March 18, 2006) ("It is very unlikely that several grants spread over a number of years would all fall on high-ranked days [i.e. most favorable to the recipient].").

91.     Plaintiffs allege that the reason for the extraordinary pattern set forth in the above data can only be that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Officer Defendants, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Cablevision stock was lower than the market price on the actual grant dates.

454069                                    46

92.     This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer Defendants and improperly reduced the amounts the Officer Defendants had to pay the Company upon exercise of the options.

93.     According to the Cablevision Proxy Statements issued during fiscal years 1997 through 2002, each of the options granted to the Officer Defendants were for a term of ten years. Thus, none of the options identified in paragraph 81 above, have yet expired. Consequently, the Individual Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Officer Defendants exists to this day.

**Dissemination of False and Misleading Financial Statements and Reports**

94.     As a result of the Individual Defendants' backdating of stock options, the Company issued materially false and misleading financial statements and reports, including but not limited to annual reports, filed with the SEC and disseminated to shareholders and the public as Forms 10-K or 10-Q, proxy statements, filed with the SEC and disseminated to shareholders and the public as Form DEF-14A, and other quarterly and interim reports. Each of the Individual Defendants knew or should have known that these statements were false and either knowingly participated in their dissemination or failed to prevent or correct them.   These financial statements and reports were prepared and presented in violation of GAAP. Due to the improper backdating of the stock options alleged herein, these financial statements and reports overstated Cablevision's net income and earnings and understated Cablevision's compensation expense.

95.     For instance, with respect to accounting for stock-based compensation, Cablevision stated the following, which was materially false and misleading due to the options backdating alleged herein:

Stock Option Plan

> The Company applies the intrinsic value based method of accounting prescribed by the Accounting Principles Board (APB) Opinion No. 25, Accounting for Stock Issued to Employees and related interpretations to account for its stock options. Under this method, compensation expense is recorded on the date of grant only if the current market value price of the underlying stock exceeded the exercise price. Statement of Financial Accounting Standards No. 123, Accounting for Stock Based Compensation, established accounting and disclosure requirements using a fair value based method of accounting for stock based employee compensation plans. As allowed by Statement 123, the Company has elected to continue to apply the intrinsic value method of accounting described above.

Cablevision Annual Report, Form 10-K for Fiscal Year 2003 (filed March 15, 2004).[6]

96.     On May 18, 1998, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Cablevision's shareholders the Company's annual proxy statement (the "1997 Proxy Statement"), which provided, among other things, notice of and information for Cablevision's annual shareholders' meeting to be held June 10, 1998. The 1997 Proxy Statement falsely reported the dates of stock option grants to the Officer Defendants stating, for example, that "On April 17, 1997, the Compensation Committee granted to certain key employees of the Company, including Messrs. Bell, Lustgarten, Lemle and

---

[6] Cablevision's prior 10-Ks contained virtually identical language. *See, e.g.,* Form 10-K for Fiscal Year 2001 (filed April 1, 2002) and Form 10-K for Fiscal Year 2002 (filed March 31, 2003) ("The Company applies the intrinsic value based method of accounting prescribed by Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees' and related interpretations, to account for its stock options. Under this method, compensation expense is recorded on the date of grant only if the current market price of the underlying stock exceeded the exercise price. Statement 123 'Accounting for Stock Based Compensation', established accounting and disclosure requirements using a fair value based method of accounting for stock based employee compensation plans. As allowed by Statement 123, the Company has elected to continue to apply the intrinsic value method of accounting described above."); Form 10-K for Fiscal Year 2000 (filed March 30, 2001), Form 10-K for Fiscal Year 1999 (filed March 30, 2000), Form 10-K for Fiscal Year 1998 (filed March 31, 1999) and Form 10-K for Fiscal Year 1997 (filed March 31, 1998) ("The Company applies APB 25 and related interpretations in accounting for its stock option plans.").

Rosengard, certain stock options and SARs.... These awards were made at the then current price for the Company's Class A Common Stock." 1997 Proxy Statement (filed May 18, 1998). The 1997 Proxy Statement also contained a table of the various stock options granted to executive officers during the prior fiscal year which included the "market price on date of grant" for each awarded option.[7] In making these statements, the Company represented that the exercise price of all of the stock options awarded under its Employee Stock Plan was for no less than the fair market value of the Company's common stock as measured by the publicly traded closing price for Company stock on the day of the grant. These statements were materially false and misleading in light of the backdating alleged herein. The 1997 Proxy Statement failed to report the true value of the compensation paid to the Officer Defendants or that the options were backdated as alleged herein, rather than issued on the date at which Cablevision stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

97. The 1997 Proxy Statement further stated that in connection with the April 17, 1997 awards made to Defendants Bell, Lemle, Rosengard and non-defendant Lustgarten "certain options and SARs previously granted to the recipients with exercise prices greater than the then current market price of the Company's Class A Common Stock, were cancelled." The 1997 Proxy Statement explained that "The Compensation Committee determined that the retention value of the executive's Option/SAR package would be significantly enhanced if a greater portion of their unvested Option/SAR's were at exercise prices not below the current market value of the underlying Class A Common Stock." The offer had the effect of swapping options

---

[7] Each of Cablevision's yearly proxy statements for 1998 through 2000 contained a table listing stock option grants to its top five executives during the prior fiscal year which included the "market price on date of grant" for each option awarded to the Officer Defendants. *See* 1998 Proxy Statement (filed June 8, 1999); 1999 Proxy Statement (filed May 17, 2000); 2000 Proxy Statement (filed May 9, 2001).

that would have been less profitable for those holding them, for options that were more advantageous. In short, the Individual Defendants ensured that Cablevision's officers benefited at a cost to the Company not only when the backdating stock practices worked to their advantage, but also when they didn't.

98.     In the 1997 Proxy Statement, the Directors also recommended that Cablevision's stockholders approve an amendment to the Company's Employee Stock Plan to increase the number of shares of Common Stock reserved for issuance thereunder by 3,500,000 shares. The Compensation Committee, in its report included in the 1997 Proxy Statement, touted the benefits of the Plan, stating that the "compensation philosophy" of the Company included (i) placing "the majority of the annual and long-term compensation for the Company's senior executive officers...at risk" such that "compensation levels correlat[e] with the Company's actual performance"; (ii) shifting "incentive compensation of the Company's senior executive officers...more heavily on long-term rather than short-term accomplishments and results"; and (iii) tying executive officers interests to stockholders' interests.

99.     In the 1997 Proxy Statement and in subsequent proxy statements filed during the relevant period with the SEC and disseminated to Cablevision's shareholders, the Company falsely reported the dates of stock option grants to the Officer Defendants through its representations that the award of stock options to the Officer Defendants were made pursuant to the Employee Stock Plan and were therefore granted at the market price of the Company's common stock on the date of grant as required under the Employee Stock Plan (discussed *infra* Section 4(e)). *See, e.g.,* 1997 Proxy Statement ("Stock options...granted under the company's Employee Stock Plan"); *see also* 1998 Proxy Statement (filed June 8, 1999); 1999 Proxy Statement (filed May 17, 2000); 2000 Proxy Statement (filed May 9, 2001); 2001 Proxy

Statement (filed May 8, 2002); 2002 Proxy Statement (filed May 8, 2003); ("We have granted stock options, restricted stock and stock appreciation rights to executives under the Employee Stock Plan and earlier plans."). These statements were materially false and misleading in light of the backdating alleged herein. The proxy statements for 1997 through 2002 failed to report the true value of the compensation paid to the Officer Defendants or that options were backdated as alleged herein, rather than issued on the date at which Company stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

100. The Individual Defendants knew or reasonably should have known of these misstatements and omissions and failed to prevent or correct them.

101. In addition, in the Report of the Audit Committee included in the 2000 Proxy Statement, the Audit Committee "recommended to the Board that [the Company's] audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2000 to be filed with the Securities and Exchange Commission." The Audit Committee Defendants knew or reasonably should have known that these financial statements were materially false and misleading for the reasons set forth in paragraph 94 herein.[8]

102. With respect to compliance with I.R.C. § 162(m), the 1997 Proxy Statement stated:

> Beginning in 1994, the Omnibus Reconciliation Act of 1993 limits to $1 million the amount that may be deducted by a publicly held corporation for compensation paid to each of its named executives in a taxable year, unless the compensation in excess of $1 million is 'qualified performance-based compensation.' The Committee and the Company have determined that the Company's policy is to

---

[8] The Audit Committee made identical representations in subsequent proxy statements filed during the relevant time period. *See, e.g.,* 2001 Proxy Statement (filed May 8, 2002); 2002 Proxy Statement (filed May 8, 2003).

454069                    51

  
> design its short-term and long-term compensation plans to qualify
> for the exemption from the deduction limitations of Section
> 162(m) of the Internal Revenue Code and to be consistent with
> providing appropriate compensation to executives.   Stockholder
> approval of incentive compensation plans and various provisions
> thereunder has been sought and obtained, is being sought this year
> for the Executive Performance Incentive Plan (referenced above),
> and will be sought in the future to continue to qualify performance-
> based compensation for the exemption.

On information and belief, this statement was materially false and misleading in light of the

options backdating alleged herein.  Because of the options backdating, Plaintiffs believe and

therefore allege that Cablevision violated I.R.C. § 162(m) by taking tax deductions based on

stock option grants that were not payable solely on account of the attainment of one or more

performance goals, and therefore violated the terms of the Plan.

     103.    With respect to compliance with I.R.C. § 162(m), the 1998 Proxy Statement

stated:

> Beginning in 1994, the Omnibus Reconciliation Act of 1993 limits
> to $1 million the amount that may be deducted by a publicly held
> corporation for compensation paid to each of its named executives
> in a taxable year, unless the compensation in excess of $1 million
> is 'qualified performance-based compensation.' Our policy is to
> design its short-term and long-term compensation plans to qualify
> for the exemption from the deduction limitations of Section
> 162(m) of the Code and to be consistent with providing appropriate
> compensation to executives.

On information and belief, this statement was materially false and misleading in light of the

options backdating alleged herein.  Because of the options backdating, Plaintiffs believe and

therefore allege that Cablevision violated I.R.C. § 162(m) by taking tax deductions based on

stock option grants that were not payable solely on account of the attainment of one or more performance goals, and therefore violated the terms of the Plan.[9]

104.   In addition, between fiscal year 1997 and the present, the Company, with the effect of concealing the options backdating, filed with the SEC numerous annual and quarterly reports, which were materially false and misleading.   Specifically, the annual and quarterly reports overstated net income and earnings per share and understated the Company's compensation expense, due to the backdating alleged herein.   These reports included the following:

- Cablevision 1997 Form 10-K (filed March 31, 1998);
- Cablevision 1998 Form 10-K (filed March 31, 1999);
- Cablevision 1999 Form 10-K (filed March 30, 2000);
- Cablevision 2000 Form 10-K (filed March 30, 2001);
- Cablevision 2001 Form 10-K (filed April 1, 2002);
- Cablevision 2002 Form 10-K (filed March 31, 2003);
- Cablevision 2003 Form 10-K (filed April 30, 2004); and
- Cablevision 2004 Form 10-K (filed March 16, 2005).

105.   Furthermore, between fiscal year 1997 and the present, the Company, with the effect of concealing the improper options backdating, filed with the SEC numerous Form 4s that failed to disclose the backdating of stock option grants to the Officer Defendants. The Individual Defendants knew or should have known about these misstatements and omissions and failed to prevent or correct them.

---

[9] The Company made nearly identical representations in subsequent proxy statements filed during the relevant time period. *See* 1999 Proxy Statement (filed May 17, 2000); 2000 Proxy Statement (filed May 9, 2001); 2001 Proxy Statement (filed May 8, 2002); 2002 Proxy Statement (filed May 8, 2003).

**Backdating is Revealed**

106.    Backdating practices were largely undetected until academics investigated timing anomalies related to stock options.  These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year.  Such timing could not be statistically explained by random selection of grant dates.  One study hypothesized that the dates of the grants had been selected retroactively; such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in the money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.  Since companies are required to report "in the money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers and employees that was not detectable, thereby permitting the Company to conceal the additional compensation and forego reporting or recording the charge.

107.    The academic research did not identify specific companies that had engaged in these practices, although it apparently triggered increased scrutiny by the SEC and other government officials.

108.    The practice was publicly disclosed on March 18, 2006, when The Wall Street Journal published *The Perfect Payday,* in which it described stock option backdating practices by a number of companies, including Affiliated Computer Services, Inc. ("ACS"), KLA Group, Inc., Comverse Technology, Inc., and Vitesse Semiconductor Corporation, that defied random chance.  The Wall Street Journal, together with finance professors Eric Lie and David Yermack and statistician John Emerson, studied patterns of particularly favorable stock grants at certain companies and calculated the probability of such patterns occurring randomly and concluded that

the odds were improbable. The Journal reported, for example, that all six of the stock options granted by ACS to its former CEO Jeffrey Rich displayed a pattern of profitability that could not be explained by chance:

> In a striking pattern all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some options carry favorable grant dates for a different reason: They were backdated.

Charles Forelle and James Bandler, *The Perfect Payday*, The Wall Street Journal (March 18, 2006).

109.    Since the date of The Wall Street Journal article, more than 100 companies have reported internal and/or governmental investigations of their backdating practices. *Perfect Payday Options Scorecard,* The Wall Street Journal, (updated daily, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html)     (as     of September 11, 2006, more than 105 companies "have disclosed government probes, misdated options, restatements and/or executive departures."). Additional research by Professor Lie suggests that between the period 1996-2005, 18.9% of unscheduled "in the money" option grants to top executives were backdated or manipulated, by nearly one-third of the companies investigated.

110.    On August 8, 2006, Cablevision announced that it "had undertaken a voluntary review of its past practices in connection with grants of stock options and stock appreciation rights." Press Release, Cablevision Systems Corporation (August 8, 2006) (available at

company website, www.cablevision.com). The Company also announced that as a result of its review, it had determined that the grant date and exercise price assigned to a number of its stock option and SAR grants during the 1997-2002 period did not correspond to the actual grant date and the closing price of the Company's common stock on the actual grant date. *Id.* Cablevision also announced that it expected it "would restate previously issued annual and interim financial statements to record adjustments relating to stock option and SAR matters" and that "financial statements for all the periods beginning January 1, 1997 should not be relied upon." *Id.*

111.   The following day, August 9, 2006, *The New York Times* reported that Cablevision was in fact restating earnings due to questions regarding the timing of stock option grants. The article also stated that "Company filings show that more than 1.9 million options were granted from 1997 to 2002 to James L. Dolan, the chief executive of Cablevision, and four other executives" and that "[i]n several cases the grants were made when Cablevision stock was trading at or near a quarterly low." Geraldine Fabrikant, *Cablevision to Restate Its Earnings*, The New York Times (August 9, 2006).

112.   On August 16, 2006, Cablevision announced that the SEC and U.S. Attorney's Office were each conducting investigations into the Company's alleged backdating of stock options. Press Release, Cablevision Systems Corporation (August 16, 2006) (available at company website, www.cablevision.com).

113.   On September 21, 2006, Cablevision provided further detail regarding its option back-dating improprieties:

> In such cases, the date assigned to the grant corresponded to the date of a unanimous written consent executed by the members of the compensation committee of the Company's Board of Directors, but the date of that consent did not correspond to the actual date of the grant. ***In nearly all such cases, the stock price on the assigned date was lower, sometimes substantially lower, than the price on***

*the date the award was actually granted.* At all relevant times, the
Company's stock plan required that the exercise price of options be
not less than the fair market value per share of the Company's
common stock on the date of grant. The former officers of the
Company and the Company's former compensation consultant
who were identified in the stock options review as having directly
participated in the options dating process have either retired or had
their relationship with the Company otherwise terminated (in every
case more than one year prior to the commencement of the stock
options review). In addition to grant dating issues, the Company's
review identified certain modifications made to outstanding stock
option award grants, principally extensions of expiration dates that
were not accounted for properly.

In addition, *two awards of options and one option modification
were also incorrectly accounted for as having been granted to
employees or modified for employees.* One of these two awards
was to the Company's former compensation consultant (which was
subsequently cancelled in 2003) and the other award related to an
executive officer whose death occurred after the stated grant date
of the award and before the actual grant date. The option
modification that was incorrectly accounted for related to the
options issued to this executive officer. Management of the
Company has concluded that the Company's consolidated financial
statements for the years ended December 31, 2005, 2004 and 2003
and all quarterly periods in 2005 and 2004 and the quarter ended
March 31, 2006, as well as the selected financial data for the years
ended December 31, 2002 and 2001 should be restated to adjust
previously recognized amounts of non-cash stock based
compensation (expense) benefit resulting from the Company's
stock option review.

Cablevision Annual Report, Form 10-K for Fiscal Year 2005 (filed September 21, 2006)

(emphasis added).

114.   As a result of the Company's restatement of earnings for 2003-2005 and the first

quarter of 2006, net income decreased in the period 1997 to March 2006 by $89.2 million. *See*

Cablevision Quarterly Report, Form 10-Q/A for the Quarter Ended March 31, 2006 (filed

September 21, 2006).

**Proposed Acquisition**

115.    On Monday, October 9, 2006, before the market opened for trading, the Dolan

family ("Dolan Family") issued a press release that attached a letter dated October 8, 2006,

wherein the family stated the "Dolan Family Group" intended to launch an all cash offer to take

the Company private at a price of $27 per share in a transaction valued at approximately $7.9

billion, or $19.2 billion including debt (the "Acquisition"). The release, in part, stated:

> Charles F. Dolan and James L. Dolan, on behalf of members of the
> Dolan family group (the "Dolan Family Group") who own
> approximately 22.5% of the common stock (representing
> approximately 74.0% of the voting power) of Cablevision Systems
> Corporation (the "Company"), are pleased to offer to acquire, at a
> purchase price of $27.00 per share in cash, all of the outstanding
> shares of common stock of the Company except for the shares held
> by the Dolan Family Group.

*See* Exhibit 99.30 to Cablevision Schedule 13D/A, *Press Release* (filed October 10, 2006).[10]

116.    According to the Company's filings, the Dolan Family will finance the acquisition

of all outstanding shares by investing all of the Class B shares it currently holds, valued at

approximately $1.7 billion and through additional investment by Merrill Lynch & Co. and Bear,

---

[10] According to Company filings, the "Dolan Family or "Dolan Family Group" is comprised of the Dolan
Defendants: Charles F. Dolan; James L. Dolan; Thomas C. Dolan; Patrick F. Dolan; Marianne Dolan
Weber; as well as, Helen A. Dolan; Kathleen M. Dolan, individually and as a Trustee of the Dolan
Descendants Trust, the Dolan Grandchildren Trust, the Dolan Spouse Trust and the Dolan Progeny Trust
(collectively, the "Family Trusts"), the DC James Trust, the DC Thomas Trust, the DC Patrick Trust, the
DC Kathleen Trust, the DC Deborah Trust, the DC Marianne Trust, the CFD Trust No.1, the CFD Trust
No. 2, the CFD Trust No. 3, the CFD Trust No. 4, the CFD Trust No. 5 and the CFD Trust No. 6 and as
sole Trustee of the Marissa Waller 1989 Trust, the Charles Dolan 1989 Trust (for the benefit of Charles P.
Dolan), the Ryan Dolan 1989 Trust and the Tara Dolan 1989 Trust; Deborah A. Dolan-Sweeny;
Lawrence J. Dolan, as a Trustee of the Charles F. Dolan 2001 Family Trust (the "2001 Trust); David M.
Dolan, as a Trustee of the 2001 Trust; Paul J. Dolan, as a Trustee of each of the Family Trusts, the DC
Kathleen Trust, the DC James Trust, the CFD Trust No. 1 and the CFD Trust No. 6, and as Trustee of the
CFD Trust No. 10; Matthew J. Dolan, as a Trustee of the DC Deborah Trust, the DC Patrick Trust, the
CFD Trust No. 2 and the CFD Trust No.4; and Dolan Family LLC, a limited liability company organized
under the laws of the State of Delaware. *See* Amendment 16 to Schedule 13D/A (filed October 10, 2006).

Stearns & Co., Inc, financed through a combination of revolving credit facilities, term loans and high yield notes. *See* Amendment No. 16 to Schedule 13D/A (filed October 10, 2006).

117.    Under the terms of the offer, the Dolan Family will own all outstanding shares of Cablevision, and the shareholders will receive $27 per share in cash, in a transaction valued at more than $7.9 billion.  This price reflects a scant premium of 13 percent over the closing price of the stock prior to the Dolan Family's offer on October 9, 2006.

118.    According to published reports, the Dolan Family's offer:

> comes 16 months after the family – led by Cablevision Chairman Charles F. Dolan and his son, Chief Executive James L. Dolan – made an offer to buy the company's cable unit and spin off its other assets.  That offer was resisted by a special committee of Cablevision's board, which found the price and structure of the deal inadequate for Cablevision's public shareholders.

Dennis K. Berman and Peter Grant, *Dolans Make New Cablevision Bid – Offer to Take Firm Private Sets Value of $7.9 Billion; Is 13% Premium Enough?*, The Wall Street Journal (October 9, 2006).

119.    In their letter to the Cablevision board of directors, Defendants C. Dolan and J. Dolan stated that:

> We believe that our offer is fair to and in the best interests of the Company and its public stockholders. In structuring our proposal, we took into account the feedback we received from the special committee and its advisors in connection with the proposal made by the Dolan Family Group in 2005. We are now offering a simpler structure, enhanced value and value certainty. We believe that the public stockholders will find our offer attractive because:
>
> - The offer price represents a premium of 17.0% over the average closing price of the Company's Class A common stock for the past ten trading days, which follows substantial price appreciation in recent months.
>
> - The offer price represents an 11.3% premium to the 52-week high closing price for the Company's Class A common stock.

- The offer price is 14.9% higher than the 2005 proposal, as valued by the Dolan Family Group at the time and when adjusted for the $10 per share special dividend paid in April 2006.

- The all cash nature of the consideration provides value certainty.

*See* Exhibit 99-1 to Cablevision Form 8-K (filed October 10, 2006), *Letter from Dolans to Cablevision* (October 8, 2006).

120.   Later in the day on October 9, 2006, the Company issued a press release stating that a special committee of independent directors was formed to review the offer and act accordingly:

> On October 9, 2006, Cablevision's Board of Directors appointed a special transaction committee, which consists of Thomas V. Reifenheiser and Vice Admiral John R. Ryan USN (Ret.), to evaluate and act on the proposal from the Dolan Family Group. The special transaction committee intends to proceed in a deliberate and timely manner. There can be no assurance that any agreement on financial and other terms satisfactory to the special transaction committee will result from the committee's evaluation or negotiation of the proposal or that any corporate transaction recommended by the special transaction committee will be completed.
>
> The special transaction committee has retained Willkie Farr & Gallagher LLP as its legal counsel and intends to retain financial advisors to assist it in its review of the proposal.

*See* Cablevision Form 8-K (filed October 10, 2006).

121.   The Dolan Family's proposed Acquisition assigns the Company an enterprise value of approximately $19 billion, including debt.  A spate of sophisticated and well-respected investors swiftly criticized this valuation.  According to published reports, the Company's media assets (including assets such as the New York Knickerbockers and Cable-TV Networks, but not the Company's cable units) are valued at approximately $5 billion.  Thus, critics argue the remaining value of the deal, $14 billion, greatly undervalues the in cable-unit assets as it equates to less than nine times the unit's earnings before interest, taxes, depreciation, and amortization –

commonly referred to as EBITDA. *See* Peter Grant, *Investors Are Wary of Buyout Offer For Cablevision – Some Say Timing Leaves the upside for the Dolans Following Lean Years – Putting a Value on the Knicks*, The Wall Street Journal (October 10, 2006).

122.    By contrast, Comcast trades at more than nine times EBITDA and industry analysts almost uniformly believe that Cablevision's systems are more valuable than Comcast's given Cablevision's affluent customer base and that the Company is poised to rebound strongly after a relatively stagnant period of growth. *Id.*

123.    For example, Mr. John Linehan of T. Rowe Price Group Inc. stated, "I'm getting tired of management and private-equity firms trying to steal companies from underneath our noses, and I think this is another example of that[.]" *Id.* T. Rowe Price Group Inc. holds more than two million Cablevision shares. Further, he averred "[s]hareholders have been asked to sit through a fairly fallow period of time. As things are beginning to look up, a lot of our upside is being taken away from us." *Id.*

124.    There is ample support for the position that the Company's prospects have turned much brighter especially under the leadership of Chief Operating Officer Thomas M. Rutledge. During the summer of 2002, the Company faced a cash crunch stemming from the debt it took on to finance cable-network upgrades. To address the liquidity crisis, the Company fired thousands of workers and sold the Bravo cable network. At that time, the Company was trading at $5 per share. By mid-2003, Cablevision' stock was trading at over $20 per share. *Id.*

125.    The Dolan Family's proposed Acquisition is for $27 per share. Certain securities analysts have expressed the belief that $27 per share is too low a valuation. Kaufman Bros. L.P. states that a $27 per share price implies a cable valuation of $5,150 per subscriber but a $28 per share price captures, at least at this time, a more adequate take-out premium given the healthy

subscriber base. *See* Todd Mitchell, *Raising Price Target to $28 on Take-Out Announcement; Reiterate Hold*, Kaufman Bros. Equity Research (October 10, 2006). Bank of America analyst Douglas Shapiro believes the offer merits an additional premium. "Our guess is the family didn't initially offer its best bid," he wrote in a note. *See Cablevision Rises on Buyout Offer*, Business Week Online (October 10, 2006).

126. Prudential Equity Group analyst Katherine Styponias, stated she believes the $27 per share offer will probably be considered too low by shareholders and that "[w]e would note that despite accelerating operating momentum since the family's first attempt to take the company private last year, its offer represents only a 10.5% premium to its original offer." *Id.* Based on her valuation of Cablevision, she thinks the Company could be sold for as much as $28 per share. *Id.*

127. Goldman Sachs analyst Lale Topcuoglu calculated a "sum-of-the-parts value" for Cablevision of $31 a share. *Id.* "We believe the 13% premium is low compared to 24% average premium paid in management buyouts since 2002." *Id.*

128. Thus, the Dolan Family, and the Dolan Defendants as a subset of the Dolan Family, are offering Cablevision's Class A shareholders inadequate consideration. And, in addition to trying to take the Company away from its stockholders for an unfair price, the Dolan Family's going private transaction will extinguish pending options backdating cases and expunge the directors of liability for granting them, including liability for options granted to a then-deceased former employee and close confidante of Defendant C. Dolan. Under Delaware law, a stockholder loses standing to prosecute a derivative claim on behalf of a company once that company ceases to exist. Accordingly, the Dolan Family is trying to acquire the company in an

effort to avoid having to pay it hundreds of millions of dollars in damages premised on the Board's malfeasance.

**THE INDIVIDUAL DEFENDANTS BREACHED THEIR**
**FIDUCIARY DUTIES TO THE COMPANY**
**AND ITS SHAREHOLDERS**

129.    By reason of their positions as directors, officers, and/or fiduciaries of Cablevision, and because of their ability to control Cablevision's business, corporate and financial affairs, each of the Individual Defendants owed Cablevision and public shareholders the following fiduciary duties in their management and administration of the affairs of the Company and in the use and preservation of corporate assets:

> a.  **Good Faith.**  The duty to act at all times in good faith and in the best interests of the company and its shareholders, and to avoid action that results in a waste of corporate assets.
>
> b.  **Due Care.**  The duty to take all reasonable steps to be informed with respect to the decision in question and operate in a manner reasonably believed to be in the best interests of the company, with the care of ordinarily prudent persons in a like position and under similar circumstances.
>
> c.  **Loyalty.**  Defined by courts in broad and unyielding terms, the duty of loyalty mandates that the best interests of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by the shareholders generally.

130.    In order to satisfy these fiduciary obligations, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company and to exercise their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner, in the best interests of Cablevision and its

shareholders. Defendants' fiduciary obligations did not allow them to act in furtherance of their own self-interest, to the detriment of the Company and its shareholders.

131.    The Individual Defendants owed a duty to Cablevision and its shareholders to ensure that Cablevision and its directors, officers and agents operated in compliance with all applicable federal and state laws, rules and regulations, and that Cablevision did not engage in any unsafe, unsound, or illegal business practices.

132.    The Individual Defendants were further required to remain informed as to how Cablevision was operating and, upon receiving notice or information of unsafe, imprudent, unsound or illegal practices, to make a reasonable investigation into and take steps to correct the practices. The Individual Defendants' duties included, but were not limited to, maintaining and implementing an adequate system of internal accounting, as well as other financial controls and reporting, and gathering and reporting information internally, to allow the Individual Defendants to perform their oversight function properly and to prevent the use of non-public corporate information for personal profit.

133.    The Individual Defendants were also required to supervise the preparation, filing, and/or dissemination of Cablevision's SEC filings, press releases, audits, reports, and other information to be publicly disseminated, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of Cablevision's officers, and to make full and accurate disclosure of all material facts concerning each of the items set forth herein.

134.    In addition, the Individual Defendants were required to preserve and enhance Cablevision's reputation as a publicly-traded company, and to maintain public trust and

confidence in Cablevision as a prudently managed corporate entity fully capable of meeting its duties and obligations, including its public reporting obligations.

135.    In violation of these duties, as well as GAAP, the Individual Defendants failed to accurately record, process, summarize, and report the Company's financial data.

136.    Specifically, the Officer Defendants and Compensation Committee Defendants breached their fiduciary duties by backdating the option grants in violation of the Plan and applicable federal and state laws, rules and regulations as described more fully in the Counts below.

137.    Similarly, all Individual Defendants, including the Officer Defendants, Compensation Committee Defendants and Audit Committee Defendants, breached their fiduciary duties by, *inter alia*: (a) failing to account for and report the options backdating; (b) filing and disseminating to Cablevision shareholders and the public false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and (c) filing and disseminating to Cablevision shareholders and the public false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

138.    The Individual Defendants' misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did, unduly benefit the Individual Defendants at the expense of the Company and its public shareholders.

139.    As a direct and proximate result of the Individual Defendants' fiduciary breaches, the Company has sustained millions of dollars in damages. The Individual Defendants have diverted millions of dollars of corporate assets to senior Cablevision executives, caused Cablevision to incur additional compensation expenses and tax liabilities, as well as loss of funds

paid to Cablevision upon the exercise of the options, and subjected Cablevision to potential liability from regulators, including the Securities and Exchange Commission and Internal Revenue Service.

140.    Furthermore, because none of the options granted to the Officer Defendants have expired, the Individual Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Officer Defendants exists to this day.

## CLASS ACTION ALLEGATIONS

141.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were common stockholder of the Company at any time between April 17, 1997 and the present (the "Class Period") and excluding all Defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

142.    The members of the Class are so numerous that joinder of all members is impracticable.  As of September 12, 2006, there were 228 million shares of Cablevision Class A Common Stock and 64 million shares of Class B Common Stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class who were common stockholders of Cablevision during the Class Period.

143.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Acquisition is unfair to the Class;

(b)     whether Plaintiffs and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

(c)     whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiffs and the other members of the Class; and

(d)     whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by Defendants.

144.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal and state law as complained of herein.

145.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and complex litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

146.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.

147.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive

of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

148.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

149.     Plaintiffs bring this action derivatively on behalf of and for the benefit of Cablevision to redress injuries suffered, and yet to be suffered by Cablevision, as a direct and proximate result of the wrongdoing alleged herein.  Cablevision is named as a nominal defendant solely in a derivative capacity.

150.     Plaintiffs were Cablevision shareholders during the relevant period described herein during which the alleged wrongdoing occurred; Plaintiffs have held Cablevision common stock during the relevant period, and intend to retain these shares of Cablevision stock through the duration of this litigation.

151.     Pursuant to Fed. R. Civ. P. 23.1, Plaintiffs have standing to assert these claims on behalf of the company and will fairly and adequately protect the interests of the Company and its other stockholders.

152.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

153.     Plaintiffs will fairly and adequately represent the interests of other similarly situated Cablevision shareholders in enforcing Cablevision's rights.

154.     The Cablevision Board of Directors at the time of filing of this Complaint consisted of the following ten Defendants: Charles F. Dolan, James L. Dolan, Patrick F. Dolan, Marianne Dolan Weber, Brian G. Sweeney, Richard H. Hochman, Victor Oristano, Thomas V.

Reifenheiser, John R. Ryan and Vincent Tese, as well as four non-Defendants: Rand V. Araskog, Frank J. Biondi, Charles D. Ferris and Leonard Tow.

155.    Plaintiffs have not made any demand upon the current Cablevision Board of Directors to bring an action asserting the claims herein, for the damages suffered by Cablevision, since such demand would be a futile, wasteful and useless act, particularly for the following reasons:

156.    Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of Cablevision to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims.

157.    Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by Director Defendants and incapable of ratification by the current Board of Directors.

158.    In addition to the conflicts that exist as a result of their participation in the improper accounting, demand is also excused because Cablevision's Board of Directors has ratified the egregious actions outlined herein, and these same Directors cannot be expected to prosecute claims against themselves, and persons with whom they have extensive inter-related business, professional and personal entanglements, if Plaintiff demanded that they do so. The Directors, because of these relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company. Indeed, in addition to compensation, a number of these Directors authorized stock option grants to themselves under the Cablevision Systems Corporation Non-Employee Stock Plan.

159.    Demand is also futile because the Cablevision Board of Directors is currently controlled by the Dolan Family.  In fact, five of the fourteen current Board members are part of the Dolan Family.  The Dolan Family currently owns 22% of the Company's stock and has a 71% controlling interest through their ownership of the super-voting Class B shares, affording them the power to elect nine Cablevision directors.[11]  In its 2006 Proxy Statement, the Company states as much:

> Our Class A Stock is listed on the New York Stock Exchange. As a result, we are subject to most of the New York Stock Exchange's corporate governance listing standards. A listed company that meets the New York Stock Exchange's definition of "controlled company" may elect not to comply with certain of these requirements. On March 19, 2004, the Class B stockholders who are members of the Dolan family and related family entities entered into a Stockholder Agreement relating, among other things, to the voting of their shares of our Class B Stock and filed a Schedule 13D with the Securities and Exchange Commission as a "group" under the rules of the SEC. As a result, we are a "controlled company." As a "controlled company," we have the right to elect not to comply with the corporate governance rules of the New York Stock Exchange requiring: (i) a majority of independent directors on our Board; (ii) an independent corporate governance and nominating committee; and (iii) an independent compensation committee.
>
> We have elected not to comply with the New York Stock Exchange requirement for a majority independent board of directors and for a corporate governance and nominating committee because of our status as a "controlled company." We do comply with the requirement for an independent compensation committee. Our Board elected not to comply with the requirement for a majority independent board of directors because of our shareholder voting structure. Under the terms of our Amended and

---

[11] While each holder of Cablevision Class A common stock has one vote per share, holders of Cablevision Class B common stock have ten votes per share. Cablevision Class B stockholders have the right to elect 75% of the members of the Company's Board of Directors while the Cablevision Class A stockholders are entitled to elect the remaining 25% of the Company's board.  In addition, Class B stockholders entered into an agreement which has the effect of causing the voting power of these Class B stockholders to be cast as a block. *See* Cablevision Annual Report, Form 10-K for Fiscal Year 2005 (filed March 2, 2006).

> Restated Certificate of Incorporation, the holders of our Class B
> Stock have the right to elect 75% of the members of our Board and
> there is no requirement that any of those directors be independent.

2006 Proxy Statement (filed April 28, 2006).

160.    Three members of the current Cablevision Board were handpicked by Mr. C. Dolan to serve his needs: Directors Araskog, Biondi, and Tow. Thus, these Directors are blatantly beholden to Defendant C. Dolan and would not take any affirmative steps to question his authority or effect governance change that would adversely impact Mr. C. Dolan or any member of the Dolan Family.

161.    Also, as alleged in further detail herein, two other members of the Board have professional entanglements with Defendant C. Dolan: Directors Ferris and Hochman. Thus, these Directors are blatantly beholden to Defendant C. Dolan and would not take any affirmative steps to question his authority or effect governance change that would adversely impact Defendant C. Dolan or any member of the Dolan Family.

162.    In particular, Director Ferris is beholden to Mr. C. Dolan and the Dolan Family. Mr. Ferris has served on the Company's Board and enjoyed the privileges of that position longer than any Director -- other than Defendant Oristano and Mr. C. Dolan, himself. Over the course of his twenty years on the Board, Mr. Ferris has been paid well in excess of $2 million and has received Company stock options worth at least that much. Mr. Ferris has been associated with the Dolan Family and has financially benefited from that association for two decades, and as such, Mr. Ferris is not an independent Director.

163.    Also, Director Defendant Hochman is beholden to Mr. C. Dolan and the Dolan Family. Since 1995, Mr. C. Dolan has had an investment in Regent Equity Partners, a limited partnership in which Mr. Hochman is one of the general partners. In addition, since 1999, Mr. C. Dolan has had a preferred stock investment in Danskin Inc. Mr. Hochman's spouse has been the

CEO of Danskin Inc. since May 1999. Mr. Hochman, his spouse and Regent Equity Partners have had a substantial direct or indirect equity investment in Danskin Inc. since 1997. On December 31, 2004, Mr. and Mrs. Hochman collectively and Mr. C. Dolan owned, directly or indirectly, approximately 11% and 6 % respectively of the common equity of Danskin Inc. calculated on a fully diluted as converted basis. Mr. Hochman has received substantial pecuniary benefits (well in excess of $100,000 per year) for serving on the Company's Board and as a member of the Audit, Compensation and Executive Committees (and for a time, as Chairman of the Compensation Committee) for nearly 20 years. Mr. Hochman has been associated with the Dolan Family and has financially benefited from that association for nearly two decades, and as such, Mr. Hochman is not an independent Director.

164. Director Defendant Oristano is not an independent Director. Mr. Oristano is the founder and Chairman of Alda Limited Partners, a holding company which has built and operated cable television systems in Connecticut, Florida, New Jersey, Pennsylvania and England since 1966. Since 2004, Mr. C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company in which Alda Limited Partners has an investment. Moreover, Matthew Oristano is the son of Mr. Oristano and serves as the President and CEO of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004. Mr. Oristano has received substantial pecuniary benefits (well in excess of $100,000 per year) for serving on the Company's board and the Audit Committee for the past twenty years. Further, upon information and belief, Mr. Oristano maintains social relationships with certain members of the Dolan Family as well. Based on the foregoing, Mr. Oristano's loyalties lie with the Dolan Family, and he is therefore not an independent Director.

165.    Director Defendant Reifenheiser is not an independent Director. Mr. Reifenheiser retired as a Managing Director of JP Morgan Chase, overseeing the Global Media and Telecommunications Division in September 2000, after 38 years with JP Morgan Chase and its predecessors ("JP Morgan"). JP Morgan has provided services to Cablevision in the past and has sponsored programs with the Radio City Music Hall Rockettes, part of the Cablevision family of companies. JP Morgan is also administrative agent on an August 2004 loan agreement. In 2004, Mr. Reifenheiser enjoyed the perquisites of serving on the Board and as Chairman of the Company's Audit Committee.

166.    Director Defendant Tese is also not an independent Director. Mr. Tese has served as a director of Bear Stearns & Co., Inc since 1994. Bear Stearns and/or entities affiliated with it has significant business relationships with the Company and the Dolan Family, including but not limited to acting as the lead underwriter for the Company's secondary offering in October 2001, the Dolan Family's proposed Acquisition, currently pending, as well as being party to certain credit agreements and sales plans with the Company and/or Mr. C. Dolan.

167.    Indeed, the Company's Proxy Statement cavalierly states how Mr. C. Dolan wields power over the Cablevision Board:

> Each current Class A director was elected by the Class A stockholders at the last annual meeting. Charles F. Dolan, James L. Dolan and Patrick F. Dolan were elected by the Class B stockholders at the last annual meeting. On March 2, 2005, Charles F. Dolan and certain other Class B stockholders removed three of the Class B directors elected at the last annual meeting (William J. Bell, Sheila A. Mahony and Steven Rattner) and appointed Rand V. Araskog, Frank J. Biondi, John C. Malone and Leonard Tow to fill the vacancies created by those removals as well as the vacancy created by the death of John Tatta, a Class B director, in February 2005. Mr. Sweeney was appointed to the Board by the Class B directors on March 7, 2005, to fill the last remaining vacancy on the Board.

168.     Non-employee directors are handsomely compensated and even given free cable

television:

> Each non-employee director receives a base fee of $50,000 per
> year; $2,000 per Board and committee meeting attended in person;
> and $500 per Board and committee meeting attended by telephone.
> Non-employee directors also receive $5,000 annually per
> committee membership and $10,000 annually per committee
> chairmanship.
>
> We also pay our non-employee directors compensation in stock
> options and restricted stock units. Each non-employee director
> receives options to purchase 4,000 shares of Cablevision NY
> Group Class A common stock and a number of restricted stock
> units for the number of shares of common stock equal to $40,000
> divided by the fair market value of a share of Cablevision NY
> Group Class A common stock each year the non-employee director
> remains in office. The per share exercise price of each option will
> be equal to the fair market value of the common stock. In general,
> fair market value is determined by taking the average of the high
> and low prices of a share of Cablevision NY Group Class A
> common stock as reported in the consolidated reporting system of
> the New York Stock Exchange on the date of grant.
>
> Our directors receive free cable television service for their primary
> residence. Those directors who do not reside in our service
> territory are reimbursed for the cost of cable television service at
> their primary residence.

169.     Additionally, the Dolan Family uses the Company to employ other family

members, including spouses and in-laws, at highly competitive salaries. According to the Proxy

Statement, Kristin Aigner Dolan is a Senior Vice President of Consumer Product Management of

the Company. Ms. Dolan earned a base salary of $279,342 and a bonus of $162,000 in 2004.

The bonus was paid in 2005. Ms. Aigner Dolan is the spouse of Mr. J. Dolan, the daughter-in-

law of Mr. C. Dolan and the sister-in-law of Messrs. T. Dolan and P. Dolan, as well as Ms.

Dolan Weber.

170.    Moreover, Ms. Aigner Dolan's mother, Rosemary E. Aigner, is employed by the Company as an executive secretary earning a base salary (including overtime) of $80,756 per annum.

171.    Mr. C. Dolan also employs his brother-in-law, Edward Atwood, as a Vice President of Multimedia and paid him over $250,000 in 2004.

172.    Demand is also excused because the Cablevision Directors participated in, approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly and/or negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as described in paragraphs herein:

173.    The Cablevision Board has only three permanent committees: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Executive Committee.

174.    The Audit Committee is comprised of Reifenheiser, Hochman, Oristano, Ryan, and Tese, who have been members during the Relevant Period.  Defendant Reifenheiser has served as Chairman of the Audit Committee during the Relevant Period.  By its charter, the Audit Committee function is oversight. Defendants Reifenheiser, Hochman, Oristano, Ryan and Tese were responsible, as members of Cablevision's Audit Committee, for insuring that the Company's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate.  Cablevision's internal controls, however, were woefully deficient as evidenced by its executives' improper backdating of stock option grants. As a result of this improper option backdating, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to Cablevision's executives.  Accordingly, there is reasonable doubt that Defendants Reifenheiser, Hochman, Oristano, Ryan and Tese are disinterested because they face a substantial likelihood of

liability for their breaches of fiduciary duty to Cablevision. Thus, demand is futile as to Defendants Reifenheiser, Hochman, Oristano, Ryan and Tese.

175.    The Compensation Committee is comprised of Defendants Hochman, Ryan, and Tese, who have been members during the Relevant Period. Defendant Hochman has served as Chairman of the Compensation Committee during the Relevant Period. The members of Cablevision's Compensation Committee are responsible for administering the issuance of awards under the Company's stock option plans. Therefore, Defendants Hochman, Ryan and Tese were responsible for reviewing the stock option grants to Cablevision executives during their respective tenures on the Compensation Committee. Clearly, these Defendants did not fulfill their duties, therefore causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is reasonable doubt that Defendants Hochman, Ryan and Tese are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Cablevision. Thus, demand is futile as to Defendants Hochman, Ryan and Tese.

176.    The Cablevision Directors, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Cablevision Board members from taking the necessary and proper action on behalf of the Company, as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting, as detailed herein, the majority of the Cablevision Board are subject to prejudicial entanglements, namely resulting from the overriding presence and control of the Dolan Family.

177.    The Directors, including the Audit Committee and Compensation Committee Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs

alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Cablevision's stockholders or recklessly and/or negligently disregarded those wrongs, and are therefore not disinterested parties.

178.    In order to bring this suit, a number of the Cablevision Directors would be forced to sue themselves and/or persons with whom they have extensive business, professional and personal entanglements, which they will not do, thereby excusing demand.

179.    The Sarbanes-Oxley Act of 2002 placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Cablevision, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure.  This new law was a disaster for the Cablevision Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a massive ongoing scheme to backdate executive stock option grants, which rendered its reported financial results materially false and inaccurate.   Any real compliance with the Sarbanes-Oxley Act of 2002 would have exposed this scheme, brought it to an end and resulted in embarrassing discharges.  Thus, the Cablevision Board of Directors did not enforce or comply with the Sarbanes-Oxley Act of 2002, despite its legal obligation under federal law to do so.  Clearly, the Cablevision Board of Directors will not sue themselves for this failure.

180.    Demand is also excused because insurance policies covering the liability of a company's directors and officers purport to exclude legal claims asserted directly by the company against such persons.   Thus, there was, and is, a substantial disincentive for Cablevision to bring any action directly against Defendants. Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to

cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Cablevision, including Defendants in this action, for misconduct and mismanagement. Thus, if the policy or policies which Cablevision maintains contain the foregoing provision, the insurance carriers would argue that Cablevision and its Board of Directors are thereby contractually disabled from complying with any demand that would cause Cablevision to institute, and/or prosecute any action against Defendants for such misconduct and mismanagement; because to do so could result in the loss to Cablevision of its insurance coverage. Similarly, Cablevision would be disabled from pursuing Defendants as it would not benefit from any insurance they may have.

181.    Moreover, Cablevision has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite Directors Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board of Directors has failed and refused to seek to recover for Cablevision for any of the wrongdoing alleged by Plaintiffs herein.

182.    Demand is futile because Cablevision's Board of Directors cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint. In addition, the failures of the Board of Directors to design and implement an effective corporate information and reporting system to assure the existence of reasonable internal financial controls and the accuracy of the Company's publicly reported financial information cannot constitute a good faith exercise of business judgment. The Board of Directors would thus be required potentially to investigate and bring claims against themselves for their own misconduct. No

shareholder demand could or would prompt the Cablevision Board of Directors to take action. As such, demand is excused.

183.    Finally, Plaintiff have not made any demand on shareholders of Cablevision to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Cablevision is a publicly held company with approximately 228 million shares of Class A Common Stock outstanding, approximately 64 million shares of Class B Common Stock outstanding, as well as thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## TOLLING OF THE STATUTE OF LIMITATIONS

184.    The Counts alleged herein are timely. As an initial matter, Defendants wrongfully concealed their manipulation of Cablevision's stock option plans through strategic timing and backdating, by issuing false and misleading SEC filings, including proxy statements and quarterly and annual reports, by falsely reassuring Cablevision's investors that Cablevision's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based upon the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the exercise price on the actual date of the option grant.

454069                                          79

185. Cablevision's public investors had no reason to know of the Defendants' breaches of their fiduciary duties until August 8, 2006, when Cablevision disclosed that its internal investigation had discovered irregularities related to the issuance of certain stock option grants made between 1997 and 2002. The full extent of Defendants' breaches and the damages caused as a result is not known and cannot be known at this time.

186. Finally, as fiduciaries of Cablevision and its public shareholders, the Defendants cannot rely on any limitations defense when they withheld from Cablevision's public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that Cablevision's board breached its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates were manipulated so as to maximize the profit for the option grant recipients and, accordingly, to maximize the Company's costs.

## CAUSES OF ACTION

### COUNT I:

### Derivative Claim for Violation of Exchange Act Section 14 (against the Compensation and Audit Committee Defendants)

187. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

188. The Compensation and Audit Committee Defendants solicited proxies by means of the Company's 1997 through 2002 Proxy Statements, as described above. Each of these Defendants caused and/or participated in the filing of each of these Proxy Statements.

189. Each of these Proxy Statements included a proxy solicitation within the meaning of Exchange Act Section 14(a), 15 U.S.C. § 78n(a), and the Rules promulgated thereunder. Each of the Compensation and Audit Committee Defendants permitted the use of his name on the Proxy Statements and directed the proxies to be sent to the Company's shareholders.

190.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act prohibits the inclusion in a proxy statement of "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

191.    The Company's 1997 through 2002 Proxy Statements contained materially false and misleading statements because the respective sections disclosing executive compensation failed to disclose that the Defendants had backdated options granted during the fiscal years described in each of these Proxy statements, as set forth above.    Moreover, each of the Compensation and Audit Committee Defendants knew or should have known that the Proxy Statements were materially false or misleading as a result of the statements made and/or omitted material facts regarding Defendants' options backdating practices.

192.    By reasons of the conduct alleged herein, therefore, each of the Compensation and Audit Committee Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated pursuant thereto, 17 C.F.R. § 240.14a-9, and the Company was damaged as a result.

## COUNT II

### Derivative Claims for Breach of Fiduciary Duty
### (against the Individual Defendants)

193.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.    By reason of their positions as executive officers and/or directors of Cablevision and because of their ability to control the business and corporate affairs of the Corporation, the Individual Defendants owe Cablevision and its shareholders the fiduciary obligations of good

faith, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Cablevision in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cablevision and its shareholders equally and not in furtherance of theirs or other fiduciaries' personal interests or benefit. Each officer and director owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

195.     The Individual Defendants violated and breached these duties by their actions described herein. Each of these Defendants either received backdated options or approved, administered, and ratified or permitted the backdated options to be granted to other Defendants. The Individual Defendants knew or, with exercise of reasonable care, should have known, that Cablevision's executives were engaged in backdating stock options, that the option grants they approved were not actually executed on the dates reflected in the relevant documents, that the practice of backdating and failing to report the additional compensation was illegal, that the backdated stock options violated relevant provisions of the pertinent stock option Plans, and that the practice of backdating options was not an exercise of sound business judgment. The Individual Defendants nevertheless continued to approve such options or to acquiesce in their approval.

## COUNT III

### Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty
### (against the Individual Defendants)

196.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

197.    As a result of the foregoing conduct, including their approval of the backdated stock options, the Individual Defendants participated in and facilitated the breach of fiduciary duties described herein.

198.    By virtue of their role in creating and administering the Corporation's stock option Plans, and their approval and authorization of the stock options that were backdated as alleged herein, the Audit and Compensation Committee Defendants were able to, and in fact did, render aid and assistance to the Officer Defendants in their breach of fiduciary duty.  These Defendants did so when they knew or should have known that the practice of backdating was illegal, harmful to the company, inconsistent with GAAP and a breach of their fiduciary duties.

199.    The Company and its shareholders have been injured as a result.  Plaintiffs, derivatively on behalf of Cablevision, seek damages and other relief for the Company as set forth herein.

### COUNT IV

### Derivative Claim for Unjust Enrichment
### (against the Officer Defendants)

200.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

201.    As a result of the foregoing conduct, including millions of dollars in excess compensation awarded to Cablevision officers and directors through backdated stock options, the Officer Defendants have been unjustly enriched at the expense of the Company and its shareholders.

202.    The Company has been injured by reason of this unjust enrichment.  Plaintiffs, derivatively on behalf of Cablevision, seek damages and other relief for the Company.

83

## COUNT V

### Derivative Claim for Rescission
### (against the Officer Defendants)

203.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

204.    As a result of the acts alleged herein, a number of stock option contracts between the Officer Defendants and the Company entered into between at least fiscal years 1997 and 2002 were obtained through the Officer Defendants' deceit and abuse of control. Moreover, the backdated stock options and the shares underlying these options were not duly authorized by the Board, as was legally required, because they were not authorized in accordance with the terms of the publicly filed contracts—including the Plan—approved by the Company shareholders and filed with the SEC.

205.    These stock option contracts between the Officer Defendants and the Company should, therefore, be rescinded, with sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT VI

### Derivative Claim for Gross Mismanagement
### (against the Individual Defendants)

206.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

207.    By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cablevision in a manner consistent with the operations of a publicly held corporation.

208.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Cablevision has sustained and will continue to sustain significant damages in the millions of dollars.

209.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT VII

### Derivative Claim for Waste of Corporate Assets
### (against the Individual Defendants)

210.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

211.    By failing to properly consider the interests of the Company and its public shareholders and by failing to conduct proper supervision, the Individual Defendants, without any valid corporate purpose, have caused Cablevision to waste valuable corporate assets solely for the financial gain of the Officer Defendants.

212.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT VIII

### Derivative Claim for Disgorgement under Sarbanes Oxley Act of 2002
### (against Defendants J. Dolan and Bell)

213.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

214.    Pursuant to Sarbanes-Oxley Act of 2002 § 304, because Cablevision announced that it will prepare a restatement for fiscal years 1997 through 2002, due to material noncompliance with GAAP, as a result of false and misleading financial statements, Defendants J. Dolan and Bell, as Cablevision's CEO and CFO, respectively, during the restatement period,

are required to reimburse Cablevision for all bonuses or other incentive-based or equity-based compensation received by them from Cablevision during fiscal years 1997 through 2002.

215.     Defendants J. Dolan and Bell are also liable to Plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Cablevision.

## COUNT IX

### Derivative Claim for Abuse of Control
### (against Individual Defendants)

216.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

217.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cablevision, for which they are legally responsible.

218.     As a direct and proximate result of Defendants' abuse of control, Cablevision has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Cablevision's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

219.     Plaintiffs on behalf of Cablevision have no adequate remedy at law.

## COUNT X

### Class Claims for Breach of Fiduciary Duty
### (against the Dolan Defendants)

220.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

221.     By reason of their positions as executive officers and/or directors of Cablevision and because of their ability to control the business and corporate affairs of the Corporation, the Dolan Defendants owe Cablevision and its shareholders the fiduciary obligations of good faith, trust, loyalty and due care, and were and are required to use their utmost ability to control and

manage Cablevision in a fair, just, honest and equitable manner. The Dolan Defendants were and are required to act in furtherance of the best interests of Cablevision and its shareholders equally and not in furtherance of theirs or other fiduciaries' personal interests or benefit. Each officer and director owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

222.    The Dolan Defendants violated and breached these duties by their actions described herein. Each of these Defendants either received backdated options or approved, administered, and ratified or permitted the backdated options to be granted to other Defendants. The Dolan Defendants knew or, with exercise of reasonable care, should have known, that Cablevision's executives were engaged in backdating stock options, that the option grants they approved were not actually executed on the dates reflected in the relevant documents, that the practice of backdating and failing to report the additional compensation was illegal, that the backdated stock options violated relevant provisions of the pertinent stock option Plans, and that the practice of backdating options was not an exercise of sound business judgment. The Dolan Defendants nevertheless continued to approve such options or to acquiesce in their approval.

223.    The Dolan Defendants further breached their fiduciary duties in attempting to take the Company private in order to avoid liability for the hundreds of millions in dollars in damages premised on the Individual Defendants, including the Dolan Defendants', malfeasance in the options backdating scheme.

224.    In their effort to take the Company private by means of the Acquisition, the Dolan Defendants have further breached their fiduciary duties to the Class by significantly undervaluing the Company and its stock. Through the Acquisition, the Dolan Defendants are

offering Cablevision's Class A shareholders inadequate consideration in violation of their fiduciary duties to the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment, as follows:

A.     Against all of the Individual Defendants for the damages sustained by the Company as a result of their breaches of fiduciary duty;

B.     Against the Officer Defendants in an amount equal to the amount by which they have been unjustly enriched;

C.     Against the Dolan Defendants for the damages sustained by the Company and the Class.

D.     Imposing on the Officer Defendants a constructive trust on their options contracts, and on all proceeds that have been received or will in the future be received by them in respect of such interests or otherwise as the result of their backdated stock option grants;

E.     Ordering the Defendants to transfer to the Company all proceeds, directly or indirectly obtained by them as a result of the backdated stock option grants;

F.     Declaring that the proposed Acquisition is unfair, unjust and inequitable to plaintiffs and the other members of the Class;

G.     Enjoining preliminarily and permanently the defendants from taking any steps necessary to accomplish or implement the proposed Acquisition at a price that is not fair and equitable;

H.     Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable attorney, accountant, and expert fees; and

I.     Such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED October 16, 2006

Respectfully submitted

By s/ William B. Federman
William B. Federman, WF9124
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wfederman@aol.com

Marc Henzel (#MSH-9273)
**LAW OFFICES OF MARC HENZEL**
335 Central Avenue
Lawrence, NY 11559
Mhenzel182@aol.com

*Attorneys for Arnold Wandel*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Gregory M. Nespole, Esq. (#GN-6820)
Lawrence P. Kolker, Esq. (#LK-6432)
Robert B. Weintraub, Esq. (#RW-2897)
Paulette S. Fox, Esq. (#PF-2145)
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Attorneys for Plaintiff Patricia L. Fulco*

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Juli E. Farris
jfarris@kellerrohrback.com
Elizabeth A. Leland
bleland@kellerrohrback.com
Cari C. Laufenberg
claufenberg@kellerrohrback.com
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900 (phone);
(206) 623-3384 (fax)

Gary A. Gotto
ggotto@kellerrohrback.com
Keller Rohrback P.L.C.
National Bank Plaza
3101 North Central Avenue, Suite 900
Phoenix, AZ 85012
(602) 248-0088 (phone)
(602) 248-2822 (fax)

Richard A. Lockridge
ralockridge@locklaw.com
Karen Hanson Riebel
khriebel@locklaw.com
Lockridge Grindal Nauen, PLLP
100 Washington Ave. So., Suite 2200
Minneapolis, MN 55401
(612) 339-6900 (phone)
(612) 339-0981 (fax)

Lisa M. Pollard (#LP-6327)
lmpollard@locklaw.com
Lockridge Grindal Nauen, PLLP
380 Madison Avenue, 21st Floor
New York, NY 10017
(212) 271-8232 (phone)
(212) 271-8258

***Attorneys for Plaintiff Heffner***

## VERIFICATION

I, Arnold Wandel, declare that I am a shareholder of Cablevision Systems Corp. ("Cablevision") common stock and have so owned Cablevision stock during the relevant times pertinent hereto.

I have reviewed the foregoing Verified Amended Shareholder Derivative Complaint ("Complaint"), and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of perjury under the laws of the United States.

Dated: October 12, 2006.

Arnold Wandel