**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE CABLEVISION SYSTEMS CORP.
SHAREHOLDER DERIVATIVE LITIGATION

_____

This document relates to:
ALL CASES

Master File No.
06-cv-4130-DGT-AKT

**DEMAND FOR JURY TRIAL**

### VERIFIED CONSOLIDATED SECOND AMENDED DERIVATIVE AND CLASS ACTION COMPLAINT

Plaintiffs, by and through their attorneys, derivatively on behalf of Cablevision Systems Corp. ("Cablevision" or the "Company"), and individually on behalf of themselves and all other shareholders of Cablevision similarly situated, allege upon personal knowledge, and upon information and belief based on the investigation conducted by and through their attorneys, as follows:

### NATURE OF THE ACTION

1.       Plaintiffs bring claims on behalf of Cablevision alleging myriad breaches of fiduciary duty, aiding and abetting, unjust enrichment, rescission, gross mismanagement, abuse of control and corporate waste arising from the actions of the Individual Defendants (defined below) who engaged in, or permitted others to engage in, the deceptive practice of backdating stock options granted to certain executives—for the purpose of increasing the value of the stock options issued to those executives—without disclosing or reporting the additional compensation or resulting costs to the Company.

2.      Plaintiffs also bring claims on behalf of Cablevision against defendants for violating and for causing the Company to violate the Securities Exchange Act of 1934 (the "Exchange Act") and Rules promulgated thereunder, thereby exposing the Company to massive liability.

3.      In this case, in breach of their fiduciary duties of good faith, due care and loyalty as officers and/or directors of Cablevision, between at least fiscal years 1997 and 2002 (the "Backdating Period"), Defendants engaged in a concerted effort to improperly backdate stock option grants, which represented thousands of shares of Cablevision stock, to Cablevision's executive officers.

4.      During the Backdating Period, the Options Defendants (defined below) received grants of stock options from the Company on unusually favorable dates when Cablevision stock was trading at virtually the lowest price for the given period.  Analysis of the fortuitous timing of these option grants reveals that the pattern is not a coincidence. The grants, instead, were backdated in violation of the applicable stock option plans in order to provide the Options Defendants with the largest possible return on their stock, at the expense of Cablevision and its public shareholders.

5.      In furtherance of the backdating scheme, Defendants improperly reported and accounted for the stock option grants, in violation of Generally Accepted Accounting Principles ("GAAP").

6.      As a result, Defendants harmed Cablevision by causing it to file financial results with the Securities and Exchange Commission ("SEC") – including quarterly and annual reports, among others – that violated GAAP and contained materially false and misleading statements and information concerning the backdated option grants.

7.      Cablevision's proxy statements, which contained materially false and misleading information, were disseminated to Cablevision's shareholders as proxy solicitations within the meaning of Exchange Act Section 14, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

8.      As described herein, the backdating scheme violated the Company's shareholder-approved stock option plans, the Exchange Act, and other applicable federal and state laws.

9.      As a result of Defendants' stock option backdating scheme and related misconduct, Defendants diverted millions of dollars of corporate assets to senior Cablevision executives, caused Cablevision to incur additional compensation expenses and tax liabilities, as well as loss of funds paid to Cablevision upon the exercise of the options, and subjected Cablevision to liability from regulators, including the SEC and Internal Revenue Service.

10.      Moreover, according to Cablevision Proxy Statements issued during the Backdating Period, which are discussed in more detail below, almost none of the options granted to the Options Defendants have expired.  Thus, Defendants are in continued breach of their fiduciary obligations, and the Options Defendants remain in a position to further unjustly enrich themselves today.

11.      The practice of backdating stock, though widespread in the corporate world, remained virtually undetected until academic research revealed patterns of stock option grants that could not be explained by chance.  Professor Eric Lie of the Tippie College of Business at the University of Iowa hypothesized that at least some grant dates must have been determined retroactively, prompting the SEC to begin investigating the anomaly.  In March 2006, *The Wall Street Journal* published a study it performed with the help of Professor Lie and Professor John Emerson - a statistician at Yale University - that tested Professor Lie's theory.  *See* Charles

Forelle and James Bandler, *The Perfect Payday*, *The Wall Street Journal* (March 18, 2006). That article identified a number of companies whose executives achieved stock paydays – the unlikelihood of which far exceeded that of winning the lottery. Since then, more than 100 corporations have become targets of investigations by the SEC, the Department of Justice, or one or more United States Attorneys, or have conducted internal investigations that resulted in a restatement of earnings.

12.     On August 8, 2006, Cablevision first disclosed that it initiated an internal investigation of all grants made during the Backdating Period in response to reports concerning the pricing of stock options and the timing of option grants at various companies. The Company stated that as a result of its review, it determined that the date and exercise price assigned to a number of its stock option and stock appreciation rights ("SAR") grants during the Backdating Period failed to correspond to the actual grant data and the closing price of Cablevision's common stock on that day. Cablevision therefore admitted that the Options Defendants received improper grants of stock options. *See* Press Release, Cablevision Systems Corporation (August 8, 2006) (available at company website, www.cablevision.com). The announcement on August 8, 2006 also detailed that the Company would delay its quarterly filing for the quarter ending June 30, 2006, pending completion of its review; would restate previously issued annual and interim financial statements to record adjustments relating to stock option and SAR matters; and that management had concluded financial statements for all the periods beginning January 1, 1997 should not be relied upon.

13.     Indeed, in September 2006, the Company disclosed that it granted options to an executive after his death, but improperly recorded the date of the grant to an earlier time when the executive was still alive. Moreover, the Company filed with the SEC an Amended Annual Report

on Form 10-K for fiscal year 2005, which admitted "[t]he Company's Board of Directors and senior management believe that the practices related to the granting of options during 1997-2002 discussed above are contrary to the high ethical standards as they believe should apply to all of the Company's business practices."

## PARTIES

### Plaintiffs

14.     Plaintiff Patricia L. Fulco is a resident of New York and has owned at all times relevant to this action, and continues to own, Cablevision common stock.

15.     Plaintiff Alvin J. Heffner is a resident of Mesa, Arizona and has owned at all times relevant to this action, and continues to own, Cablevision common stock.

16.     Plaintiff Arnold Wandel is a resident of New York and has owned at all times relevant to this action, and continues to own, Cablevision common stock.

17.     Plaintiff Plumbers and Pipefitters Local 51 Pension Fund ("Plumbers") is a union retirement fund based in East Providence, Rhode Island, and has owned at all times relevant to this action, and continues to own, Cablevision common stock.

18.     Plaintiff Robert S. Bassman ("Bassman") is a resident of New Jersey and has owned at all times relevant to this action, and continues to own, Cablevision common stock.

19.     Plaintiff Sima Milgraum ("Milgraum") is a resident of New Jersey and has owned at all times relevant to this action, and continues to own, Cablevision common stock.

20.     As current holders of Cablevision common stock and holders during the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, Plaintiffs have standing to assert these claims on behalf of the Company as well as the Class defined below and will fairly and adequately protect the interests of the Company and its other stockholders.

**Nominal Defendant**

21.     Nominal Defendant Cablevision is a Delaware corporation which was organized in 1997 and is headquartered in Bethpage, New York.  The Company's publicly traded stock, Cablevision NY Group Class A Common Stock ("Company stock" or "Cablevision stock") is traded on NYSE under the ticker symbol "CVC."  According to its recent press releases and SEC filings, Cablevision is one of the nation's largest entertainment and telecommunications companies.  The Company operates three business segments: telecommunications, entertainment and programming, including Telecommunications Services, Rainbow Media Holdings L.L.C., and Madison Square Garden.  The Company's cable television operations serve more than 3 million households in the New York metropolitan area.  The Company also operates New York's famed Radio City Music Hall, owns and operates Clearview Cinemas, and owns the New York Knicks, Rangers and Liberty.  *See, e.g.* Press Release, Cablevision Systems Corporation, Cablevision Systems Corporation Second Quarter 2006 Selected Operating and Financial Measures; also Reports on an Ongoing Stock Options Review and Expected Restatement (August 8, 2006) (available at Company website, www.cablevision.com).  The terms "Defendants" or "All Defendants" as used herein in this Complaint do not refer to or include nominal Defendant Cablevision, unless specifically noted otherwise.

**Director Defendants**

22.     **Defendant Charles F. Dolan** ("C. Dolan") has served as the Chairman of the Cablevision Board of Directors, and a Director of the Company since 1985.  Defendant C. Dolan was also CEO of the Company from 1985 through October 1995.  He founded and acted as the General Partner of the Company's predecessor from 1973 until 1985, and established Manhattan Cable Television in 1961 and Home Box Office in 1971.  For serving in his Cablevision

capacities, upon information and belief, Defendant C. Dolan was paid, not including his stock options, approximately $8.692 million for fiscal year 2005.

23.     Defendant C. Dolan is not an independent director.  First and foremost, Defendant C. Dolan is the father of Defendants James L. Dolan, Patrick F. Dolan, Thomas C. Dolan, and Marianne Dolan Weber, as well as father-in-law of Defendant Brian G. Sweeney.  Moreover, according to the Company's April 28, 2006 Proxy Statement, since 1995, Defendant C. Dolan "has had a personal investment in Regent Equity Partners, a limited partnership in which Defendant Richard H. Hochman is one of the general partners."  In addition, with respect to Mr. Hochman, since 1999, Defendant C. Dolan has had a personal preferred stock investment in Danskin Inc., a company in which Defendant Hochman's spouse is the CEO. As of December 31, 2005, Mr. and Mrs. Hochman, collectively, and Defendant C. Dolan owned, directly or indirectly, approximately 11% and 6%, respectively, of the common equity of Danskin Inc. calculated on a fully diluted, as converted basis.  Since 2004, Defendant C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company, in which Alda Limited Partners, a holding company of which Defendant Victor Oristano is the Founder and Chairman, has an investment. Matthew Oristano is the son of Defendant Victor Oristano and serves as the President and CEO of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004.   Defendant C. Dolan's longstanding personal and professional entanglements and relationships with Board Members have prevented him from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

24.     As Chairman of the Board of Directors, Defendant C. Dolan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Defendant C. Dolan owed to

Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant C. Dolan's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at management and Board meetings, and via reports and other information provided to him in connection therewith. Between at least January 1, 1997 and August 8, 2006 (the "Relevant Period"), Defendant C. Dolan participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

25.     **Defendant James L. Dolan** ("J. Dolan") has served as a Director of the Company since 1991, as President since June 1998 and Chief Executive Officer ("CEO") since October 1995.  Mr. Dolan also served as Vice President of the Company from 1987 to September 1992. He currently serves as Chairman of the Company's Executive Committee.  Defendant J. Dolan has also been Chairman of MSG, a subsidiary of the Company, since October 1999, and was CEO of Rainbow Media Holdings LLC, a subsidiary of the Company, from September 1992 to October 1995.  For serving in his Cablevision capacities, upon information and belief, Defendant J. Dolan was paid, not including his stock options, approximately $5.092 million for fiscal year 2005.

26.     According to Cablevision's Proxy Statements for 1997 through 2002, Defendant J. Dolan received option grants to purchase: 60,000 shares at $27.69 per share on May 29, 1998; 240,000 shares at $67.50 per share on August 2, 1999; and 241,000 shares at $36.00 per share and

189,356 shares at $20.87, both on February 14, 2002.[1]  During his tenure, Mr. Dolan sold at least 164,105 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for a profit of more than $1.7 million.

27.     Defendant J. Dolan is not an independent director.  Defendant J. Dolan is the son of Defendant C. Dolan and the brother of Defendants Patrick F. Dolan, Thomas C. Dolan, and Marianne Dolan Weber, as well as brother-in-law to Defendant Brian G. Sweeney.  Defendant J. Dolan's longstanding personal and professional entanglements and relationships with Board Members have prevented Defendant J. Dolan from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

28.     As a director, Defendant J. Dolan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Moreover, as a high-level officer during the Relevant Period, Defendant J. Dolan also assumed important managerial responsibilities at Cablevision which required him to be reasonably informed about the day-to-day operations of the Company.  Rather than fulfill the important fiduciary duties Defendant J. Dolan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant J. Dolan's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at management and Board meetings, and via reports and other information provided to him in connection therewith.  During

---

[1] Quoted shares and per share prices of Cablevision stock in 1997 have been adjusted to reflect 2-for-1 stock splits on March 30, 1998, and again on August 21, 1998.

the Relevant Period, Defendant J. Dolan participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

29. **Defendant Patrick F. Dolan** ("P. Dolan") has served as a Director of the Company since August 1991. Defendant P. Dolan has been President of the Company's News 12 Networks since February 2002, Vice President of News from September 1995 to February 2002, and News Director of News 12 Long Island, a subsidiary of the Company, from December 1991 to September 1995. For serving in his Cablevision capacities, upon information and belief, Defendant P. Dolan was paid a salary, not including his stock options, of approximately $327,700 for fiscal year 2005.

30. Defendant P. Dolan is not an independent director. Defendant P. Dolan is the son of Defendant C. Dolan and the brother of Defendants J. Dolan and Thomas C. Dolan, and Marianne Dolan Weber, as well as brother-in-law to Defendant Brian G. Sweeney. Defendant P. Dolan's longstanding personal and professional entanglements and relationships with Board Members have prevented Defendant P. Dolan from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

31. As a director, Defendant P. Dolan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill the important fiduciary duties Defendant P. Dolan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant P. Dolan's positions within the Company, he knew the adverse non-public information about the

business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.   During the Relevant Period, Defendant P. Dolan participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.   P. Dolan also received option grants to purchase 34,000 shares at $62.25 on May 31, 2000.

32.     **Defendant Marianne Dolan Weber** ("Dolan Weber") has served as a Director of the Company since 2005.   Defendant Dolan Weber has been President of the Dolan Family Foundation from 1986 to September 1999, and its Chairman since September 1999, as well as President of the Dolan Children's Foundation from 1997 to September 1999, and its Chairman since September 1999. Since 1997, Defendant Dolan Weber has served as Manager of the Dolan Family Office, LLC.

33.     Defendant Dolan Weber is not an independent director.   Defendant Dolan Weber is the daughter of Defendant C. Dolan and the sister of Defendants J. Dolan, P. Dolan and Thomas C. Dolan, as well as sister-in-law to Defendant Brian G. Sweeney.   Defendant Dolan Weber's longstanding personal and professional entanglements and relationships with Board Members have prevented her from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

34.     As a director, Defendant Dolan Weber owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.   Rather than fulfill the important fiduciary duties Defendant Dolan Weber owed to Cablevision, she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions

complained of herein, and/or breached her fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Dolan Weber's positions within the Company, she knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to her in connection therewith. During the Relevant Period, Defendant Dolan Weber has participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

35. **Defendant Brian G. Sweeney** ("Sweeney") has served as a Director of the Company since March 2005. Defendant Sweeney has been the Company's Senior Vice President of eMedia since January 2000. For serving in his Cablevision capacities, upon information and belief, Defendant Sweeney was paid a salary, not including his stock options, of approximately $901,988 for fiscal year 2005.

36. Defendant Sweeney is not an independent director. Defendant Sweeney is the son-in-law of Defendant C. Dolan and the brother-in-law of Defendants J. Dolan, P. Dolan, Thomas C. Dolan, and Dolan Weber. Defendant Sweeney's longstanding personal and professional entanglements and relationships with Board Members have prevented him from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

37. As a director, Defendant Sweeney owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill the important fiduciary duties Defendant Sweeney owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions

complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.   Because of Defendant Sweeney's positions within the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.   During the Relevant Period, Defendant Sweeney has participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.   In addition, Sweeney received option grants to purchase: 13,000 shares at $27.69 on May 29, 1998 and 46,000 share at $62.25 on May 31, 2000.

38.     **Defendant Richard H. Hochman** ("Hochman") has served as a Director of the Company since 1986.  Defendant Hochman served as a member of the Audit Committee of the Board of Directors ("Audit Committee") and Compensation Committee of the Board of Directors ("Compensation Committee") during all of the Backdating Period.  Defendant Hochman is also Chairman of Regent Capital Management Corp. since April 1995, and a director of R.A.B. Enterprises, Inc.

39.     Defendant Hochman is not an independent director.  According to the Company's April 28, 2006 Proxy Statement, since 1995, Defendant C. Dolan "has had a personal investment in Regent Equity Partners, a limited partnership in which Defendant Hochman is one of the general partners."   In addition, with respect to Defendant Hochman, since 1999, Defendant C. Dolan has had a personal preferred stock investment in Danskin Inc., a company in which Defendant Hochman's spouse is the CEO.  As of December 31, 2005, Mr. and Mrs. Hochman,

collectively, and Defendant C. Dolan owned, directly or indirectly, approximately 11% and 6%, respectively, of the common equity of Danskin Inc. calculated on a fully diluted, as converted basis. Defendant Hochman's longstanding personal and professional entanglements and relationships with Board Members have prevented Defendant Hochman from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

40. As a director, Defendant Hochman owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill the important fiduciary duties Defendant Hochman owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of Defendant Hochman's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, Defendant Hochman participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

41. **Defendant Victor Oristano** ("Oristano") presently serves as a member of Cablevision's Board of Directors, a position he has held since 1985. He was a member of the Board's Audit and Compensation Committees during the Backdating Period. Mr. Oristano is the founder and Chairman of Alda Limited Partners, a holding company which has built and operated cable television systems in Connecticut, Florida, New Jersey, Pennsylvania and England since

1966.  Defendant Oristano was also the founder of the nation's largest holder of wireless TV frequencies, a company controlled by Alda.

42.     Defendant Oristano is not an independent director.  According to the Company's April 28, 2006 Proxy Statement, since 2004, Defendant C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company, in which Alda Limited Partners, a holding company of which Defendant Oristano is the Founder and Chairman, has an investment. Matthew Oristano is the son of Defendant Oristano and serves as the President and CEO of Alda Limited Partners, and has served as Chairman of Reaction Biology since March 2004.  Defendant Oristano's longstanding personal and professional entanglements and relationships with Board Members have prevented him from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

43.     As a director, Defendant Oristano owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company. Rather than fulfill the important fiduciary duties Defendant Oristano owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.   Because of Defendant Oristano's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.   During the Relevant Period, Defendant

Oristano participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

44.    **Defendant Thomas V. Reifenheiser** ("Reifenheiser") presently serves as a member of Cablevision's Board of Directors, a position he has held since 2002.  He has been a member of the Company's Audit Committee since 2002 and currently serves as Chairman of the Audit Committee.  Mr. Reifenheiser retired as a Managing Director of JP Morgan Chase in September 2000, after 38 years with the company and its predecessors.  Defendant Reifenheiser is also a director of Lamar Advertising Company, Mediacom Communications Corporation and F&W Publications Inc.  According to the Company's April 28, 2006 Proxy Statement, Defendant Reifenheiser was considered an "audit committee financial expert" within the meaning of the rules of the SEC.

45.    As a director, Defendant Reifenheiser owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Defendant Reifenheiser owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Reifenheiser's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period,

Defendant Reifenheiser has participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

46.     **Defendant Vice Admiral John R. Ryan USN (Ret.)** ("Ryan") presently serves on Cablevision's Board of Directors, a position he has held since 2002.  He has served on the Company's Audit Committee and Compensation Committee since 2002.  Defendant Ryan served in the U.S. navy until his retirement in July, 2002.  Defendant Ryan is also a director of CIT Group Inc.

47.     As a director, Defendant Ryan owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Defendant Ryan owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Ryan's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Defendant Ryan has participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

48.     Neither Defendant Reifenheiser nor Defendant Ryan is truly independent.  Each is potentially liable as a defendant in this litigation stemming from the backdating of stock-options, to which the Company has already admitted.  Defendant Reifenheiser is Audit Committee

Chairman, and both Reifenheiser and Ryan have served on the Audit Committee for several years. Both have also served on the Company's Compensation Committee.   In short, Defendants Reifenheiser and Ryan were both in a special position to know about and approve the wrongful acts alleged herein.

49.   **Defendant John Tatta** ("Tatta") served as a Director of the Company from 1985 to 2005.   He also served as President of the Company from 1985 to December 1991.   He also served as a member of the Compensation Committee during the Backdating Period.

50.   As a director, Tatta owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.   Rather than fulfill the important fiduciary duties Tatta owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.   Because of Tatta's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.   During the Relevant Period, Tatta participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

51.   **Defendant Vincent Tese** ("Tese") presently serves on Cablevision's Board of Directors, a position he has held since 1996.   Defendant Tese served on the Audit Committee from 2000-2003, and currently serves on the Company's Compensation Committee.   Tese has been the Director of Bear Stearns & Co., Inc. since 1994.   He served as Chairman and CEO of the New

York State Urban Development Corporation from 1985 to 1987, and as Director of Economic Development for New York State from 1987 to December 1994.  Defendant Tese is also a director of Bowne and Company, Inc., Cabrini Mission Society, Catholic Guardian Society, Custodial Trust Co., Gabelli Asset Management, Mack-Cali Realty Corp., Magfusion, Inc., National Wireless Holdings, Inc., Municipal Art Society, Xanboo Inc., Intercontinental Exchange, Wireless Cable International, Inc. and a trustee of New York Presbyterian Hospital and New York University School of Law.

52.     Defendant Tese is not an independent director.  According to the Company's April 28, 2006 Proxy Statement, since 2005, Charles Tese, the brother of Defendant Tese, has been employed by MSG, L.P., a subsidiary of the Company, in a non-executive officer position. Defendant Tese's longstanding personal and professional entanglements and relationships with other Board Members have prevented Defendant Tese from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

53.     As a director, Defendant Tese owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Defendant Tese owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Defendant Tese's positions with the Company, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers and employees, attendance at Board meetings, and via reports and other information

19

provided to him in connection therewith.    During the Relevant Period, Defendant Tese participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

54.    **Defendant Rand V. Araskog** ("Araskog") has served as a Director of the Company since March 2005.  Araskog is self-employed as a private investor as principal in RVA Investments since March 1998.

55.    As a director, Araskog owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Araskog owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Araskog's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents and conversations with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Araskog has participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

56.    **Defendant Frank J. Biondi** ("Biondi") has served as a Director of the Company since March 2005.  Biondi has been a Senior Managing Director of WaterView Advisors LLC since June 1999.

57.    As a director, Biondi owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary

duties Biondi owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Biondi's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents and conversations with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Biondi has participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

58.     **Defendant Leonard Tow** ("Tow") has served as a Director of the Company since March 2005.  Tow is CEO of New Century Holdings LLC since January 2005.

59.     As a director, Tow owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Tow owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Tow's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents and conversations with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Tow has

participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

60.     **Defendant John Malone** ("Malone") served as Director of Cablevision from approximately March 2005 until his resignation in June 2005.

61.     As a director, Malone owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill these important fiduciary duties Malone owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Malone's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents and conversations with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Malone participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

62.     Defendants Araskog, Biondi, Tow, and Malone were appointed to Cablevision's Board by C. Dolan following his removal of certain of Cablevision's Directors in early 2005 that were unwilling to support his business plan.  C. Dolan's business plan included investing in the Company's high definition satellite TV service, a project that Wall Street analysts and members of his own Board, including his son J. Dolan, were vehemently against.  As such, they were and are all beholden to C. Dolan.  Defendants Araskog, Biondi and Tow, who remain on the Board, thus cannot be considered to be independent directors, as detailed further below.

63.     **Defendant Charles D. Ferris** ("Ferris") has served as a Director of the Company since 1985.  Ferris has been a member of the law firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin") since 1981.  Ferris was Chairman of the Federal Communications Commission from October 1977 until April 1981.

64.     Ferris is not an independent director.  The Mintz Levin firm has performed substantial legal services for Cablevision and members of the Dolan Family for many years and has garnered substantial fees in consideration for these services.  Ferris's longstanding personal and professional entanglements and relationships with Board Members have prevented Ferris from acting independently to fulfill the fiduciary duties owed to Cablevision and its shareholders.

65.     As a director, Ferris owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Ferris owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Ferris's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Ferris participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

66.     **Defendant Leo J. Hindery, Jr.** ("Hindery") served as Director from 1998 through 1999, during the Backdating Period.

67.     As a director, Hindery owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Hindery owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Hindery's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents and conversations with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Hindery participated in the issuance of false and/or misleading statements by Cablevision, including the approval of false and/or misleading press releases and SEC filings.

68.     **Defendant Estate of Marc A. Lustgarten** ("Lustgarten").  Lustgarten was a Director of the Company starting from 1985, and the Company's Vice Chairman from 1989 until his death in August, 1999.   Plaintiffs accordingly name his Estate as a Defendant in this action.  Lustgarten received at least 400,000 options from 1997 to 1999, according to Company filings.  Additionally, according to the Company itself and to recent published reports, Cablevision awarded options to Mr. Lustgarten *after* his 1999 death, but backdated them to make it appear as if the grant was awarded while he was still alive.  *See* Cablevision Amendment to Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006); Peter Grant, James Bandler and Charles Forelle, *Cablevision Gave Backdated Grant to Dead Official – Two Directors Quit Key Posts Amid Earnings Restatement; An Award for a Consultant*, *The Wall Street Journal* (September 22, 2006).  Lustgarten was a member of the Executive Committee of the Board of

Directors of Cablevision at the time of his death, and besides being Cablevision's chief negotiator, was a close confidant of Defendant J. Dolan and of his father, the founder of the Company, Defendant C. Dolan.  *Id.*

69.     As a director, Lustgarten owed a duty to Cablevision to be reasonably informed about the business, operations and finances of the Company.  Rather than fulfill the important fiduciary duties Lustgarten owed to Cablevision, he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to Cablevision by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  Because of Lustgarten's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and accounting practices, via access to internal corporate documents and conversations with other corporate directors, officers, and employees, attendance at Board meetings, and via reports and other information provided to him in connection therewith.  During the Relevant Period, Lustgarten participated in the issuance of false and/or misleading statements by Cablevision, including the approval of the false and/or misleading press releases and SEC filings.

70.     Defendants identified in paragraphs 22 - 69 above are referred to collectively as the "Director Defendants."

71.     Defendants Hochman, Oristano, Ryan, Tatta and Tese are referred to collectively as the "Compensation Committee Defendants."

72.     Defendants Hochman, Reifenheiser, Oristano, Ryan and Tese are referred to collectively as the "Audit Committee Defendants."

**Officer Defendants**

73.     **Defendant Robert S. Lemle** ("Lemle") served as Vice Chairman and Secretary of the Company from December 2002 to 2004 and as Vice Chairman, General Counsel and Vice

President of the Company from February 2001 to December 2002.  He also served as Vice Chairman, General Counsel and Secretary of the Company from February 1994 to February 2001 and as a Director of the Company from 1988 to 2004.  According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Lemle received option grants to purchase: 575,200 shares at $7.13 per share, adjusted for splits, on April 17, 1997; 150,000 shares at $67.50 per share on August 2, 1999; 130,000 shares at $76.69 per share on December 4, 2000; and 241,000 shares at $36.00 per share and 189,356 shares at $20.87, both on February 14, 2002.  During his tenure, Mr. Lemle sold at least 811,700 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $47 million.

74.     **Defendant William J. Bell** ("Bell") served as a Director, Vice Chairman of the Company and principal Financial Officer of Cablevision since 1985, until his retirement in 2005. According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Bell received option grants to purchase: 700,000 shares at $7.13 per share, adjusted for splits, on April 17, 1997; 200,000 shares at $67.50 per share on August 2, 1999; and 241,000 shares at $36.00 per share and 189,356 shares at $20.87, both on February 14, 2002.  During his tenure, Mr. Bell sold at least 715,400 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $59 million.

75.     **Defendant Andrew B. Rosengard** ("Rosengard") served as Cablevision's Executive Vice President of Finance from June 2001 until 2005, as Controller of the Company from April 1999 to June 2001, Executive Vice President of Financial Planning and Controller of the Company from November 1997 to April 1999, Senior Vice President and Controller of the Company from February 1996 to November 1997, and Senior Vice President of Finance for Rainbow Media Holdings, Inc., a subsidiary of the Company, from 1990 to February 1996.

According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Rosengard received option grants to purchase: 140,000 shares at $7.13 per share, adjusted for splits, on April 17, 1997; 150,000 shares at $67.50 per share on August 2, 1999; and 196,000 shares at $36.00 per share and 153,628 shares at $20.87, both on February 14, 2002.  During his tenure, Mr. Rosengard sold at least 170,868 shares of Cablevision stock, including shares obtained by exercising options granted to him by the Company, for proceeds of more than $9.9 million.

76.     **Defendant Hank J. Ratner** ("Ratner") has served as Cablevision's Vice Chairman since December 2002 and as Director of Rainbow Media Holdings, Inc. since April 1997.  Mr. Ratner also served as Chief Operating Officer of Rainbow Media Holdings, Inc. from October 1999 to June 2002 and as Chief Operating Officer and Secretary of Rainbow Media Holdings, Inc. from October 1998 to October 1999.  According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Ratner received option grants to purchase: 140,000 shares at $7.13 per share on April 17, 1997; 20,000 shares at $27.69 per share on May 29, 1998; 80,000 shares on May 31, 2000; 90,000 shares at $67.50 per share on August 2, 1999; and 50,000 shares at $36.00 per share and 214,366 shares at $20.87, both on February 14, 2002.

77.     **Defendant Sheila A. Mahony** ("Mahony") served as a Director from 1988 until March 2, 2005 and as Cablevision's Executive Vice President of Communications and Government and Public Affairs of the Company from April 1999 until her retirement in March 2004.   Upon her March 15, 2004 retirement date, the Company entered into a three-year consulting agreement with Ms. Mahony.  Ms. Mahony also served as Senior Vice President of Communications and Public Affairs of the Company from June 1995 to April 1999 and as Vice President of Government Relations and Public Affairs of the Company and the Company's predecessor from 1980 to June 1995.  According to Cablevision's Proxy Statements for 1987

through 2002, Ms. Mahony received option grants to purchase: 140,000 shares at $7.13 on April 17, 1997; 90,000 shares at $67.50 per share on August 2, 1999; and 82,000 shares at $36.00 per share and 64,310 shares at $20.87, both on February 14, 2002.

78.     **Defendant Thomas C. Dolan** ("T. Dolan") served as a Director from 1998 to May 2005 and has served as Cablevision's Executive Vice President and Chief Information Officer since October 2001.  T. Dolan also served as Senior Vice President and Chief Information Officer of Cablevision from February 1996 to October 2001 and as Vice President and Chief Information Officer from July 1994 to February 1996.  Mr. Dolan is the son of Defendant C. Dolan, the brother of Defendants J. Dolan, P. Dolan and Dolan Weber and the brother-in-law of Defendant Sweeney.  According to Cablevision's Proxy Statements for 1997 through 2002, Mr. Dolan received option grants to purchase: 60,000 shares at $7.13 on April 17, 1997; 50,000 shares at $67.50 per share on August 2, 1999; and 83,600 shares at $36.00 per share and 66,212 shares at $20.87, both on February 14, 2002.

79.     **Defendant Michael P. Huseby** ("Huseby") has been Executive Vice President and Chief Financial Officer ("CFO") of Cablevision since August 2004.  Because of Huseby's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and present and future business prospects, via access to internal corporate documents and conversations with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Huseby has participated in the issuance of false and/or misleading statements by Cablevision, including the preparation of false and/or misleading press releases and SEC filings. Defendant Huseby, by his specialized financial expertise, was in a unique position to understand

the business of Cablevision, as well as its finances, markets and present and future business prospects.

80.     **Defendant John Bickham** ("Bickham") has been President, Cable and Communications, of Cablevision since April 2004.  Because of Bickham's position, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and present and future business prospects, via access to internal corporate documents and conversations with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Bickham has participated in the issuance of false and/or misleading statements by Cablevision, including the preparation of false and/or misleading press releases and SEC filings.

81.     **Defendant Thomas M. Rutledge** ("Rutledge") has been Chief Operating Officer ("COO") of Cablevision since April 2004.  Previously, Rutledge served as President, Cable and Communications, of Cablevision from January 2002 to April 2004.  Because of Rutledge's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Rutledge has participated in the issuance of false and/or misleading statements by Cablevision, including the preparation of false and/or misleading press releases and SEC filings.

82.     **Defendant John Bier** ("Bier") has been Senior Vice President and Treasurer of Cablevision since April 2004.  Previously, Bier served as Senior Vice President, Treasury of Cablevision from January 2000 to April 2004.  Because of Bier's positions, he knew the adverse

non-public information about the business of Cablevision, as well as its finances, markets and present and future business prospects, via access to internal corporate documents and conversations with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.   During the Relevant Period, Bier has participated in the issuance of false and/or misleading statements by Cablevision, including the preparation of false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Bier sold 14,687 shares of Cablevision stock for proceeds of $308,721 during the Relevant Period.

83.   **Defendant Jonathan D. Schwartz** ("Schwartz") has been Executive Vice President and General Counsel of Cablevision since August 2003.   Because of Schwartz's positions, he knew the adverse non-public information about the business of Cablevision, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.   Schwartz has participated in the issuance of false and/or misleading statements by Cablevision, including the preparation of false and/or misleading press releases and SEC filings.

84.   **Defendant Raymond S. Andersen** ("Andersen") was Senior Vice President, Controller, and Acting Principal Accounting Officer of Cablevision until his resignation in September of 2004.   Andersen was a recipient of unlawfully priced options as alleged below.

85.   **Defendant Robert P. May** ("May") was Chief Operating Officer and a director of Cablevision from October 1996 until 1998.   May was a recipient of unlawfully priced options as alleged below.

86.     **Defendant Joshua Sapan** ("Sapan") was Chief Executive Officer of Rainbow Media Holdings from at least April 1997 through at least November 2004.  Sapan was a recipient of unlawfully priced options as alleged below.

87.     **Defendant Margaret A. Albergo** ("Albergo") was Cablevision's Executive Vice President of Planning and Operations between 1999 and 2003, and Senior Vice President for Financial Planning and Controller from 1996 to 1999.  Albergo was a recipient of unlawfully priced options as alleged below.

88.     **Defendant Lyons, Benenson & Company, Inc.** ("LBC") was the Company's compensation consultant during the Backdating Period.  Cablevision's Form 10-Q filing dated September 21, 2006 notes that "the Company's former compensation consultant [has been] identified in the stock options review process as having directly participated in the options dating process . . ."

89.     **Defendant Harvey L. Benenson** ("Benenson") has been Managing Director, Chairman and Chief Executive Officer of LBC since 1988.

90.     Defendants Lemle, Bell, Rosengard, Ratner, Mahony, J. Dolan, T. Dolan, Lustgarten, Huseby, Rutledge, Bickham, Bier, Schwartz, Andersen, May, Sapan and Albergo are collectively referred to as the "Officer Defendants."

91.     Defendants C. Dolan, J. Dolan, P. Dolan, T. Dolan, Dolan Weber and Sweeney are collectively referred to as the "Dolan Defendants."

92.     Defendants Lemle, Bell, Rosengard, Ratner, Mahony, T. Dolan, J. Dolan, Sapan, May, Albergo, Andersen, Sweeney, P. Dolan, LBC, and Lustgarten are collectively referred to herein as the "Options Defendants."

## JURISDICTION AND VENUE

31

93.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because Plaintiffs assert claims under that Act and the Rules promulgated thereunder. Alternatively, this Court has jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1332 as the Parties are citizens of different states and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.   This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1376(a).

94.     This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

95.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(a)(1) because one or more Defendants, including Nominal Defendant Cablevision, either resides or maintains offices in this District, and a substantial portion of the alleged wrongdoing occurred in this District.   Moreover, Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District.

## SUBSTANTIVE ALLEGATIONS

### Background

96.     Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense on the Company's income statement if the options' strike prices were at or above the market's closing prices for the stock on the days the options were granted.   These are called "out of the money" options, and the holders are not economically incentivized to cash in the options.

97.     If the option that was granted to the recipient was priced below the market price on the date granted (known as an "in the money" options grant), SEC regulations required that any

publicly traded company recognize and record the difference as a compensation expense in their financial statements, thereby lowering the company's reported net income.  *See, e.g.*, APB 25, superseded in 2004 by FAS 123(R).  Accounting rules also required that companies recognize the same compensation expense if "in the money" options were granted to non-employees.  Thus, while "in the money" stock options are more valuable to the recipient, the additional expenses (if reported by the grantor) reduces the total amount of net income reported to shareholders of a publicly traded company.

98.     In order to maximize remuneration to its officers and employees and to attract non-employee executives to its ranks without impacting its net income, one or more of the Defendants engaged in a practice of falsifying the issuance date of stock options to certain personnel by engaging in a process known as "backdating."

99.     Through this practice, these Defendants reviewed the Company's historical stock prices prior to issuing stock options to determine the date that the stock price was significantly below the current market price, and falsified the relevant documents to make it appear as if the stock options were granted on the earlier date.  As a result, the executive that received the options realized the gain between the historical and actual grant date, though the Company's records reflected no differences between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

100.     A company's board of directors (and usually the board's compensation commtitee) must approve in advance the stock options granted to company insiders. The grants must be disclosed in order to comply with SEC regulations and reporting requirements.  *See, e.g.,* Regulation S-K.  Approval can be obtained through pre-approval of a prescribed option grant plan, or through discretionary grants that are individually reviewed and approved.

**Cablevision's Stock Option Plans**

101.    The Cablevision Systems Corporation 1996 Employee Stock Plan (the "Employee Stock Plan" or the "Plan") purportedly was created "to compensate key employees of the Company and its Affiliates who have been largely responsible for the management and growth of the business of the Company and its Affiliates and to advance the interests of the Company by encouraging and enabling the acquisition of a larger personal proprietary interest in the Company by key employees upon whose judgment and keen interest the Company and its Affiliates are largely dependent for the successful conduct of their operations." *See* Employee Stock Plan, Section 1.[2]

102.    The Employee Stock Plan currently in effect was originally adopted by the Board on February 13, 1996, and was approved by the Company's stockholders at the 1996 annual meeting.

103.    During the Relevant Period, the Employee Stock Plan was amended several times and was referred to under various names. The Employee Stock Plan includes the First, Second and Third Amendments and Restatements of the 1996 Employee Stock Plan.  The Second Amended and Restated 1996 Employee Stock Plan previously was called the 1998 Employee Stock Plan. *See* Form S-8 (filed March 30, 2001).  The Company also has a 1985 Stock Plan; however, pursuant to its terms, no award could be granted under the 1985 Stock Plan after December 5, 1995.  Thus, for the purposes of this action, the effective stock option plan is the Employee Stock Plan.

_____

[2] Unless otherwise specified, references are to the Cablevision Systems Corporation 1996 Stock Option Plan.  Plaintiffs believe that, except where indicated, the relevant provisions of the Plan remained the same during the entirety of the Relevant Period.  During the Relevant Period, the Company also maintained the Cablevision Systems Corporation Amended and Restated Stock Plan for Non-Employee Directors, which provided for each Non-Employee Director to receive an automatic grant of 4,000 shares on the date of each annual meeting of the Company's shareholders.

104.    The Employee Stock Plan permitted grants of stock options, up to a specified maximum, at the discretion of the administrator, each fiscal year to officers or key employees of the Company or an affiliate.

105.    The Employee Stock Plan was to be administered by a committee consisting of at least three non-employee members of the Cablevision Board of Directors to be appointed by the Cablevision Board of Directors.  According to Cablevision's Proxy Statements for the Backdating Period, the Employee Stock Plan and, more specifically the grant of stock options under the Employee Stock Plan, were administered by a subcommittee of the Compensation Committee of the Cablevision Board of Directors (the "Compensation Subcommittee").  The Employee Stock Plan gave broad powers to the Compensation Subcommittee, as set forth further below.

106.    The Employee Stock Plan provided that the option price was to be determined by the Compensation Subcommittee, but could not be less than "the Fair Market Value of a Rainbow Media Group Share or a Cablevision NY Group Share, as applicable, on the day on which the Option is granted."  Employee Stock Plan, Section 6(b).  The Employee Stock Plan also states that Fair Market Value "shall mean the average of the bid and asked closing prices at which one Share is traded on the over-the-counter market, as reported on the National Association of Securities Dealers Automated Quotation System, or the closing price for a Share on the stock exchange, if any, on which such Shares are primarily traded, but if no Shares were traded on such date, then on the last previous date on which a Share was so traded, or if none of the above is applicable, the value of a Share as established by the Committee for such date using any reasonable method of evaluation."  *Id.* at Section (2)(i).

107.    The very terms of the Plan forbade granting options that were "in the money," and to do otherwise violated the Plan's directives.

108.    Under the Employee Stock Plan, the Compensation Subcommittee has full authority, subject to the terms of the Plan, to set the date of any option award and any terms or conditions associated with any such award.  *Id*. at Section (3).

**The Cablevision Compensation Committee and Subcommittee**

109.    From the beginning of the backdating period, the Compensation Committee of the Cablevision Board of Directors was to consist of not less than two purportedly independent members of the Board and was responsible for overseeing the development and implementation of compensation programs, including the Employee Stock Plan.  Moreover, the Compensation Committee was directed to:

> make recommendations to the Board with respect to non-CEO compensation, incentive-compensation plans and equity-based plans, including the Executive Performance Incentive Plan, the Management Performance Incentive Plan, the Employee Stock Plan and the Long Term Incentive Plan, oversee the activities of individuals and committees responsible for administering these plans and discharge any responsibilities imposed on the Committee by any of these plans.

Cablevision Systems Corporation Compensation Committee Charter ("Compensation Committee Charter") at 1-2 (available at the Company's website, www.cablevision.com).  The Compensation Committee also has direct responsibility to "oversee regulatory compliance with respect to compensation matters" and to "prepare an annual report of the Compensation Committee on Executive Compensation for inclusion in the Company's annual proxy statement in accordance with applicable SEC rules and regulations."  *Id.* at 2.

110.    Moreover, according to Cablevision's Proxy Statements for 1997-2002, the Compensation Committee was responsible for: (i) representing the Board in discharging its responsibilities with respect to the Company's employee stock plans and, in doing so, to administer such plans with regard to, among other things, the determination of eligibility of

employees, the granting of Company stock, SARs and/or options, and the termination of such plans; and (ii) to determine the appropriate level of compensation, including salaries, bonuses, Company stock and option rights and retirement benefits for members of the Company's senior management, subject to the approval of the Board of Directors. *See, e.g.,* 2002 Proxy Statement, Form DEF 14A (filed May 8, 2003).

111.    According to Cablevision's Proxy Statements for 1997-2002, a subcommittee of the Compensation Committee had "exclusive authority and responsibility for, and with respect to, any grants or awards under the Company's employee stock plans to any executive officer of the Company, and to the Company's most senior employees. *See, e.g.,* 1997 Proxy Statement, Form Def 14A (filed May 18, 1998).

112.    During the Backdating Period, Defendants Hochman, Oristano, and Tatta served on the Compensation Committee, with Defendants Ryan and Tese serving thereafter.

113.    Defendants Hochman and Oristano comprised the Compensation Subcommittee during the Backdating Period.

114.    As of September 20, 2006, Defendant Hochman resigned from the Compensation Committee, but remains on the Board of Directors.  Geraldine Fabrikant, *Cablevision Restates Results Because of Stock Options*, The New York Times (September 22, 2006); *see also* Cablevision Amended Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006).

115.    Pursuant to Cablevision's Proxy Statements filed with the SEC during the Backdating Period, the Compensation Subcommittee was directly responsible for determining the stock option awards that are the subject of this litigation.  Pursuant to the Employee Stock Plan

and the Compensation Committee Charter, the Compensation Committee had responsibility to oversee and ensure proper administration of the stock option awards at issue in this litigation.

**The Cablevision Audit Committee**

116.    During the Backdating Period, Defendants Hochman, Oristano and Tese served on the Audit Committee, which was to be comprised of at least three directors who satisfied the independence and experience requirements of the Company and applicable NASDAQ rules.

117.    The Board's Audit Committee was responsible for monitoring the Company's financial reporting, including compensation reporting.  The stated purpose of the Audit Committee is as follows:

> The purposes of the Audit Committee are to: (1) assist Board oversight (i) of the integrity of the Company's financial statements, (ii) of the Company's compliance with legal and regulatory requirements, (iii) in assessing the independent auditors' qualifications and independence, and (iv) in assessing the performance of the independent auditor and the Company's internal audit function; and (2) prepare an audit committee report as required by the SEC for inclusion in the Company's annual proxy statement.

Cablevision Systems Corporation Audit Committee Charter ("Audit Committee Charter"), § II (available at the Company's website, www.cablevision.com).

118.    The Audit Committee Charter grants the Audit Committee with broad authority and responsibility over the Company's financial reporting, including the following:

> 1.    with respect to the independent auditors,
>
> (i) to be directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditors (including the resolution of disagreements between management and the independent auditors regarding financial reporting), who shall report directly to the Audit Committee;
>
> (ii) to be directly responsible for the appointment, compensation, retention and oversight of the work of any other registered public accounting firm engaged for the purpose of preparing or issuing an

audit report or to perform audit, review or attestation services, which firm shall also report directly to the Audit Committee;

(iii) to pre-approve, or to adopt appropriate procedures to pre-approve, all audit and non-audit services to be provided by the independent auditors;

(iv) to ensure that the independent auditors prepare and deliver annually an Auditors' Statement (as defined below) (it being understood that the independent auditors are responsible for the accuracy and completeness of this Statement), and to discuss with the independent auditors any relationships or services disclosed in this Statement that may impact the quality of audit services or the objectivity and independence of the Company's independent auditors;

(v) to obtain from the independent auditors in connection with any audit a timely report relating to the Company's annual audited financial statements describing all critical accounting policies and practices used, all alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors, and any material written communications between the independent auditors and management, such as any "management" letter or schedule of unadjusted differences;

(vi) to review and evaluate the qualifications, performance and independence of the engagement partner of the independent auditors;

(vii) to discuss with management the timing and process for implementing the rotation of the engagement partner, the concurring partner and any other active audit engagement team partner and consider whether there should be a regular rotation of the audit firm itself; and

(viii) to take into account the opinions of management and the Company's internal auditors in assessing the independent auditor's qualifications, performance and independence;

<center>*       *       *</center>

3.    with respect to accounting principles and policies, financial reporting and internal control over financial reporting,

<center>39</center>

(i) to advise management, the internal auditing department and the independent auditors that they are expected to provide to the Audit Committee a timely analysis of significant issues and practices relating to accounting principles and policies, financial reporting and internal control over financial issues and practices;

(ii) to consider any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Audit Committee by the independent auditors required by or referred to in SAS 61 (as codified by AU Section 380), as it maybe modified or supplemented, including reports and communications related to:

• deficiencies, including significant deficiencies or material weaknesses, in internal control identified during the audit or other matters relating to internal control over financial reporting;

• consideration of fraud in a financial statement audit;

• detection of illegal acts;

• the independent auditor's responsibility under generally accepted auditing standards;

• any restriction on audit scope;

• significant accounting policies;

• issues discussed with the national office respecting auditing or accounting issues presented by the engagement;

• management judgments and accounting estimates;

• any accounting adjustments arising from the audit that were noted or proposed by the auditors but were passed (as immaterial or otherwise);

• the responsibility of the independent auditor for other information in documents containing audited financial statements;

• disagreements with management;

• consultation by management with other accountants;

• major issues discussed with management prior to retention of the independent auditor;

• difficulties encountered with management in performing the audit;

• the independent auditor's judgments about the quality of the entity's accounting principles;

• review of interim financial information conducted by the independent auditor; and

• the responsibilities, budget and staffing of the Company's internal audit function;

(iii) to discuss with the Company's General Counsel or Deputy General Counsel any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;

(iv) to discuss and review the type and presentation of information to be included in earnings press releases;

(v) to discuss the Company's earnings and press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies, which discussion may be done generally (i.e., a discussion of the types of information to be disclosed and the type of presentation to be made) and which discussion need not be conducted in advance of earnings release or instance in which the Company may provide earnings guidance;

(vi) to meet with management and/or the independent auditors and if appropriate, the head of the internal audit department:

• to discuss the scope of the annual audit;

• to discuss the audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

• to discuss any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal auditing department or the independent auditors, relating to the Company's financial statements;

• to discuss any difficulties the independent auditors encountered in the course of the audit, including any restrictions on their activities or access to requested information and any significant disagreements with management;

• to discuss any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company;

• to review the form of opinion the independent auditors propose to render to the Board of Directors and shareholders; and

• to discuss, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;

(vii) to inquire of the Company's chief executive officer and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting;

(viii) to discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company assess and manage the Company's exposure to risk, and to discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

(ix) to obtain from the independent auditors assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under the Securities Exchange Act of 1934;

(x) to establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters and review submissions and the treatment of any such complaints;

(xi) to review and discuss any reports concerning material violations submitted to it by Company attorneys or outside counsel pursuant to the SEC attorney professional responsibility rules (17 C.F.R. Part 205), the Company's attorney reporting policies or otherwise; and

(xii) to establish hiring policies for employees or former employees of the independent auditors.

4.   with respect to reporting and recommendations,

(i) to prepare any report or other disclosures, including any recommendation of the Audit Committee, required by the rules of the SEC to be included in the Company's annual proxy statement;

(ii) to conduct the evaluation required by "Performance Evaluation" below; and

(iii) to report its activities to the full Board of Directors on a regular basis and to make such recommendations with respect to the above and other matters as the Audit Committee may deem necessary or appropriate.

Audit Committee Charter, §§ 1, 3-4.

119.   As members of the Audit Committee during various times during the Relevant Period, Defendants Reifenheiser, Hochman, Ryan, Oristano and Tese had a duty to know and understand the information and circumstances surrounding the stock option grants as set out in the Audit Committee's charter, including oversight of the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, and assisting the Board of Directors in its oversight of the Company's financial reporting, among other duties.

120.   Admitting that they failed to satisfy these responsibilities, as of September 20, 2006, Defendants Hochman and Oristano resigned from the Audit Committee, though they remain members of the Board and continue to enjoy the substantial perquisites and benefits that flow from that position.  Geraldine Fabrikant, *Cablevision Restates Results Because of Stock Options*, The New York Times, (September 22, 2006); *see also* Cablevision Amended Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006).

121.    The members of the Audit Committee knew or should have known that Cablevision's financial statements contained materially false or misleading statements and made and/or omitted material facts regarding Defendants' options backdating practices and how backdating stock options resulted in a reported net income figure that was inflated.

**Stock Option Grants to the Options Defendants**

122.    From 1997 to 2002, the Compensation Committee improperly granted millions of Cablevision stock options to the Options Defendants as follows[3]:

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|---|
| Dolan, James J. | 5/29/1998 | $27.69 | 60,000 |
| | 8/2/1999 | $67.50 | 240,000 |
| | 2/14/2002 | $36.00 | 241,000 |
| | | $20.87[4] | 189,356 |
| Lemle, Robert S. | 4/17/1997 | $7.13 | 575,200 |
| | 8/2/1999 | $67.50 | 150,000 |
| | 12/4/2000 | $76.69 | 130,000 |

---

[3] Allegations regarding the specific options listed are based on Plaintiffs' investigations to date. Plaintiffs are investigating additional time periods during which Plaintiffs believe backdating may have occurred. Plaintiffs reserve their right to amend their complaint and expand their allegations should additional information come to light as a result of discovery which suggests the Company engaged in additional improper backdating.

[4] Options granted with an exercise price of $20.87 on February 14, 2002, represent the exchange of options to purchase shares of Rainbow Media Group Class A tracking stock at the conversion ratio of 1.19093 for options to purchase shares of Cablevision NY Group Class A common stock. *See* Cablevision Amended Annual Report, Form 10-K/A for Fiscal Year 2002 (filed April 30, 2003). On March 29, 2001, the Company had distributed a new series of common stock called Rainbow Media Group tracking stock. The tracking stock was distributed to holders of the Company's common stock at a ratio of one share of Rainbow Media Group for every two shares of the Company's common stock held. The Company's then existing common stock was redesignated as Cablevision NY Group common stock. As of August 2002, Cablevision's Board of Directors approved the exchange of Rainbow Media Group common stock for shares of Cablevision NY Group common stock and all rights of holders of shares of Rainbow Media Group common stock ceased except for the right, upon surrender of the certificates representing their shares of Rainbow Media Group common stock, to receive the shares of Cablevision NY Group common stock. *See* Cablevision Annual Report, Form 10-K for Fiscal Year 2004 (filed March 16, 2005). For those options granted prior to 2002, the number of options listed reflects information contained in the Company's proxy statements for the fiscal year in which the option was granted and does not reflect subsequent conversions due to the distribution of Rainbow Media Group stock on March 29, 2001, or the exchange on August 2002.

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|---|
| | 2/14/2002 | $36.00 | 241,000 |
| | | $20.87 | 189,356 |
| Bell, William J. | 4/17/1997 | $7.13 | 700,000 |
| | 8/2/1999 | $67.50 | 200,000 |
| | 2/14/2002 | $36.00 | 241,000 |
| | | $20.87 | 189,356 |
| Mahony, Sheila A. | 4/17/1997 | $7.13 | 140,000 |
| | 8/2/1999 | $67.50 | 90,000 |
| | 2/14/2002 | $36.00 | 82,000 |
| | | $20.87 | 64,310 |
| Ratner, Hank J. | 4/17/1997 | $7.13 | 140,000 |
| | 5/29/1998 | $27.69 | 20,000 |
| | 8/2/1999 | $67.50 | 90,000 |
| | 2/14/2002 | $36.00 | 50,000 |
| | | $20.87 | 214,366 |
| | 5/31/2000 | $62.25 | 80,000 |
| Rosengard, Andrew B. | 4/17/1997 | $7.13 | 140,000 |
| | 8/2/1999 | $67.50 | 150,000 |
| | 2/14/2002 | $36.00 | 196,000 |
| | | $20.87 | 153,628 |
| Dolan, Thomas C. | 4/17/1997 | $7.13 | 60,000 |
| | 8/2/1999 | $67.50 | 50,000 |
| | 2/14/2002 | $36.00 | 83,600 |
| | | $20.87 | 66,212 |
| Marc A. Lustgarten[5] | 4/17/1997 | $7.13 | 720,000 |
| Joshua Sapan | 4/17/1997 | $7.13 | 404,000 |
| | 8/2/1999 | $67.50 | 150,000 |
| Robert P. May | 4/17/1997 | $7.13 | 400,000 |
| Margaret A. Albergo | 4/17/1997 | $7.13 | 100,000 |
| | 5/29/1998 | $27.69 | 30,000 |
| | 8/2/1999 | $67.50 | 150,000 |
| Raymond S. Andersen | 5/29/1998 | $27.69 | 34,000 |
| | 5/31/2000 | $62.25 | 46,000 |
| Brian G. Sweeney | 5/29/1998 | $27.69 | 13,000 |

[5] Cablevision has yet to disclose exactly how and at what exercise price the Company granted options to Lustgarten after his death.   In its September 2006 amended filing, Cablevision said only that an "executive officer" had received backdated options after his death.  Subsequent news reports identified Mr. Lustgarten as that executive. *See* Cablevision Amendment to Annual Report, Form 10-K/A for Fiscal Year 2005 (filed September 21, 2006); Peter Grant, James Bandler and Charles Forelle, *Cablevision Gave Backdated Grant to Dead Official – Two Directors Quit Key Posts Amid Earnings Restatement; An Award for a Consultant*, *The Wall Street Journal* (September 22, 2006).

| Officer | Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|---|
| | 5/31/2000 | $62.25 | 46,000 |
| P. Dolan | 5/31/2000 | $62.25 | 34,000 |
| Lyons, Benenson & Co. Inc. | 5/31/2000 | $62.25 | 20,000 |
| Other Grants | 11/28/1998 | $41.38 | 167,000 |
| | 6/3/1999 | $74.69 | 341,000 |

123.    As noted above, the Plan required that absent specific approval by the administrator or a merger or acquisition the exercise price for any stock option issued under the Plan must be at least 100% of the Fair Market Value on the date of the grant.  A granted option could not be in the money at the time of the grant.

124.    Pursuant to APB 25, which predated FAS 123(R) and was the applicable GAAP provision at the time of the foregoing stock option grants, if the market price of the underlying security on the date of grant exceeded the exercise price of the options, the Company was required to recognize the difference as an expense.  Cablevision failed to do this.

125.    Pursuant to Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

126.    As recognized by Professor Lie, "in the absence of opportunistic grant timing or opportunistic timing of information flows around grants, the returns before and after grant dates should be similar.   Consequently, if opportunistic timing is absent, the distribution of the difference between the returns for a given number of days after the grants and the returns for the same number of days should be centered roughly at zero."  Randall A. Heron and Erik Lie, *What Fraction of Stock Option Grants to Top Executives Have Been Backdated or Manipulated* (July 14, 2006).

127.    With respect to Cablevision, the stock option grant dates follow a striking pattern that could not have been the result of chance.   Each of the Options Defendants received a substantial number of option shares that increased in value immediately after they were granted, by significant amounts.

128.    As has been reported by *The New York Times* regarding options granted at Cablevision for the years 1997-1999:

> On April 17, 1997, when more than 60 percent of the more than 1.9 million options were granted to top executives, shares were trading at a quarterly low of $7.13, adjusted for splits.

> Though Mr. Dolan did not receive any of those options, four other executives got sizable grants representing 48 percent of the total.

> After April 17, the shares rose sharply, closing the quarter at $11.39. On June 9, the Company announced that it would buy 10 cable systems.  Cablevision's stock rose 38 percent that day and the next. By the end of 1997, the stock had risen to $19.52 [unadjusted close, $23.94].

> \* \* \*

> On May 29, 1998, the board gave Mr. Dolan 160,000 [sic] options at a split-adjusted $27.69 a share.   By the end of that year, Cablevision's stock had risen substantially from that price.

> In 1999, the year Cablevision's board handed out the second-largest batch of options to its executives, the grants were made on Aug. 2,

> when the stock was at $57.34 a share [unadjusted close, $67.50], its
> low for the quarter.  It closed the year at $64.13 [unadjusted close,
> $75.50].

Geraldine Fabrikant, *Cablevision To Restate Its Earnings*, The New York Times (August 9, 2006).

129.   In fact, Cablevision's stock grants issued between fiscal year 1997 and 2002 display an extraordinary pattern:

- 1997:  the closing price of Cablevision stock on April 17, 1997 was $6.05 [unadjusted close, $28.50][6], the second lowest closing price of Cablevision stock during the entire year – by year-end, the price had increased 235% to $23.94;

- 1998:  after the Company granted shares to Defendant James Dolan on May 29, 1998, Cablevision stock saw an 81% per share increase by year-end;

- 1999:  the closing price of Cablevision's stock on August 2, 1999 was $57.34 [unadjusted close, $67.50], the lowest closing price for the entire quarter; and

- 2000:  after the Company's December 4, 2000 grant of 130,000 stock options to Defendant Lemle, Cablevision stock rose to $84.94 near the end of the year.

130.   The following charts demonstrate this extraordinary pattern of Cablevision's stock grants issued between fiscal year 1997 and 2002[7]:

---

[6] See FN 7, below.

[7] Closing prices reflected in the graphs indicated in paragraph 129 herein are the adjusted closing prices according to Yahoo! Finance as of December 11, 2006, which are adjusted for all dividends and splits.  Not all of these dividends and splits are not fully reflected in the exercise prices recorded in the proxies for the Backdating Period.

March 19, 1997 - May 19, 1997
Split-Adjusted Close Share Price
$25
$23
$21
$19
$17
$15
$13
$11
$9
$7
$5
**4/17/1997**- Options Granted on 2,135,200 Shares
3/19/1997
4/2/1997
4/16/1997
4/30/1997
5/14/1997
5/28/1997
6/11/1997
6/25/1997
7/9/1997
7/23/1997
8/6/1997
8/20/1997
9/3/1997
9/17/1997
10/1/1997
10/15/1997
10/29/1997
11/12/1997
11/26/1997
12/10/1997
12/24/1997

April 30, 1998 - June 26, 1998
Split-Adjusted Close Share Price
$40
$38
$36
$34
$32
$30
$28
$26
$24
$22
$20
**5/29/1998**- Options Granted on 160,000 Shares
4/30/1998
5/7/1998
5/14/1998
5/21/1998
5/28/1998
6/4/1998
6/11/1998
6/18/1998
6/25/1998
7/2/1998
7/9/1998
7/16/1998





Sept. 21 1998-Feb. 5, 1999



March 21,2000- July 27, 2000



January 16, 2002 - March 15, 2002

131.    As the research by Professor Lie and others demonstrates, while positive returns for a single grant might be innocently explained, a consistent pattern of frequent and well-timed grants makes backdating the most plausible -- if not the only plausible -- explanation.  *See, e.g.,* Charles Forelle, *How the Journal Analyzed Stock-Option Grants*, The Wall Street Journal (March 18, 2006) ("It is very unlikely that several grants spread over a number of years would all fall on high-ranked days [i.e. most favorable to the recipient].").

132.    Plaintiffs allege that the reason for the extraordinary pattern set forth in the above data can only be that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Cablevision stock was lower than the market price on the actual grant dates.

133.     This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Options Defendants and improperly reduced the amounts the Options Defendants had to pay the Company upon exercise of the options.

134.     According to the Cablevision Proxy Statements issued during fiscal years 1997 through 2002, each of the options granted to the Options Defendants were for a term of ten years. Thus, almost none of the options identified above have yet expired. Consequently, Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Options Defendants exists to this day.

**Dissemination of False and Misleading Financial Statements and Reports**

135.     As a result of the backdating of stock options described above, during the Relevant Period, the Company issued materially false and misleading financial statements and reports, including but not limited to annual reports, filed with the SEC and disseminated to shareholders and the public as Forms 10-K or 10-Q, proxy statements, filed with the SEC and disseminated to shareholders and the public as Form DEF-14A, and other quarterly and interim reports. Each of the Defendants knew or should have known that these statements were false and either knowingly participated in their dissemination or failed to prevent or correct them. These financial statements and reports were prepared and presented in violation of GAAP. Due to the improper backdating of the stock options alleged herein, these financial statements and reports overstated Cablevision's net income and earnings and understated Cablevision's compensation expense.

136.     For instance, with respect to accounting for stock-based compensation, Cablevision stated the following, which was materially false and misleading due to the options backdating alleged herein:

Stock Option Plan

> The Company applies the intrinsic value based method of accounting prescribed by the Accounting Principles Board (APB) Opinion No. 25, Accounting for Stock Issued to Employees and related interpretations to account for its stock options. Under this method, compensation expense is recorded on the date of grant only if the current market value price of the underlying stock exceeded the exercise price. Statement of Financial Accounting Standards No. 123, Accounting for Stock Based Compensation, established accounting and disclosure requirements using a fair value based method of accounting for stock based employee compensation plans. As allowed by Statement 123, the Company has elected to continue to apply the intrinsic value method of accounting described above.

Cablevision Annual Report, Form 10-K for Fiscal Year 2003 (filed March 15, 2004).[8]

137.   On May 18, 1998, the Company, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Cablevision's shareholders the Company's annual proxy statement (the "1997 Proxy Statement"), which provided, among other things, notice of and information for Cablevision's annual shareholders' meeting to be held June 10, 1998.  The 1997 Proxy Statement falsely reported the dates of stock option grants to the Options Defendants stating, for example, that "On April 17, 1997, the Compensation Committee granted to certain key employees of the Company, including Messrs. Bell, Lustgarten, Lemle and Rosengard, certain stock options and SARs…. These awards were made at the then current price for the Company's Class A Common Stock."  1997 Proxy Statement (filed May 18, 1998).  The 1997 Proxy

---

[8] Cablevision's prior 10-Ks contained virtually identical language.  *See, e.g.,* Form 10-K for Fiscal Year 2001 (filed April 1, 2002) and Form 10-K for Fiscal Year 2002 (filed March 31, 2003) ("The Company applies the intrinsic value based method of accounting prescribed by Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees' and related interpretations, to account for its stock options. Under this method, compensation expense is recorded on the date of grant only if the current market price of the underlying stock exceeded the exercise price. Statement 123 'Accounting for Stock Based Compensation', established accounting and disclosure requirements using a fair value based method of accounting for stock based employee compensation plans. As allowed by Statement 123, the Company has elected to continue to apply the intrinsic value method of accounting described above."); Form 10-K for Fiscal Year 2000 (filed March 30, 2001), Form 10-K for Fiscal Year 1999 (filed March 30, 2000), Form 10-K for Fiscal Year 1998 (filed March 31, 1999) and Form 10-K for Fiscal Year 1997 (filed March 31, 1998) ("The Company applies APB 25 and related interpretations in accounting for its stock option plans.").

Statement also contained a table of the various stock options granted to executive officers during the prior fiscal year which included the "market price on date of grant" for each awarded option.[9] In making these statements, the Company represented that the exercise price of all of the stock options awarded under its Employee Stock Plan was for no less than the fair market value of the Company's common stock as measured by the publicly traded closing price for Company stock on the day of the grant.  These statements were materially false and misleading in light of the backdating alleged herein.  The 1997 Proxy Statement failed to report the true value of the compensation paid to the Options Defendants or that the options were backdated as alleged herein, rather than issued on the date at which Cablevision stock traded at the market value identified in the proxy statement.  Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

138.    The 1997 Proxy Statement further stated that in connection with the April 17, 1997 awards made to Defendants Bell, Lemle, Rosengard and Lustgarten "certain options and SARs previously granted to the recipients with exercise prices greater than the then current market price of the Company's Class A Common Stock, were cancelled."  The 1997 Proxy Statement explained that "The Compensation Committee determined that the retention value of the executive's Option/SAR package would be significantly enhanced if a greater portion of their unvested Option/SAR's were at exercise prices not below the current market value of the underlying Class A Common Stock."  The offer had the effect of swapping options that would have been less profitable for those holding them, for options that were more advantageous.  In

---

[9] Each of Cablevision's yearly proxy statements for 1998 through 2000 contained a table listing stock option grants to its top five executives during the prior fiscal year which included the "market price on date of grant" for each option awarded to the Officer Defendants.  *See* 1998 Proxy Statement (filed June 8, 1999); 1999 Proxy Statement (filed May 17, 2000); 2000 Proxy Statement (filed May 9, 2001).

short, the scheme ensured that Cablevision's officers benefited at a cost to the Company not only when the backdating stock practices worked to their advantage, but also when they didn't.

139.    In the 1997 Proxy Statement, the Directors also recommended that Cablevision's stockholders approve an amendment to the Company's Employee Stock Plan to increase the number of shares of Common Stock reserved for issuance thereunder by 3,500,000 shares.  The Compensation Committee, in its report included in the 1997 Proxy Statement, touted the benefits of the Plan, stating that the "compensation philosophy" of the Company included (i) placing "the majority of the annual and long-term compensation for the Company's senior executive officers…at risk" such that "compensation levels correlat[e] with the Company's actual performance"; (ii) shifting "incentive compensation of the Company's senior executive officers…more heavily on long-term rather than short-term accomplishments and results"; and (iii) tying executive officers interests to stockholders' interests.

140.    In the 1997 Proxy Statement and in subsequent proxy statements filed during the Relevant Period with the SEC and disseminated to Cablevision's shareholders, the Company falsely reported the dates of stock option grants to the Options Defendants through its representations that the award of stock options to the Options Defendants were made pursuant to the Employee Stock Plan and were therefore granted at the market price of the Company's common stock on the date of grant as required under the Employee Stock Plan (discussed *infra* Section 4(e)).  *See, e.g.,* 1997 Proxy Statement ("Stock options…granted under the company's Employee Stock Plan"); *see also* 1998 Proxy Statement (filed June 8, 1999); 1999 Proxy Statement (filed May 17, 2000); 2000 Proxy Statement (filed May 9, 2001); 2001 Proxy Statement (filed May 8, 2002); 2002 Proxy Statement (filed May 8, 2003); ("We have granted stock options, restricted stock and stock appreciation rights to executives under the Employee Stock Plan and

earlier plans."). These statements were materially false and misleading in light of the backdating alleged herein. The proxy statements for 1997 through 2002, in particular, failed to report the true value of the compensation paid to the Options Defendants or that options were backdated as alleged herein, rather than issued on the date at which Company stock traded at the market value identified in the proxy statement. Thus, backdated stock options provided undisclosed compensation to the executive officers on the date of the grant.

141. Defendants knew or reasonably should have known of these misstatements and omissions and failed to prevent or correct them.

142. In addition, in the Report of the Audit Committee included in the 2000 Proxy Statement, the Audit Committee "recommended to the Board that [the Company's] audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2000 to be filed with the Securities and Exchange Commission." The Audit Committee Defendants knew or reasonably should have known that these financial statements were materially false and misleading for the reasons set forth above.[10]

143. With respect to compliance with I.R.C. § 162(m), the 1997 Proxy Statement stated:

> Beginning in 1994, the Omnibus Reconciliation Act of 1993 limits to $1 million the amount that may be deducted by a publicly held corporation for compensation paid to each of its named executives in a taxable year, unless the compensation in excess of $1 million is 'qualified performance-based compensation.' The Committee and the Company have determined that the Company's policy is to design its short-term and long-term compensation plans to qualify for the exemption from the deduction limitations of Section 162(m) of the Internal Revenue Code and to be consistent with providing appropriate compensation to executives. Stockholder approval of incentive compensation plans and various provisions thereunder has been sought and obtained, is being sought this year for the

---

[10] The Audit Committee made identical representations in subsequent proxy statements filed during the relevant time period. *See, e.g.,* 2001 Proxy Statement (filed May 8, 2002); 2002 Proxy Statement (filed May 8, 2003).

> Executive Performance Incentive Plan (referenced above), and will be sought in the future to continue to qualify performance-based compensation for the exemption.

Upon information and belief, this statement was materially false and misleading in light of the options backdating at Cablevision alleged herein.  Because of the options backdating, Plaintiffs believe and therefore allege that Cablevision violated I.R.C. § 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals, and therefore violated the terms of the Plan.

144.    With respect to compliance with I.R.C. § 162(m), the 1998 Proxy Statement stated:

> Beginning in 1994, the Omnibus Reconciliation Act of 1993 limits to $1 million the amount that may be deducted by a publicly held corporation for compensation paid to each of its named executives in a taxable year, unless the compensation in excess of $1 million is 'qualified performance-based compensation.'  Our policy is to design its short-term and long-term compensation plans to qualify for the exemption from the deduction limitations of Section 162(m) of the Code and to be consistent with providing appropriate compensation to executives.

On information and belief, this statement was materially false and misleading in light of the options backdating alleged herein.  Because of the options backdating, Plaintiffs believe and therefore allege that Cablevision violated I.R.C. § 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals, and therefore violated the terms of the Plan.[11]

145.    In addition, between fiscal year 1997 and the present, the Company, with the effect of concealing the options backdating, filed with the SEC numerous annual and quarterly reports, which were materially false and misleading.  Specifically, the annual and quarterly reports

---

[11] The Company made nearly identical representations in subsequent proxy statements filed during the relevant time period.  *See* 1999 Proxy Statement (filed May 17, 2000); 2000 Proxy Statement (filed May 9, 2001); 2001 Proxy Statement (filed May 8, 2002); 2002 Proxy Statement (filed May 8, 2003).

overstated net income and earnings per share and understated the Company's compensation expense, due to the backdating alleged herein.   These reports include but are not limited to the following:

- Cablevision 1997 Form 10-K (filed March 31, 1998);

- Cablevision 1998 Form 10-K (filed March 31, 1999);

- Cablevision 1999 Form 10-K (filed March 30, 2000);

- Cablevision 2000 Form 10-K (filed March 30, 2001);

- Cablevision 2001 Form 10-K (filed April 1, 2002);

- Cablevision 2002 Form 10-K (filed March 31, 2003);

- Cablevision 2003 Form 10-K (filed April 30, 2004);

- Cablevision 2004 Form 10-K (filed March 16, 2005);

- Cablevision 2005 Form 10-K (filed March 2, 2006); and

- Cablevision Form 10-Qs for all of 2004, 2005 and the quarter ended March 31, 2006.

146.   Furthermore, between fiscal year 1997 and the present, the Company, with the effect of concealing the improper options backdating, filed with the SEC numerous Form 4s that failed to disclose the backdating of stock option grants to the Options Defendants.   Defendants knew or should have known about these misstatements and omissions and failed to prevent or correct them.

**Backdating is Revealed**

147.   Backdating practices were largely undetected until academics investigated timing anomalies related to stock options.   These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year.   Such timing could not be statistically explained by random selection of

grant dates.  One study hypothesized that the dates of the grants had been selected retroactively; such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in the money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.  Since companies are required to report "in the money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers and employees that was not detectable, thereby permitting the company to conceal the additional compensation and forego reporting or recording the charge.

148.   The academic research did not identify specific companies that had engaged in these practices, although it apparently triggered increased scrutiny by the SEC and other government officials.

149.   The practice was publicly disclosed on March 18, 2006, when The Wall Street Journal published *The Perfect Payday,* in which it described stock option backdating practices by a number of companies, including Affiliated Computer Services, Inc. ("ACS"), KLA Group, Inc., Comverse Technology, Inc., and Vitesse Semiconductor Corporation, that defied random chance. The Wall Street Journal, together with finance professors Eric Lie and David Yermack and statistician John Emerson, studied patterns of particularly favorable stock grants at certain companies and calculated the probability of such patterns occurring randomly and concluded that the odds were improbable.  The Journal reported, for example, that all six of the stock options granted by ACS to its former CEO Jeffrey Rich displayed a pattern of profitability that could not be explained by chance:

> In a striking pattern all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some options carry favorable grant dates for a different reason:  They were backdated.

Charles Forelle and James Bandler, *The Perfect Payday*, The Wall Street Journal (March 18, 2006).

150.    Since the date of *The Wall Street Journal* article, more than 100 companies have reported internal and/or governmental investigations of their backdating practices.  *Perfect Payday Options Scorecard,* The Wall Street Journal, (updated daily, available at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html) (as of September 11, 2006, more than 105 companies "have disclosed government probes, misdated options, restatements and/or executive departures.").  Additional research by Professor Lie suggests that between the period 1996-2005, 18.9% of unscheduled "in the money" option grants to top executives were backdated or manipulated, by nearly one-third of the companies investigated.

151.    On August 8, 2006, Cablevision announced that it "had undertaken a voluntary review of its past practices in connection with grants of stock options and stock appreciation rights."  Press Release, Cablevision Systems Corporation (August 8, 2006) (available at company website, www.cablevision.com).  The Company also announced that as a result of its review, it had determined that the grant date and exercise price assigned to a number of its stock option and SAR grants during the 1997-2002 period did not correspond to the actual grant date and the closing price of the Company's common stock on the actual grant date.  *Id*.  Cablevision also

announced that it expected it "would restate previously issued annual and interim financial statements to record adjustments relating to stock option and SAR matters" and that "financial statements for all the periods beginning January 1, 1997 should not be relied upon." *Id.*

152. The following day, August 9, 2006, *The New York Times* reported that Cablevision was in fact restating earnings due to questions regarding the timing of stock option grants. The article also stated that "Company filings show that more than 1.9 million options were granted from 1997 to 2002 to James L. Dolan, the chief executive of Cablevision, and four other executives" and that "[i]n several cases the grants were made when Cablevision stock was trading at or near a quarterly low." Geraldine Fabrikant, *Cablevision to Restate Its Earnings*, The New York Times (August 9, 2006).

153. On August 16, 2006, Cablevision announced that the SEC and U.S. Attorney's Office were each conducting investigations into the Company's alleged backdating of stock options. Press Release, Cablevision Systems Corporation (August 16, 2006) (available at company website, www.cablevision.com).

154. On September 21, 2006, Cablevision provided further detail regarding its option back-dating improprieties:

> In such cases, the date assigned to the grant corresponded to the date of a unanimous written consent executed by the members of the compensation committee of the Company's Board of Directors, but the date of that consent did not correspond to the actual date of the grant. ***In nearly all such cases, the stock price on the assigned date was lower, sometimes substantially lower, than the price on the date the award was actually granted.*** At all relevant times, the Company's stock plan required that the exercise price of options be not less than the fair market value per share of the Company's common stock on the date of grant. The former officers of the Company and the Company's former compensation consultant who were identified in the stock options review as having directly participated in the options dating process have either retired or had their relationship with the Company otherwise terminated (in every

case more than one year prior to the commencement of the stock options review). In addition to grant dating issues, the Company's review identified certain modifications made to outstanding stock option award grants, principally extensions of expiration dates that were not accounted for properly.

In addition, ***two awards of options and one option modification were also incorrectly accounted for as having been granted to employees or modified for employees.*** One of these two awards was to the Company's former compensation consultant (which was subsequently cancelled in 2003) and the other award related to an executive officer whose death occurred after the stated grant date of the award and before the actual grant date. The option modification that was incorrectly accounted for related to the options issued to this executive officer. Management of the Company has concluded that the Company's consolidated financial statements for the years ended December 31, 2005, 2004 and 2003 and all quarterly periods in 2005 and 2004 and the quarter ended March 31, 2006, as well as the selected financial data for the years ended December 31, 2002 and 2001 should be restated to adjust previously recognized amounts of non-cash stock based compensation (expense) benefit resulting from the Company's stock option review.

Cablevision Annual Report, Form 10-K for Fiscal Year 2005 (filed September 21, 2006) (emphasis added).

155. As a result of the Company's restatement of earnings for 2003-2005 and the first quarter of 2006, net income decreased in the period 1997 to March 2006 by $89.2 million. *See* Cablevision Quarterly Report, Form 10-Q/A for the Quarter Ended March 31, 2006 (filed September 21, 2006).

156. On October 27, 2006, the Board of Directors appointed Grover C. Brown and Zachary W. Carter as directors of the Company. On the same day, the Board appointed Messrs. Brown and Carter to a newly formed special litigation committee of the Board.

157. The special litigation committee is to review and analyze the facts and circumstances surrounding claims that have been raised in certain litigations in which the Company has been named as a nominal defendant. The special litigation committee purportedly

has full and sole authority to consider and determine whether or not prosecution of such claims is in the best interests of the Company and its shareholders, and what actions the Company should take with respect to the cases.

<div align="center">

**DEFENDANTS BREACHED THEIR
FIDUCIARY DUTIES TO THE COMPANY
AND ITS SHAREHOLDERS**

</div>

158.     By reason of their positions as directors, officers, and/or fiduciaries of Cablevision, and because of their ability to control Cablevision's business, corporate and financial affairs, each of the Defendants owed Cablevision and public shareholders the following fiduciary duties in their management and administration of the affairs of the Company and in the use and preservation of corporate assets:

    **a.  Good Faith.**  The duty to act at all times in good faith and in the best interests of the company and its shareholders, and to avoid action that results in a waste of corporate assets.

    **b.  Due Care.**  The duty to take all reasonable steps to be informed with respect to the decision in question and operate in a manner reasonably believed to be in the best interests of the company, with the care of ordinarily prudent persons in a like position and under similar circumstances.

    **c.  Loyalty.**  Defined by courts in broad and unyielding terms, the duty of loyalty mandates that the best interests of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by the shareholders generally.

159.     In order to satisfy these fiduciary obligations, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company and to exercise their utmost ability to control and manage the Company in a fair, just,

honest, and equitable manner, in the best interests of Cablevision and its shareholders. Defendants' fiduciary obligations did not allow them to act in furtherance of their own self-interest, to the detriment of the Company and its shareholders.

160.   Defendants owed a duty to Cablevision and its shareholders to ensure that Cablevision and its directors, officers and agents operated in compliance with all applicable federal and state laws, rules and regulations, and that Cablevision did not engage in any unsafe, unsound, or illegal business practices.

161.   Defendants were further required to remain informed as to how Cablevision was operating and, upon receiving notice or information of unsafe, imprudent, unsound or illegal practices, to make a reasonable investigation into and take steps to correct the practices. Defendants' duties included, but were not limited to, maintaining and implementing an adequate system of internal accounting, as well as other financial controls and reporting, and gathering and reporting information internally, to allow Defendants to perform their oversight function properly and to prevent the use of non-public corporate information for personal profit.

162.   Defendants were also required to supervise the preparation, filing, and/or dissemination of Cablevision's SEC filings, press releases, audits, reports, and other information to be publicly disseminated, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of Cablevision's officers, and to make full and accurate disclosure of all material facts concerning each of the items set forth herein.

163.   In addition, Defendants were required to preserve and enhance Cablevision's reputation as a publicly-traded company, and to maintain public trust and confidence in Cablevision as a prudently managed corporate entity fully capable of meeting its duties and obligations, including its public reporting obligations.

164.    In violation of these duties, as well as GAAP, Defendants failed to accurately record, process, summarize, and report the Company's financial data.

165.    Specifically, the Options Defendants and Compensation Committee Defendants breached their fiduciary duties by backdating the option grants in violation of the Plan and applicable federal and state laws, rules and regulations as described in more detail in the Counts below.

166.    Similarly, all Defendants, including the Options Defendants, Compensation Committee Defendants and Audit Committee Defendants, breached their fiduciary duties by, *inter alia*: (a) failing to account for and report the options backdating; (b) filing and disseminating to Cablevision shareholders and the public false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and (c) filing and disseminating to Cablevision shareholders and the public false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

167.    Defendants' misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit Defendants at the expense of the Company and its public shareholders.

168.    As a direct and proximate result of Defendants' fiduciary breaches, the Company has sustained millions of dollars in damages. Defendants have diverted millions of dollars of corporate assets to senior Cablevision executives, caused Cablevision to incur additional compensation expenses and tax liabilities, as well as loss of funds paid to Cablevision upon the exercise of the options, and subjected Cablevision to potential liability from regulators, including the Securities and Exchange Commission and Internal Revenue Service.

169.    Furthermore, because almost none of the options granted to the Options Defendants have expired, Defendants are in continued breach of their fiduciary obligations and the opportunity for further unjust enrichment of the Options Defendants exists to this day.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who were common stockholders of the Company at any time between April 17, 1997 and the present (the "Class Period") and excluding all Defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

171.    The members of the Class are so numerous that joinder of all members is impracticable.  As of November 2, 2007, there were nearly 231 million shares of Cablevision Class A Common Stock and 63 million shares of Class B Common Stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class who were common stockholders of Cablevision during the Class Period.

172.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiffs and the other members of the Class; and

(b)     whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by Defendants.

173.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal and state law as complained of herein.

174.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and complex litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.   Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

175.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.   Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.

176.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

177.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## **DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS**

178.    Plaintiffs bring this action derivatively on behalf of and for the benefit of Cablevision to redress injuries suffered, and yet to be suffered by Cablevision, as a direct and

proximate result of the wrongdoing alleged herein.  Cablevision is named as a nominal defendant solely in a derivative capacity.

179.   Plaintiffs were Cablevision shareholders during the Relevant Period, including the Backdating Period; Plaintiffs have held Cablevision common stock during the Relevant Period, and intend to retain these shares of Cablevision stock through the duration of this litigation.

180.   Pursuant to Fed. R. Civ. P. 23.1, Plaintiffs have standing to assert these claims on behalf of the company and will fairly and adequately protect the interests of the Company and its other stockholders.

181.   This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

182.   Plaintiffs will fairly and adequately represent the interests of other similarly situated Cablevision shareholders in enforcing Cablevision's rights.

183.   The Cablevision Board of Directors at the time of the filing of the initial complaint consisted of the following fourteen Defendants: Charles F. Dolan, James L. Dolan, Patrick F. Dolan, Marianne Dolan Weber, Brian G. Sweeney, Richard H. Hochman, Victor Oristano, Thomas V. Reifenheiser, John R. Ryan, Vincent Tese, Rand V. Araskog, Frank J. Biondi, Charles D. Ferris and Leonard Tow.

184.   Plaintiffs have not made any demand upon the current Cablevision Board of Directors to bring an action asserting the claims herein, for the damages suffered by Cablevision, since such demand would be a futile, wasteful and useless act, particularly for the following reasons:

185.   Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent

business judgment since it would undoubtedly be to the benefit of Cablevision to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims.

186.    Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by Director Defendants and incapable of ratification by the current Board of Directors.

187.    In addition to the conflicts that exist as a result of their participation in the improper accounting, demand is also excused because Cablevision's Board of Directors has ratified the egregious actions outlined herein, and these same Directors cannot be expected to prosecute claims against themselves, and persons with whom they have extensive inter-related business, professional and personal entanglements, if Plaintiffs demanded that they do so.  The Directors, because of these relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company.  Indeed, in addition to compensation, a number of these Directors authorized stock option grants to themselves under the Cablevision Systems Corporation Non-Employee Stock Plan.

188.    Demand is also futile because the Cablevision Board of Directors is currently controlled by the Dolan Family.  In fact, five of the fourteen current Board members are part of the Dolan Family.  The Dolan Family currently owns 24% of the Company's stock and has a 74% controlling interest through their ownership of the super-voting Class B shares, affording them the power to elect nine Cablevision directors.[12]  In its 2006 Proxy Statement, the Company states as much:

---

[12] While each holder of Cablevision Class A common stock has one vote per share, holders of Cablevision Class B common stock have ten votes per share. Cablevision Class B stockholders have the right to elect 75% of the members of the Company's Board of Directors while the Cablevision Class A stockholders are entitled to elect the remaining 25% of the Company's board.  In addition, Class B stockholders entered into (continued…)

Our Class A Stock is listed on the New York Stock Exchange. As a result, we are subject to most of the New York Stock Exchange's corporate governance listing standards. A listed company that meets the New York Stock Exchange's definition of "controlled company" may elect not to comply with certain of these requirements. On March 19, 2004, the Class B stockholders who are members of the Dolan family and related family entities entered into a Stockholder Agreement relating, among other things, to the voting of their shares of our Class B Stock and filed a Schedule 13D with the Securities and Exchange Commission as a "group" under the rules of the SEC. As a result, we are a "controlled company." As a "controlled company," we have the right to elect not to comply with the corporate governance rules of the New York Stock Exchange requiring: (i) a majority of independent directors on our Board; (ii) an independent corporate governance and nominating committee; and (iii) an independent compensation committee.

We have elected not to comply with the New York Stock Exchange requirement for a majority independent board of directors and for a corporate governance and nominating committee because of our status as a "controlled company." We do comply with the requirement for an independent compensation committee. Our Board elected not to comply with the requirement for a majority independent board of directors because of our shareholder voting structure. Under the terms of our Amended and Restated Certificate of Incorporation, the holders of our Class B Stock have the right to elect 75% of the members of our Board and there is no requirement that any of those directors be independent.

2006 Proxy Statement (filed April 28, 2006).

189. Three members of the current Cablevision Board were handpicked by Mr. C. Dolan to serve his needs: Directors Araskog, Biondi, and Tow. Thus, these Directors are entirely beholden to Defendant C. Dolan and would not take any affirmative steps to question his authority or effect governance change that would adversely impact Mr. C. Dolan or any member of the Dolan Family.

_____

(…continued)

an agreement which has the effect of causing the voting power of these Class B stockholders to be cast as a block. *See* Cablevision Annual Report, Form 10-K for Fiscal Year 2005 (filed March 2, 2006).

190.    Also, as alleged in further detail herein, two other members of the Board have professional entanglements with Defendant C. Dolan:  Directors Ferris and Hochman. Thus, these Directors are entirely beholden to Defendant C. Dolan and would not take any affirmative steps to question his authority or effect governance change that would adversely impact Defendant C. Dolan or any member of the Dolan Family.

191.    In particular, Director Ferris is beholden to Mr. C. Dolan and the Dolan Family. Mr. Ferris has served on the Company's Board and enjoyed the privileges of that position longer than any Director -- other than Defendant Oristano and Mr. C. Dolan, himself.  Over the course of his twenty years on the Board, Mr. Ferris has been paid well in excess of $2 million and has received Company stock options worth at least that much.  Mr. Ferris has been associated with the Dolan Family and has financially benefited from that association for two decades, and as such, Mr. Ferris is not an independent Director.

192.    Also, Director Defendant Hochman is beholden to Mr. C. Dolan and the Dolan Family.  Since 1995, Mr. C. Dolan has had an investment in Regent Equity Partners, a limited partnership in which Mr. Hochman is one of the general partners.  In addition, since 1999, Mr. C. Dolan has had a preferred stock investment in Danskin Inc.  Mr. Hochman's spouse has been the CEO of Danskin Inc. since May 1999.  Mr. Hochman, his spouse and Regent Equity Partners have had a substantial direct or indirect equity investment in Danskin Inc. since 1997.  On December 31, 2004, Mr. and Mrs. Hochman collectively and Mr. C. Dolan owned, directly or indirectly, approximately 11% and 6 % respectively of the common equity of Danskin Inc. calculated on a fully diluted as converted basis.  Mr. Hochman has received substantial pecuniary benefits (well in excess of $100,000 per year) for serving on the Company's Board and as a member of the Audit, Compensation and Executive Committees (and for a time, as Chairman of the Compensation

Committee) for nearly 20 years.  Mr. Hochman has been associated with the Dolan Family and has financially benefited from that association for nearly two decades, and as such, Mr. Hochman is not an independent Director.

193.    Director Defendant Oristano is not an independent Director.  Mr. Oristano is the founder and Chairman of Alda Limited Partners, a holding company which has built and operated cable television systems in Connecticut, Florida, New Jersey, Pennsylvania and England since 1966.  Since 2004, Mr. C. Dolan has had an investment in Reaction Biology Corp., a privately held technology company in which Alda Limited Partners has an investment.  Moreover, Matthew Oristano is the son of Mr. Oristano and serves as the President and CEO of Alda Limited Partners and has served as Chairman of Reaction Biology since March 2004.  Mr. Oristano has received substantial pecuniary benefits (well in excess of $100,000 per year) for serving on the Company's board and the Audit Committee for the past twenty years.  Further, upon information and belief, Mr. Oristano maintains social relationships with certain members of the Dolan Family as well. Based on the foregoing, Mr. Oristano's loyalties lie with the Dolan Family, and he is therefore not an independent Director.

194.    Director Defendant Reifenheiser is not an independent Director.  Mr. Reifenheiser retired as a Managing Director of JP Morgan Chase, overseeing the Global Media and Telecommunications Division in September 2000, after 38 years with JP Morgan Chase and its predecessors ("JP Morgan").  JP Morgan has provided services to Cablevision in the past and has sponsored programs with the Radio City Music Hall Rockettes, part of the Cablevision family of companies.  JP Morgan is also administrative agent on an August 2004 loan agreement.  In 2004, Mr. Reifenheiser enjoyed the perquisites of serving on the Board and as Chairman of the Company's Audit Committee.

195.    Director Defendant Tese is also not an independent Director.  Mr. Tese has served

as a director of Bear Stearns & Co., Inc since 1994.  Bear Stearns and/or entities affiliated with it

has significant business relationships with the Company and the Dolan Family, including but not

limited to acting as the lead underwriter for the Company's secondary offering in October 2001,

as well as being party to certain credit agreements and sales plans with the Company and/or Mr.

C. Dolan.

196.    Indeed, the Company's Proxy Statement cavalierly states how Mr. C. Dolan wields

power over the Cablevision Board:

> Each current Class A director was elected by the Class A
> stockholders at the last annual meeting. Charles F. Dolan, James L.
> Dolan and Patrick F. Dolan were elected by the Class B
> stockholders at the last annual meeting. On March 2, 2005, Charles
> F. Dolan and certain other Class B stockholders removed three of
> the Class B directors elected at the last annual meeting (William J.
> Bell, Sheila A. Mahony and Steven Rattner) and appointed Rand V.
> Araskog, Frank J. Biondi, John C. Malone and Leonard Tow to fill
> the vacancies created by those removals as well as the vacancy
> created by the death of John Tatta, a Class B director, in February
> 2005. Mr. Sweeney was appointed to the Board by the Class B
> directors on March 7, 2005, to fill the last remaining vacancy on the
> Board.

197.    Non-employee directors are handsomely compensated and even given free cable

television:

> Each non-employee director receives a base fee of $50,000 per year;
> $2,000 per Board and committee meeting attended in person; and
> $500 per Board and committee meeting attended by telephone. Non-
> employee directors also receive $5,000 annually per committee
> membership and $10,000 annually per committee chairmanship.
>
> We also pay our non-employee directors compensation in stock
> options and restricted stock units. Each non-employee director
> receives options to purchase 4,000 shares of Cablevision NY Group
> Class A common stock and a number of restricted stock units for the
> number of shares of common stock equal to $40,000 divided by the
> fair market value of a share of Cablevision NY Group Class A
> common stock each year the non-employee director remains in

office. The per share exercise price of each option will be equal to the fair market value of the common stock. In general, fair market value is determined by taking the average of the high and low prices of a share of Cablevision NY Group Class A common stock as reported in the consolidated reporting system of the New York Stock Exchange on the date of grant.

Our directors receive free cable television service for their primary residence. Those directors who do not reside in our service territory are reimbursed for the cost of cable television service at their primary residence.

198.    Additionally, the Dolan Family uses the Company to employ other family members, including spouses and in-laws, at highly competitive salaries.  According to the Proxy Statement, Kristin Aigner Dolan is a Senior Vice President of Consumer Product Management of the Company.  Ms. Dolan earned a base salary of $279,342 and a bonus of $162,000 in 2004.  The bonus was paid in 2005.  Ms. Aigner Dolan is the spouse of Mr. J. Dolan, the daughter-in-law of Mr. C. Dolan and the sister-in-law of Messrs. T. Dolan and P. Dolan, as well as Ms. Dolan Weber.

199.    Moreover, Ms. Aigner Dolan's mother, Rosemary E. Aigner, is employed by the Company as an executive secretary earning a base salary (including overtime) of $80,756 per annum.

200.    Mr. C. Dolan also employs his brother-in-law, Edward Atwood, as a Vice President of Multimedia and paid him over $250,000 in 2004.

201.    Demand is also excused because the Cablevision Directors participated in, approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly and/or negligently disregarded them, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment as described herein:

202.    The Cablevision Board has only three permanent committees: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Executive Committee.

203.    During the Relevant Period, the Audit Committee has been comprised of Reifenheiser, Hochman, Oristano, Ryan, and Tese.  Defendant Reifenheiser is currently Chairman of the Audit Committee.   By its charter, the Audit Committee function is oversight.  Defendants Reifenheiser, Hochman, Oristano, Ryan and Tese were responsible, as members of Cablevision's Audit Committee, for insuring that the Company's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate.   Cablevision's internal controls, however, were woefully deficient as evidenced by its executives' improper backdating of stock option grants. As a result of this improper option backdating, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to Cablevision's executives.  Accordingly, there is reasonable doubt that Defendants Reifenheiser, Hochman, Oristano, Ryan and Tese are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Cablevision.  Thus, demand is futile as to Defendants Reifenheiser, Hochman, Oristano, Ryan and Tese.

204.    During the Relevant Period, the Compensation Committee has been comprised of Defendants Hochman, Oristano, Tatta, Ryan, and Tese.  Defendant Hochman served as Chairman of the Compensation Committee during the Backdating Period.  The members of Cablevision's Compensation Committee are responsible for administering the issuance of awards under the Company's stock option plans.  Therefore, Defendants Hochman, Oristano, Tatta, Ryan and Tese were responsible for reviewing the stock option grants to Cablevision executives during their respective tenures on the Compensation Committee.  Clearly, these Defendants did not fulfill their duties, therefore causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating of stock option grants.  Accordingly, there is reasonable doubt that Defendants Hochman, Oristano, Ryan and Tese are disinterested because

they face a substantial likelihood of liability for their breaches of fiduciary duty to Cablevision (Tatta is no longer a Director).  Thus, demand is futile as to Defendants Hochman, Oristano, Ryan and Tese.

205.    The Cablevision Directors, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Cablevision Board members from taking the necessary and proper action on behalf of the Company, as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting, as detailed herein, the majority of the Cablevision Board are subject to prejudicial entanglements, namely resulting from the overriding presence and control of the Dolan Family.

206.    The Directors, including the Audit Committee and Compensation Committee Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Cablevision's stockholders or recklessly and/or negligently disregarded those wrongs, and are therefore not disinterested parties.

207.    In order to bring this suit, a number of the Cablevision Directors would be forced to sue themselves and/or persons with whom they have extensive business, professional and personal entanglements, which they will not do, thereby excusing demand.

208.    The Sarbanes-Oxley Act of 2002 placed significant additional responsibilities on the boards of directors of public companies subject to the Act, like Cablevision, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure.  This new law was a disaster for the Cablevision Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and

integrity, it was sitting atop a massive ongoing scheme to backdate executive stock option grants, which rendered its reported financial results materially false and inaccurate. Any real compliance with the Sarbanes-Oxley Act of 2002 would have exposed this scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Cablevision Board of Directors did not enforce or comply with the Sarbanes-Oxley Act of 2002, despite its legal obligation under federal law to do so. Clearly, the Cablevision Board of Directors will not sue themselves for this failure.

209. Demand is also excused because insurance policies covering the liability of a company's directors and officers purport to exclude legal claims asserted directly by the company against such persons. Thus, there was, and is, a substantial disincentive for Cablevision to bring any action directly against Defendants. Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Cablevision, including Defendants in this action, for misconduct and mismanagement. Thus, if the policy or policies which Cablevision maintains contain the foregoing provision, the insurance carriers would argue that Cablevision and its Board of Directors are thereby contractually disabled from complying with any demand that would cause Cablevision to institute, and/or prosecute any action against Defendants for such misconduct and mismanagement; because to do so could result in the loss to Cablevision of its insurance coverage. Similarly, Cablevision would be disabled from pursuing Defendants as it would not benefit from any insurance they may have.

210. Moreover, Cablevision has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite Director Defendants' having knowledge of the claims and causes of action raised by Plaintiffs, the current Board of Directors

has failed and refused to seek to recover for Cablevision for any of the wrongdoing alleged by Plaintiffs herein.

211.    Demand is futile because Cablevision's Board of Directors cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint.  In addition, the failures of the Board of Directors to design and implement an effective corporate information and reporting system to assure the existence of reasonable internal financial controls and the accuracy of the Company's publicly reported financial information cannot constitute a good faith exercise of business judgment.  The Board of Directors would thus be required potentially to investigate and bring claims against themselves for their own misconduct.  No shareholder demand could or would prompt the Cablevision Board of Directors to take action.  As such, demand is excused.

212.    Finally, Plaintiffs have not made any demand on shareholders of Cablevision to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Cablevision is a publicly held company with approximately 231 million shares of Class A Common Stock outstanding, approximately 64 million shares of Class B Common Stock outstanding, as well as thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for Plaintiffs, who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## TOLLING OF THE STATUTE OF LIMITATIONS

213.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of Cablevision's stock option plans through strategic timing and backdating, by issuing false and misleading SEC filings, including proxy statements and quarterly and annual reports, by falsely reassuring Cablevision's investors that Cablevision's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based upon the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the exercise price on the actual date of the option grant.

214.    Cablevision's public investors had no reason to know of the Defendants' breaches of their fiduciary duties until August 8, 2006, when Cablevision disclosed that its internal investigation had discovered irregularities related to the issuance of certain stock option grants made between 1997 and 2002.  The full extent of Defendants' breaches and the damages caused as a result is not known and cannot be known at this time.

215.    Finally, as fiduciaries of Cablevision and its public shareholders, the Defendants cannot rely on any limitations defense when they withheld from Cablevision's public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that Cablevision's board breached its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates were manipulated so as to maximize the profit for the option grant recipients and, accordingly, to maximize the Company's costs.

## CAUSES OF ACTION

### COUNT I:

### Derivative Claim for Violation of Exchange Act Section 14(a)
### (against Director Defendants)

216.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

217.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

218.    Cablevision's Definitive Proxy Statements for 1997-2006, including those filed on May 18, 1998, June 8, 1999, May 17, 2000, May 9, 2001, May 8, 2002, May 8, 2003, April 30, 2004, April 29, 2005, and April 28, 2006,  violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Cablevision to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1997.

219.    Each of the Director Defendants caused and/or participated in the filing of each of these Proxy Statements and caused harm to the Company.

220.    Each of these Proxy Statements included a proxy solicitation within the meaning of Exchange Act Section 14(a), 15 U.S.C. § 78n(a), and the Rules promulgated thereunder. Defendants permitted the use of their names on the Proxy Statements and directed the proxies to be sent to the Company's shareholders.

221.    The Company's 1997 through 2006 Proxy Statements contained materially false and misleading statements because the respective sections disclosing executive compensation

failed to disclose that the Defendants had backdated options granted during the fiscal years 1997-2002, as set forth above.  Moreover, each of the Director Defendants knew or should have known that the Proxy Statements were materially false or misleading as a result of the statements made and/or omitted material facts regarding Defendants' options backdating practices.

222.   By reasons of the conduct alleged herein, therefore, Director Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated pursuant thereto, 17 C.F.R. § 240.14a-9, and the Company was damaged as a result.

## COUNT II

### Derivative Claims for Breach of Fiduciary Duty
### (against All Defendants)

223.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

224.   By reason of their positions as executive officers and/or directors of Cablevision and because of their ability to control the business and corporate affairs of the Corporation, Defendants owe Cablevision and its shareholders the fiduciary obligations of good faith, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Cablevision in a fair, just, honest and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Cablevision and its shareholders equally and not in furtherance of theirs or other fiduciaries' personal interests or benefit.  Each officer and director owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

225.   Defendants violated and breached these duties by their actions described herein. Each of these Defendants either received backdated options or approved, administered, and

ratified or permitted the backdated options to be granted to the Options Defendants. Defendants knew or, with exercise of reasonable care, should have known, that Cablevision's executives were engaged in backdating stock options, that the option grants they approved were not actually executed on the dates reflected in the relevant documents, that the practice of backdating and failing to report the additional compensation was illegal, that the backdated stock options violated relevant provisions of the pertinent stock option Plans, and that the practice of backdating options was not an exercise of sound business judgment. Defendants nevertheless continued to approve such options or to acquiesce in their approval.

## COUNT III

### Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty
### (against All Defendants)

226.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

227.    As a result of the foregoing conduct, including their approval of the backdated stock options, Defendants participated in and facilitated the breach of fiduciary duties described herein.

228.    By virtue of their role in creating and administering the Company's stock option Plans, and their approval and authorization of the stock options that were backdated as alleged herein, the Audit and Compensation Committee Defendants, in particular, were able to, and in fact did, render aid and assistance to the Options Defendants in their breach of fiduciary duty. These Defendants did so when they knew or should have known that the practice of backdating was illegal, harmful to the company, inconsistent with GAAP and a breach of their fiduciary duties.

229.    The Company and its shareholders have been injured as a result.   Plaintiffs, derivatively on behalf of Cablevision, seek damages and other relief for the Company as set forth herein.

## COUNT IV

### Derivative Claim for Unjust Enrichment
### (against the Options Defendants)

230.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

231.    As a result of the foregoing conduct, including millions of dollars in excess compensation awarded to Cablevision officers and directors through backdated stock options, the Options Defendants have been unjustly enriched at the expense of the Company and its shareholders.

232.    The Company has been injured by reason of this unjust enrichment.   Plaintiffs, derivatively on behalf of Cablevision, seek damages and other relief for the Company.

## COUNT V

### Derivative Claim for Rescission
### (against the Options Defendants)

233.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

234.    As a result of the acts alleged herein, a number of stock option contracts between the Options Defendants and the Company entered into between at least fiscal years 1997 and 2002 were obtained through the Options Defendants' deceit and abuse of control.   Moreover, the backdated stock options and the shares underlying these options were not duly authorized by the Board, as was legally required, because they were not authorized in accordance with the terms of

the publicly filed contracts—including the Plan—approved by the Company shareholders and filed with the SEC.

235. These stock option contracts between the Options Defendants and the Company should, therefore, be rescinded, with sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT VI

### Derivative Claim for Gross Mismanagement
### (against All Defendants)

236. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

237. By their actions alleged herein, Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cablevision in a manner consistent with the operations of a publicly held corporation.

238. As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Cablevision has sustained and will continue to sustain significant damages in the millions of dollars.

239. As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## COUNT VII

### Derivative Claim for Waste of Corporate Assets
### (against All Defendants)

240. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

241. By failing to properly consider the interests of the Company and its public shareholders and by failing to conduct proper supervision, Defendants, without any valid

corporate purpose, have caused Cablevision to waste valuable corporate assets solely for the financial gain of the Options Defendants.

242.    As a result of the waste of corporate assets, Defendants are liable to the Company.

## COUNT VIII

### Derivative Claim for Disgorgement under Sarbanes Oxley Act of 2002
### (against Defendants J. Dolan and Bell)

243.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

244.    Pursuant to Sarbanes-Oxley Act of 2002 § 304, because Cablevision announced that it will prepare a restatement for fiscal years 1997 through 2002, due to material noncompliance with GAAP, as a result of false and misleading financial statements, Defendants J. Dolan and Bell, as Cablevision's CEO and CFO, respectively, during the restatement period, are required to reimburse Cablevision for all bonuses or other incentive-based or equity-based compensation received by them from Cablevision during fiscal years 1997 through 2002.

245.    Defendants J. Dolan and Bell are also liable to Plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Cablevision.

## COUNT IX

### Derivative Claim for Abuse of Control
### (against All Defendants)

246.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

247.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cablevision, for which they are legally responsible.

248.    As a direct and proximate result of Defendants' abuse of control, Cablevision has suffered substantial monetary damages, as well as further and even greater damage in the future,

including damage to Cablevision's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

249.    Plaintiffs on behalf of Cablevision have no adequate remedy at law.

## COUNT X

### Derivative Claim for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information
### (Against Defendants C. Dolan, J. Dolan, P. Dolan, Sweeney, Oristano and Bier)

250.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

251.    At the time of the stock sales set forth herein, Defendants C. Dolan, J. Dolan, P. Dolan, Sweeney, Oristano and Bier (the "Insider Selling Defendants") knew the information described above, and sold Cablevision common stock on the basis of such information.

252.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Insider Selling Defendants used for their own benefit when they sold Cablevision common stock.

253.    At the time of their stock sales, Insider Selling Defendants knew that the Company's revenues were materially overstated.  Insider Selling Defendants' sales of Cablevision common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

254.    Since the use of the Company's proprietary information for their own gain constitutes a breach of Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Insider Selling Defendants obtained thereby.

## COUNT XI

### Class Claims for Breach of Fiduciary Duty
### (against the Dolan Defendants)

255.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

256.    By reason of their positions as executive officers and/or directors of Cablevision and because of their ability to control the business and corporate affairs of the Company, the Dolan Defendants owe Cablevision and its shareholders the fiduciary obligations of good faith, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Cablevision in a fair, just, honest and equitable manner.  The Dolan Defendants were and are required to act in furtherance of the best interests of Cablevision and its shareholders equally and not in furtherance of theirs or other fiduciaries' personal interests or benefit.  Each officer and director owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

257.    The Dolan Defendants violated and breached these duties by their actions described herein.  Each of these Defendants either received backdated options or approved, administered, and ratified or permitted the backdated options to be granted to other Defendants.  The Dolan Defendants knew or, with exercise of reasonable care, should have known, that Cablevision's executives were engaged in backdating stock options, that the option grants they approved were not actually executed on the dates reflected in the relevant documents, that the practice of backdating and failing to report the additional compensation was illegal, that the backdated stock options violated relevant provisions of the pertinent stock option Plans, and that

the practice of backdating options was not an exercise of sound business judgment.  The Dolan Defendants nevertheless continued to approve such options or to acquiesce in their approval.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Against the Dolan Defendants for the damages sustained by the Company and the Class;

B.      Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest, to ensure Defendants do not participate therein or benefit thereby;

C.      Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

D.      Directing Cablevision to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(1)      a proposal requiring that the office of CEO of Cablevision and Chairman of the Cablevision Board of Directors be permanently held by separate individuals and that the Chairman of the Cablevision Board meets rigorous independent standards;

(2)     a proposal to strengthen the Cablevision Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(3)     appropriately test and then strengthen the internal audit and control function;

(4)     rotate independent auditing firms every five years;

(5)     control and limit insider stock selling and the terms and timing of stock option grants; and

(6)     reform executive compensation.

E.      Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

F.      Appointing a special master to oversee the implementation of the aforementioned corrective acts, including but not limited to the review and evaluation of stock option procedures and prices;

I.      Awarding punitive damages;

J.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

K.      Granting such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury.

DATED:  January 9, 2008

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**


By:__/s/Gregory M. Nespole_____

Gregory Mark Nespole (GN-6820)
nespole@whafh.com
David L. Wales (DW-6912)
wales@whafh.com
Matthew M. Guiney (MG-5858)
guiney@whafh.com
270 Madison Avenue
New York, NY 10016
(212) 545-4600

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**


By:____/s/ Daniel P. Chiplock_____

Steven E. Fineman (SF-8481)
sfineman@lchb.com
Daniel P. Chiplock (DC-1137)
dchiplock@lchb.com
780 Third Avenue, 48th Floor
New York, NY 10017
(212) 355-9500

*Plaintiffs' Co-Lead Counsel*

William Federman
wfederman@aol.com
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK  73120
(405) 235-1560

Joe Kendall
jkendall@provostumphrey.com
Willie Briscoe
wbriscoe@provostumphrey.com
PROVOST & UMPHREY LAW FIRM, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
(214) 744-3000

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Juli E. Farris
jfarris@kellerrohrback.com
Elizabeth A. Leland
bleland@kellerrohrback.com
Cari C. Laufenberg
claufenberg@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
(206) 623-1900

Richard A. Lockridge
ralockridge@locklaw.com
Karen Hanson Riebel
khriebel@locklaw.com
LOCKRIDGE GRINDAL NAUEN, PLLP
100 Washington Ave. So., Suite 2200
Minneapolis, MN  55401
(612) 339-6900

Lisa M. Pollard
lmpollard@locklaw.com
LOCKRIDGE GRINDAL NAUEN, PLLP
380 Madison Avenue, 21st Floor
New York, NY 10017
(212) 271-8232

Eduard Korsinsky
ek@zlk.com
ZIMMERMAN, LEVI & KORSINSKY, LLP
39 Broadway, Suite 1601
New York, NY  10006
 (212) 363-7500

*Plaintiffs' Co-Counsel*